# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| **GULF STATES REORGANIZATION** | } | |
| **GROUP, INC.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 1:02-cv-2600-RDP** |
| | } | |
| **NUCOR CORPORATION, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendants' Motion for Summary Judgment. (Doc. #82). Plaintiff filed its opposition to summary judgment on January 24, 2005. (Docs. #88, #92). Defendants filed their reply on March 7, 2005. (Docs. #94, #95). Defendants' motion is now under submission and ripe for ruling by this court.

## I.   INTRODUCTION

Plaintiff Gulf States Reorganization Group ("GSRG") filed this antitrust litigation on October 23, 2002 against Defendants Nucor Corporation ("Nucor"), Casey Equipment Corporation ("Casey"), and Gadsden Industrial Park, LLC ("Park"). (Doc. #1). The undersigned was reassigned this case on October 1, 2003. (Doc. #47).

On October 31, 2003, Defendants filed their first Motion for Summary Judgment. (Doc. #50). After reviewing the parties' briefing and conducting a hearing with oral argument, the court entered an order denying Defendants' motion without prejudice, allowing for the parties to conduct additional discovery, and establishing a new summary judgment deadline of December 15, 2004. (Docs. #67, #68).

On December 15, 2004, Defendants filed their second Motion for Summary Judgment and supporting materials.  (Docs. #82, #86).  Defendants base their second summary judgment motion on three independent grounds:  (1) lack of causation; (2) lack of antitrust standing because of an absence of any "antitrust injury;" and (3) an absence of any anti-competitive activity by Defendants. (Doc. #83 at pp. 12, 13-25).  The court has carefully reviewed the summary judgment record and for the reasons stated in more detail below, agrees with Defendants that there are no material factual disputes and that Defendants are entitled to judgment as a matter of law.  Accordingly, consistent with this memorandum opinion, the court will enter an order granting Defendants' Motion for Summary Judgment and dismissing Plaintiff's Complaint with prejudice.

## II.   STATEMENT OF FACTS

### A.   General Background

Prior to August 2000, Gulf States Steel, Inc. of Alabama ("Gulf States Steel") owned and operated a steel plant in Gadsden, Alabama.  (AF No. 1;[1] *see also In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 499 (Bankr. N.D. Ala. 2002) (Findings of Fact and Conclusions of Law and Order Granting Trustee's Motion for an Order Authorizing Sale of Property of the Estate Free and Clear of Liens and Other Interest) ("Bankruptcy Order")).[2]  On July 1, 1999, Gulf States Steel filed for

---

[1]The designation "AF" stands for admitted fact and indicates a fact offered by Defendants that Plaintiff has admitted in its Responses and Counterstatement of Material Facts Submitted in Response to Exhibit A of the Court's Order Governing Proceedings (Doc. #88), in its representative deposition testimony, or which is undisputed based upon other evidence in the Rule 56 file. Whenever Plaintiff has adequately disputed a fact offered by Defendants, the court has accepted Plaintiff's version.  The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' Statement of Facts.  (Doc. #84).

[2]The court notes that several of the following admitted facts are derived from the findings contained in the Bankruptcy Order.

reorganization protection under Chapter 11 of the United States Bankruptcy Code (AF No. 2), but failed to reorganize under Chapter 11 of the Bankruptcy Code (AF No. 3). In August 2000, Gulf States Steel closed its Gadsden operations, including the steel-related assets which are the subject of this litigation ("Steel Mill Assets"). (AF No. 4).

In November 2000, the Gulf States Steel bankruptcy was converted to a Chapter 7 liquidation. (AF No. 5). On January 26, 2001, GSRG was formed to purchase the Steel Mill Assets of the former Gulf States Steel Plant in Gadsden, Alabama and to reopen the plant. (AF No. 6).

As part of the preparation for the Chapter 11 reorganization filing by Gulf States Steel, MB Valuation Services, Inc. performed an appraisal of the assets held by Gulf States Steel in March 1999. (AF No. 9; *see generally* MB Valuation Services, Inc., Gulf States Steel, dated March 22, 1999 ("MB Valuation Report"), attached as Exhibit 1 to the Casey Affidavit) The appraisal was performed on an "Orderly Liquidation Value" basis, which means "[t]he estimated gross amount expressed in terms of money which could be typically realized from a sale, given a reasonable period of time to find a purchaser(s), the seller being compelled to sell on an as is-where is basis." (AF No. 10; MB Valuation Report at 7).

The MB Valuation Report stated that the "Orderly Liquidation Value" of the hot strip mill at the Gulf States Steel Mill was $6,241,965. (AF No. 11; MB Valuation Report at 156). The MB Valuation Report stated that the "Orderly Liquidation Value" of the plate mill at the Gulf States Steel Mill was $9,618,305. (AF No. 12; MB Valuation Report at 244). The MB Valuation Report stated that the "Orderly Liquidation Value" of the Demag Slab Caster at the Gulf States Steel Mill was $4,010,000. (AF No. 13; MB Valuation Report at 117).

John Duncan ("Duncan") was one of GSRG's principals.  (AF No. 14).  Duncan was also President of Gulf States Steel and was retained by the senior secured lender, Ableco Finance LLC ("Ableco"), located in New York, to sell the Steel Mill Assets.  (AF No. 15).  In May 2001, the Steel Mill Assets which are at issue in this litigation (including the plate mill, hot strip mill, and Demag Slab Caster) were offered for sale at a bankruptcy auction conducted by DoveBid.  (AF No. 7).  GSRG was aware that minimum bids were set up on various pieces of equipment, including the key Steel Mill Assets, at the May 2001 auction.  (AF No. 16).

At the May 2001 auction, GSRG was present, and GSRG or persons associated with it purchased several assets other than the Steel Mill Assets at this auction.  (AF No. 17).  The Steel Mill Assets did not attract a bid or bids sufficient to meet the seller's reserve price of $7.1 million for the plate mill, the hot strip mill, and the caster, which were the key Steel Mill Assets.  (AF No. 8).  GSRG did not make a $7.1 million bid for the key Steel Mill Assets at the May 2001 auction.  (AF No. 18).  Had GSRG made a $7.1 million bid, it would have acquired the key Steel Mill Assets at the May 2001 auction.  (AF No. 19).

Following the May 2001 auction, GSRG entered into negotiations with the Trustee and Ableco about a private purchase of the Steel Mill Assets.  (AF No. 20).  In early to mid 2001, GSRG entered into negotiations with the Gadsden-Etowah County Industrial Development Authority ("Development Authority") for a $5 million loan/lease to be used in the purchase of the Steel Mill Assets.  (AF No. 21).  In late 2001, the Italian steel firm of Palini é Bertoli expressed interest in purchasing the Steel Mill Assets.  (AF No. 22).  On December 20, 2001, Mike McCain of the Development Authority sent Palini é Bertoli an e-mail, requesting that Palini é Bertoli develop a

relationship with GSRG and its Chairman, Frank E. Williams, Jr. ("Williams"), and expressing the Development Authority's "legal, moral, and ethical obligation" to GSRG.  (AF No. 23).

In March 2002, as part of its internal analysis in preparation for a purchase of the Steel Mill Assets, GSRG assigned the core Steel Mill Assets a book value of at least $13.3 million.  (AF No. 24).  In March 2002, GSRG's Management Presentation and Company Overview stated that the "Economic Acquisition of Core Assets" was one of its "Fundamentals for Success" and, in its Financial Overview, discussed "Donated Surplus Capital - $5M IDB Bond Issue."  (AF No. 25).  In June 2002, GSRG contracted with the Trustee to purchase the Steel Mill Assets for $5 million, an amount equal to the funds being loaned to GSRG by the Development Authority.  (AF No. 26).

On July 3, 2002, the Trustee moved for An Order Establishing Bidding and Other Procedures In Connection With Sale of Property of the Estate Free and Clear of Liens and Other Interests and Motion For Authority For Such Sale ("Sale Motion") in order to sell the Steel Mill Assets.  (AF No. 27).  The proposed sale was to GSRG for the purchase price of $5 million pursuant to an Asset Purchase Agreement, or, alternatively, to the highest bidder pursuant to a bidding procedure to be prescribed by the bankruptcy court.  (AF No. 28).  The terms of the Asset Purchase Agreement and the specific bidding procedures were drafted by representatives of Ableco and GSRG.  (AF No. 29).

On July 10, 2002, representatives from Palini é Bertoli toured the Gadsden steel plant.  (AF No. 30).  During this visit, representatives of the Development Authority met with representatives from Palini é Bertoli.[3]  (AF No. 31).  At this time, the Development Authority continued to encourage Palini é Bertoli to partner with GSRG rather than bid independently.  (AF No. 32).

_____

[3]GSRG understood that Palini é Bertoli had an interest in using the plate mill which was in place in Gadsden.  (AF No. 93).

5

On July 15, 2002, representatives from Palini é Bertoli met with officials of GSRG, including Williams.  (AF No. 33).  During this meeting, GSRG and Palini é Bertoli discussed the idea that competing bids in excess of $5 million would not be in either party's interest.  (AF No. 34).

There are markets, both domestic and international, for the purchase and sale of used steel mill equipment.  (AF No. 35).  Defendant Casey is actively involved in buying and selling used steel-related equipment and has participated in this business for some forty years.  (AF No. 36).  Park is a limited liability company in which Donald A. Casey, Chairman of Casey, is a member.  (AF No. 37).  On August 19, 2002, Defendant Park, through an attorney, objected to the Sale Motion.  (AF No. 38).

On August 21, 2002, the bankruptcy court held a hearing in regard to the Sale Motion and on August 26, 2002 ruled that bids identical to the GSRG offer were not required and that potential purchasers could bid for less than all of the property encompassing the Steel Mill Assets.  (AF No. 39).  Subsequently, the bankruptcy court entered an order ("Bidding Procedures Order") granting the Trustee's Sale Motion with certain modifications, including one allowing potential bidders to bid on less than all of the property.  (AF No. 40).  GSRG did not appeal or otherwise challenge the Bidding Procedures Order.  (AF No. 41).  The Bidding Procedures Order stated that if someone other than GSRG made a "qualifying bid" higher than GSRG's proposed purchase price for the Steel Mill Assets, then an auction of those assets would be triggered.  (AF No. 42).

Prior to the September 2002 public auction, GSRG contacted the Federal Trade Commission ("FTC") to raise possible antitrust concerns about Defendant Nucor's alleged involvement in Park's purchase of the Steel Mill Assets.  (AF No. 43).  There is no evidence that the FTC took any action in response to GSRG's complaint.  (AF No. 44).

6

On September 12, 2002, Park timely submitted a bid of $5,250,000 in conformity with the Bidding Procedures Order.  (AF No. 45).  In the past, Nucor has purchased and/or sold used steel-related equipment in the used capital asset market.  (AF No. 46).  On September 12, 2002, Palini é Bertoli attended the hearing at which Park's $5,250,000 bid triggered the September 16, 2002 auction.  (AF No. 47).  Palini é Bertoli did not bid in the September 16, 2002 auction.  (AF No. 48).  At the time of Park's bid, the Steel Mill Assets had been shuttered for over two years.  (AF No. 49).  In those two years, the assets had been sitting idle, with little or no maintenance, and with exposure to the elements.  (AF No. 50).

On September 16, 2002, the Trustee held a public auction for the Steel Mill Assets.  (AF No. 51).  Prior to the auction, GSRG received financial support of $5 million from the Development Authority, which was to be repaid through future taxes.  (AF No. 52).  Also prior to the auction, GSRG received an additional $1.5 million in financial support or promises of financial support from Jefferson Iron & Metal Brokerage, Inc., a scrap dealer.  (AF No.  53).  At the September 16, 2002 auction, Park's final cash bid was for $6.3 million, which was higher than the conforming cash bids by GSRG, the only other bidder.  (AF No. 54).

GSRG subsequently tendered a part credit/part cash bid at the auction that it valued at some $7 million.  (AF No. 55).  This subsequent bid did not conform to the auction procedures set out in the Bidding Procedures Order.  (AF No. 56).  The Trustee rejected GSRG's $7 million bid because it was not all cash and did not conform to the auction procedures.  (AF No. 57).  The Trustee then extended the time in which GSRG could submit an unqualified cash bid in excess of that of Park. (AF No. 58).  GSRG refused to submit any further bid.  (AF No. 59).

7

After the September 16, 2002 auction, the bankruptcy court held a hearing which all claims made by GSRG were considered.  (AF No. 60).  GSRG also filed (1) a Motion For Order Compelling Trustee to Accept Bid of Gulf States Reorganization Group, Inc. and (2) an Objection of Gulf States Reorganization Group, Inc. to Consideration of Bid by Gadsden Industrial Park, LLC and Motion to Disallow the Same.  (AF No. 61).  On September 27, 2002, the bankruptcy court issued a written order approving the sale of the Gadsden Steel Mill Assets to Park in its Bankruptcy Order.  (AF No. 62).  The bankruptcy court denied GSRG's and others' motions to amend or alter the sale of the Steel Mill Assets to Park.  (AF No. 63).  The bankruptcy court approved the Trustee's rejection of GSRG's nonconforming $7 million bid.  (AF No. 64).

In the Bankruptcy Order, the bankruptcy court expressly found that the Steel Mill Assets were "properly exposed to the marketplace thereby allowing maximization of interest in bidding on the assets."  (AF No. 65).  The bankruptcy court further found "that there was no collusion or bad faith motive on the part of the Trustee or any bidder in connection with the Sale Motion, and that all negotiations and bidding occurred at arms length."  (AF No. 66).  In addition, the bankruptcy court found that "the Trustee's decision to accept the higher and better bid of Park is consistent with sound business judgment, and is due to be approved."  (AF No. 67).

GSRG initially appealed the orders of the bankruptcy court.  (AF No. 68).  Subsequently, GSRG dropped all appeals of the Bankruptcy Order, which awarded the Steel Mill Assets to Park for $6.3 million.  (AF No. 69).  The bankruptcy court's proceedings on this matter are complete, and the Bankruptcy Order is final and conclusive.  (AF No. 70).

There is no evidence that Defendants Park, Casey or Nucor interfered with GSRG's: (1) financing of its bids for the Steel Mill Assets (AF No. 71); (2) ability to make bids at the May 2001

auction (AF No. 72); or (3) ability to make higher, conforming cash bids at the September 2002 auction (AF No. 73).

After Park acquired the Steel Mill Assets at the September 2002 auction, Casey arranged for the sale of the majority of the Steel Mill Assets for an aggregate price of approximately three times the amount of the $6.3 million purchase price and approximately the MB Valuation Services appraisal value.  (AF No. 76).  In July 2003, a contract was entered into for the sale, on an "as is – where is" basis, of the plate mill, slab caster, BOF equipment, and ladle metallurgical furnace (along with certain ancillary items) for $11 million.  (AF No. 77).  In August 2003, a separate agreement was entered into with another customer on an "as is, where is" basis for the sale of the hot strip mill in exchange for $7 million (minus $235,000 for a motor that was not part of the Steel Mill Assets).  (AF No. 78).  Subsequent to the September 2002 auction, Park leased to several tenants facilities located in the industrial park situated on the real property acquired as part of the Steel Mill Assets in the September 2002 auction.  (AF No. 79).

### B.     GSRG's Bidding Strategy at the Bankruptcy Auction

GSRG's sole shareholder is Frank E. Williams, Jr. (AF No. 80).  As of mid-2002, Mr. Williams had a personal net worth of $28.5 million, including $16.8 million listed as "Marketable Securities," and was the sole beneficiary of an estate then in probate valued at an additional $6.2 million.  (AF No. 81).  GSRG was fully aware of the 1999 MB Valuation Report stating that the Steel Mill Assets at issue in this litigation had a combined "Orderly Liquidation Value" of not less than $19.8 million.  (AF No. 82).  GSRG repeatedly represented to potential investors that the value of the Steel Mill Assets was some $19-22 million.  (AF No. 83).

In addition to being an officer and principal of GSRG, Duncan was the last CEO of Gulf States Steel and had been retained as a consultant by the senior secured lender Ableco, which had a superpriority lien on all estate assets. (AF No. 84). To justify the low $5 million purchase price proposed by GSRG for the Steel Mill Assets, Duncan testified before the bankruptcy court on August 21, 2002 that "the value of this property is depressed by an oversupply of this property." (AF No. 85). At the time of the September 16, 2002 auction of the Steel Mill Assets, GSRG and Williams had earmarked for other uses: (a) $5 million in cash from the Development Authority; (b) $1.5 million in cash from Jefferson Iron & Metal Brokerage, Inc.; (c) $1 million in cash from GSRG's bid deposit; and (d) William's personal assets worth some $28-35 million, including more than $16 million listed as "Marketable Securities." (AF No. 86). As Plaintiff maintains, GSRG and Williams did not have sufficient liquidity to make a bid of more than $8 million in cash at the September 16, 2002 auction of the Steel Mill Assets. (AF No. 91).

Just before the start of the September 16, 2002 auction, Williams made a business decision that GSRG would not bid more than $6.3-6.4 million in cash, but instead would switch to a part credit/part cash bid if the bidding reached that level. (AF No. 94). According to GSRG corporate records, on or about September 11, 2002, Williams had reported to other GSRG officers that he had been advised by GSRG's bankruptcy counsel, Daniel M. Press, that "credit bidding won't work." (AF No. 95). GSRG had not reached any agreement or understanding with the Indenture Trustee, which was the only entity that had the legal authority to bind all the Gulf States Steel bondholders, that would permit GSRG to submit a so-called "credit" bid. (AF No. 96). In submitting GSRG's part credit/part cash bid at the September 16, 2002 auction, Williams claims that he relied upon the

advice of GSRG's General Counsel, Daniel K. Maller.  (AF No. 97).  Mr. Maller is not an expert in bankruptcy law.  (AF No. 98).

### C.    Nucor-Casey Relationship

Nucor and Casey have been doing business together for many years, including activities associated with the buying and selling of used steel-related equipment.  (AF No. 102).  Nucor has a wholly-owned subsidiary, Stenroh, Inc. ("Stenroh"), which it regularly uses as an acquisition vehicle to acquire land, equipment and other assets.  (AF No. 103).  Nucor was not aware of, and did not participate in, the May 2001 bankruptcy auction of various property and equipment formerly owned by Gulf States Steel.  (AF No. 104).  Nucor first learned that the Steel Mill Assets at issue in this litigation were to be sold at bankruptcy auction sometime in mid-2002 based on a trade press article reporting that GSRG had submitted a $5 million "stalking horse" bid for those assets.  (AF No. 105).

In contrast, Casey was aware of the Gulf States Steel bankruptcy proceeding, and the efforts to sell the property and equipment formerly operated by Gulf States Steel, since at least the summer of 2000.  (AF No. 106).  For approximately two years prior to the September 2002 bankruptcy auction, Casey had tried repeatedly to get a contract with Gulf States Steel and the Trustee to liquidate the Gulf States Steel property and equipment.  (AF No. 107).  Casey inspected the Gulf States Steel property and equipment on a number of occasions in 2000 and 2001, and was very familiar with those assets.  (AF No. 108).  Don Casey attended the May 2001 auction on Casey's behalf, bid on several items at the auction, and successfully purchased some of the Gulf States Steel assets that were auctioned.  (AF No. 109).  Casey also purchased additional assets from the Gulf States Steel bankruptcy estate before the May 2001 auction.  (AF No. 110).

Based on articles in the trade press, Casey was aware in mid-2002 that GSRG was trying to purchase the remaining Steel Mill Assets.  (AF No. 111).  In mid-2002, Don Casey met with representatives of Nucor, in connection with an unrelated project, and mentioned to the Nucor representatives that:  (1) the Steel Mill Assets were available for sale; (2) in Don Casey's opinion, the value of the Steel Mill Assets was substantially more than the $5 million price that GSRG reportedly was willing to pay; and (3) this was an excellent business opportunity that should be pursued.  (AF No. 112).

Sometime later, Joe Rutkowski ("Rutkowski") of Nucor and Don Casey had several telephone discussions regarding the Steel Mill Assets during which Casey advised Nucor that, in his opinion:  (1) the salvage/scrap value of the assets was in the range of at least $7-8 million; (2) certain of the assets might be usable by Nucor in its production facilities; (3) it might be possible to resell some of the more significant assets in the export market at a very substantial profit; (4) the Asian market, in particular, was very "hot" at that time;[4] and (5) Casey would be interested in developing the real property at the Gulf States Steel site into an industrial park at its own expense.  (AF No.113).[5]

_____

[4]The court recognizes that Plaintiff disputes the representation that there was a "hot" market for used Steel Mill Assets in China or anywhere else in 2002.  However, this statement of fact clarifies that the information was part of Casey's opinion and his view of the market is not otherwise controverted in the record.

[5]The court notes that Plaintiff points to evidence that Joe Rutkowski testified that he called Casey after reading the article in the American Metal Market reporting on GSRG's intent to reopen the plant.  The court disagrees that this testimony creates a material dispute of fact because Plaintiff has done nothing to create a factual dispute and undermine Defendants' position that the telephone conversation and the meeting occurred on separate occasions (albeit in the same time period).

Don Casey and Rutkowski reached an agreement in principle that: (1) Casey would attempt to purchase the Steel Mill Assets at the September 16, 2002 public auction with Nucor to provide the funding, up to a maximum of $8 million, for acquisition of the physical assets; (2) Nucor would have the first option to acquire the equipment and other personal property for its own use; (3) Casey would be given the option at its own expense to acquire the real property to be used as an industrial park; (4) Casey would have a period of several years to attempt to resell the key Gulf States Steel assets (*e.g.*, hot strip mill, plate mill) for a substantial premium in the attractive export market; (5) Nucor and Casey would split the proceeds of any resale on a 75%-25% basis; and (6) if Casey was unsuccessful in reselling the assets, Nucor would take back the assets for their salvage/scrap value. (AF No. 114). The agreement in principle between Don Casey and Rutkowski was subsequently reduced to a letter agreement dated September 11, 2002, which included a fixed $8 million cap on any bid by Casey at the auction. (AF No. 115).

From both Nucor and Casey's perspectives, the financing arrangement had a tremendous upside potential with little downside risk. Nucor believed there was great upside based upon the resale of the assets to the Asian market, and little downside risk since its exposure was capped at $8 million, which it believed to be roughly the estimated salvage/scrap value of the Steel Mill Assets.[6] (AF No. 116). From Casey's perspective, the arrangement with Nucor had a tremendous upside based upon resale of the assets in the export market, and the only risk was the investment of its time and effort. (AF No. 117).

---

[6]The court acknowledges that Plaintiff challenges the value of the Steel Mill Assets as scrap. However, the statement of fact is limited to Nucor's perspective, and nothing in the record refutes that Nucor held this belief in good faith.

### D.      Nucor's Perception of GSRG

GSRG's "stalking horse" proposal to purchase the Steel Mill Assets for $5 million, which would be provided entirely by the local Development Authority, indicated to Nucor that GSRG was not a viable business plan.  (AF No. 118).  The entire plan was speculative and premised upon obtaining the Steel Mill Assets (using other people's money) for several million dollars less than their fair market value.  (AF No. 118).  The possibility that GSRG might attempt to re-open the plant was not discussed between Casey and Nucor.  (AF No. 120).  Nucor believed that the Steel Mill Assets were likely to be worth much more than $5 million, particularly if resold overseas in the Asian market which was viewed by Nucor as "very, very hot" for used steel-making equipment.[7] (AF No. 122).

### E.      Resale of the Assets

Casey's affiliated company, Park, won the September 16, 2002 bankruptcy auction with a final cash bid of $6.3 million.  (AF No. 123).  Casey and Nucor agreed that the value of the real property, which Casey purchased at its own expense, was $150,000.  (AF No. 124).  Under the parties' agreement, Nucor provided $6.15 million in financing to Park for the final purchase of the Steel Mill Assets.  (AF No. 125).  Nucor made a very substantial profit on its investment, more than doubled its money in about a year and a half, and made more money on the deal than GSRG was even willing to bid at the September 16, 2002 auction.  (AF No. 126).  Casey has opened an industrial park on the real property that it acquired as part of the Steel Mill Assets and made a substantial commission on the resale of the remaining plant and equipment to clients in Asia.  (AF No. 127).

---

[7]*See* n.5, *supra.*

**F.      Plaintiff's Counterstatement of Material Issues**[8]

In response to Defendants' Statement of Facts, GSRG has identified four issues for the court to consider. (*See generally* Doc. #88). First, Defendants contend that their facts support an inference that Nucor's facilitation of Casey and Park's purchase of the Steel Mill Assets was a "good faith business arrangement," while GSRG contends that the terms and conditions of the contract between Nucor and Casey, and other material facts set forth below, support an inference of anti-competitive intent, and further the assertion that Nucor's action in backing the establishment of a direct competitor caused an illegal anti-competitive effect. (Doc. #88 at Factual Issue #1). Second, GSRG disputes that the bankruptcy court,  in evaluating Park's bid, had the opportunity to give consideration to the potential anti-competitive effects of Park's purchase of the assets on behalf of Nucor, and the legality of such purchase under the antitrust laws, given Park's counsel's denial of involvement of Nucor.[9] (*Id.* at #2).  Third, Plaintiff questions whether (1) as of June 2002, when the sale of the Steel Mill Assets was negotiated between GSRG and the bankruptcy trustee, the fair value of such assets, as contended by GSRG, was $5 million, or as contended by Defendants, substantially more than $5 million, and (2) the price of the sale of the Steel Mill Assets by Casey to Asian buyers in July and August of 2003 reflects a major shift in the steel market between 2002 and 2003, rather than the value of the assets in 2002.  (*Id.* at #3).  Fourth, in its brief, GSRG contends that Nucor's representation that "the salvage/scrap value of the assets alone was worth some $7-8 million" is

---

[8]To the extent they are potentially material, the court will hereafter address the specific facts identified by Plaintiff in support of its counterstatement of material issues.

[9]The court agrees with GSRG in part.  It was not the task of the bankruptcy court to examine the potential anticompetitive effect of Park's purchase.  That court was called upon to ensure that the process was open, fair, and functionally competitive.

inaccurate and that given the market conditions in the summer of 2002, the assets had an actual value less than the cost of the labor it would have taken to prepare them for the scrap market.  (*Id.* at #4).

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure and is the prescribed manner by which claims which do not involve genuine issues of material fact should be resolved.  Fed. R. Civ. P. 56.  The fact that the parties do not agree on every fact is not significant.  The law requires only that "there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 251.  Whether a fact is material is determined by the substantive law applicable to a particular case.  *See Anderson*, 477 U.S. at 248.  Although the nonmovant is entitled to justifiable inferences from the undisputed facts, he cannot rest upon his pleadings.  Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

## IV.   DISCUSSION

GSRG contends that this is a market exclusion case.  For purposes of Defendants' motion, there is no dispute that Nucor possesses dominance in the relevant market of hot rolled coil in the Southeast region of the United States.  (*See* Doc. #94 at p. 2 n.1).  Likewise, it is undisputed that Defendants had nothing to do with the closing of the steel plant, which was owned and operated by

Gulf States Steel.  That plant was closed and removed from the steel market in August 2000.[10]

Rather, the focus in this case is on whether Defendants' purchase of the steel-related assets of Gulf

States Steel in the bankruptcy court violated federal antitrust laws.  Defendants attack those claims

head on and contend that they are entitled to summary judgment for three independent reasons: (1)

GSRG has failed to establish causation; (2) GSRG lacks antitrust standing because it has not suffered

any antitrust injury; and (3) there is an absence of anti-competitive activity by Defendants.  For the

reasons stated below, the court finds that Defendants are entitled to summary judgment.

### A.      GSRG Has Not Shown That Defendants' Actions Caused GSRG's Alleged Injuries

In order to establish an antitrust claim, a plaintiff must show causation-in-fact.  *E.g.,*

*Brunswick Corp. v. Pueblo Bowl-O-Met, Inc.*, 429 U.S. 477, 489 (1977).  The Supreme Court and

other courts have long recognized that antitrust claims are tortious in nature, and that common-law

principles governing tort claims are equally applicable to antitrust claims.  *See Associated Gen.*

*Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 532-33 (1983) (finding

proximate causation and other common-law limitations on damages are applicable in antitrust

context); *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 848 (11th Cir. 1988)

(citing *Myers v. American Dental Ass'n*, 695 F.2d 716, 723 (3rd Cir. 1982) (for the premise that

antitrust claims are, in essence, "forms of torts alleging business injury")); *Solomon v. Houston*

*Corrugated Box Co.*, 526 F.2d 389, 392 n. 4 (5th Cir. 1976) (noting that defendants in an antitrust

action may be held jointly and severally liable as joint tortfeasors).

---

[10]The record suggests that it was a sudden downturn in the United States steel industry that caused Gulf States Steel to seek protection under the Bankruptcy Code.  When it failed to reorganize under Chapter 11, its bankruptcy was converted to a Chapter 7 liquidation.

One of the common-law principles governing tort claims that applies in the antitrust context is the requirement that the plaintiff demonstrate that the defendant actually caused the alleged injury. *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1459, 1462 (11th Cir. 1991) ("A private party seeking to invoke the antitrust laws must show that the defendants caused the alleged injury. . . .   As with other causes of action that are tortious in nature, failing to show causation is fatal to a Section 1 [of the Sherman Act] claim")[11] (internal citations omitted); *Cable Holdings of GA., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1561-62 (11th Cir. 1987) ("To recover under the antitrust laws, a plaintiff must prove that a defendant's illegal conduct materially contributed to his injury.  Proof of a violation of the Sherman Act standing alone does not establish civil liability").  Thus, to survive the Defendants' motion for summary judgment, GSRG must proffer sufficient evidence to permit a fact-finder to reasonably infer that Defendants' actions actually caused the injuries that GSRG alleges in support of its antitrust claims.

Here, the undisputed evidence demonstrates that GSRG's alleged injuries were self-inflicted – they occurred as a result of its own failed bidding strategy.  Park's $6.3 million conforming bid in the September 16, 2002 auction caused it to win a fair and open bankruptcy court-supervised auction and allowed it to take possession of the Steel Mill Assets.[12]  Those assets were subsequently resold

---

[11]The Eleventh Circuit also applied this same proof requirement to a plaintiff's Section 2 claims.

[12]The bankruptcy court has the power, in appropriate circumstances, to refuse to confirm a winning bid at a public auction held pursuant to court order where, for example, the sales price is grossly inadequate. *In re Muscongus*, 597 F.2d 11, 12 (1st Cir. 1979).  Moreover, Bankruptcy Code § 363(n) permits a sale to be avoided if there was an agreement to bid among potential bidders.  The estate can recover (1) any amount by which the value of the property sold exceeds the price at which such sale was consummated, (2) attorneys' fees and costs, and (3) punitive damages for a willful disregard to § 363(n).

at a substantial profit.  Obviously, in order for Park to have won at the auction, it was necessary for GSRG to have lost.  And it was that loss which rendered GSRG ineligible to take possession of the Steel Mill Assets.

That these events (*i.e.*, Park's winning and GSRG's losing) are in some way correlated does not mean – logically or legally – that Park's winning bid "caused" GSRG's alleged antitrust injuries.[13]  Even more importantly, it does not show that Defendants engaged in any anti-competitive activity that caused GSRG to lose at the auction.  Rather, as the record amply demonstrates, it was GSRG's own actions (and inactions) which, separately and cumulatively, caused GSRG's alleged injuries.  First, GSRG failed to purchase the Steel Mill Assets at the May 2001 auction, even though it admits it could have done so for only $7.1 million.  Second, Park's $6.3 million bid prevailed even though GSRG could have bid more for the assets, but made a business decision not to do so.  Third, despite the explicit advice it received from its bankruptcy counsel that "credit bidding won't work," GSRG placed a $7 million part credit/part cash bid at the September 16, 2002 auction on the advice of GSRG's General Counsel, who was admittedly not a bankruptcy expert.  That bid was properly rejected by the Trustee as non-conforming.  Fourth, GSRG refused to submit a higher, conforming bid when given "every opportunity" to do so by the Trustee.  Finally, GSRG admits that it could easily have made a cash bid – of up to $8.1 million – that would have caused it to be the winner and Park the loser.

---

[13]As Defendants note: "To accept such a proposition would mean that the Trustee's acceptance of Park's higher bid 'caused' the alleged injuries; that the Trustee's rejection of GSRG's nonconforming part credit/part cash bid 'caused' the alleged injuries; that the bankruptcy's court's approval of the acceptance of Park's higher bid 'caused' the alleged injuries; and that the bankruptcy court's institution of an auction in which winning and losing were mutually exclusive 'caused' GSRG's alleged injuries." (Doc. #83 at p. 13).

GSRG has pointed to no facts showing any actions by the Defendants contributing to GSRG's failures.  There is no evidence that Defendants interfered with GSRG's ability to: (1) bid at the original May 2001 auction; (2) obtain financing, to understand the auction bidding procedures, to understand the Bankruptcy Code or to follow its bankruptcy attorney's advice that "credit bidding won't work" at the September 2002 auction; or (3) make additional conforming bids at the latter auction.   As for GSRG's nonconforming bids, it was its non-compliance with the Bidding Procedures Order, negotiated with the input of GSRG and approved by the bankruptcy court, that prevented GSRG from obtaining the Steel Mill Assets, not the Defendants.

GSRG's situation is very similar to a case decided by the Eighth Circuit twenty years ago. *Midwest Communications, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444 (8th Cir. 1985).  In that case, television station and cable operator WCCO was an unsuccessful bidder for sports programming and sued claiming antitrust violations.  The losing bidder had a right of first refusal in its contract for telecast rights with the Minnesota Twins.  When notified of a competing bid by Spectrum for a package of Twins and Minnesota North Stars programming, WCCO placed an inferior bid (it did not match the Spectrum bid because it left out the North Stars altogether).  The Twins and the North Stars informed WCCO that they found its offer inferior to Spectrum's, but WCCO refused to substantially alter its original proposal.  Consequently, the teams rejected WCCO's bid and accepted Spectrum's bid.

The case proceeded to trial and a jury found in favor of WCCO and against the Twins and the North Stars.[14]   The district court granted a judgment notwithstanding the verdict dismissing WCCO's antitrust claims.  The Eighth Circuit affirmed the dismissal because "the loss was not

---

[14]The jury found the teams engaged in illegal tying and pooling arrangements.

attributable to or caused by an antitrust violation." *Id.* at 452 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-88 (1977)).  As the court stated:

> WCCO did fail to gain the sports telecast rights it sought.  But, as the District Court concluded, this loss was likely regardless of whether [the Twins and North Stars] engaged in a tying arrangement.  Spectrum simply was willing to pay the teams more for their telecast rights.

*Id.* at 451.  The court found that "[t]he causal connection between the alleged antitrust violations and WCCO's asserted injury is tenuous at best."  *Id.*  Instead, "WCCO's loss stemmed from its failure to make the most satisfactory bid--a type of loss that always occurs when a transaction involves multiple bidders."  *Id.* at 451-52 (emphasis added) (footnote omitted); *see also Classic Communications, Inc. v. Rural Telephone Service, Inc.*, 995 F. Supp. 1185, 1186 (D. Kan. 1988) (finding that unsuccessful bidder lacked standing to bring antitrust claim where agreement between successful bidders may have affected the individual competitor, but did not affect all of the competitors' ability to fairly compete).

In this case, just as in *Midwest Communications*, it was the losing bidder's shortcomings – that is, its own self-imposed cash bidding limit – that caused it to lose the auction.[15]  *Midwest Communications*, 779 F.2d at 452.  Indeed, in this respect this case is similar to *Brunswick* (analyzed in more detail *infra*) because, if another entity (besides Park) had outbid GSRG, GSRG would have suffered the same "loss."  *Brunswick*, 429 U.S. at 487-88.  As Professor Areeda has stated, a "plaintiff may not recover for injuries that were not clearly attributable to the defendant's acts or that

---

[15]It is not lost on the court that GSRG's self-imposed bidding limit approximated its outside financing from the Development Authority and Jefferson Metal so that GSRG itself would put none of its own money at risk.  As Defendants note in their reply brief, "[b]ecause GSRG was attempting to re-open a plant that (1) had previously failed and (2) the bankruptcy court found could not be reorganized and should be liquidated, it was certainly not irrational for Mr. Williams to use only 'other peoples' money' and to refuse to put any of his own money at risk."  (Doc. #99 at p. 4, n.2).

were self-inflicted or the result of the plaintiffs' own mismanagement." III Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Laws* § 657a, at 113 (2d Ed. 2002); *see also Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 144 F. Supp. 2d 558, 570-71 (W.D. Va. 2001) (denying plaintiff's claim because of, among other things, plaintiff's unwillingness to pay the good-faith minimum price offered by the defendant). There is simply no causal nexus between any allegedly improper action by the Defendants and GSRG's loss, *i.e.*, its failed attempt to acquire the Steel Mill Assets. GSRG failed to prevail at a free and open public auction.[16] And it was the failure of GSRG to make a higher conforming bid, or to make a subsequent $7 million bid in a conforming manner, rather than any action on the part of the Defendants, that was the only "cause" of GSRG's alleged "harm."

Based upon the court's analysis, it should come as no surprise that the court finds GSRG's attempt to distinguish *Midwest Communications* wholly unavailing. Moreover, its arguments regarding the District Court of Kansas' decision in *Classic Communications* are equally off the mark. In *Classic Communications*, after failing to prevail in a bid for a Sprint/United telephone system, Rural Telephone asserted an antitrust counterclaim against Classic Communications. Rural alleged that, but for a horizontal noncompete agreement between Classic Communications and another company (Pioneer Telephone) that permitted Classic Communications to increase its bid, Rural's bid for certain Sprint/United telephone exchange assets would have been successful. The court described the allegations as follows:

---

[16]Defendants also contend that GSRG's bid limit was below the fair market value of the property as set at the public auction and it was GSRG's ally, Mike McCain of the Development Authority, that asked an Italian steel firm (Palini é Bertoli), which had expressed interest in purchasing the Steel Mill Assets, to work with GSRG and Frank Williams regarding the potential sale. Further, GSRG and Palini é Bertoli specifically discussed their bidding strategies before the auction. (AF No. 34). These facts come the closest in this case of hinting at anticompetitive behavior. Ironically, none of the facts involve Defendants' conduct, but rather that of GSRG.

> The heart of Rural's antitrust claim is that the Classic/Pioneer agreement enabled Classic to outbid Rural for the Sprint/United telephone system.  Rural attempts to establish the anticompetitive effect of the Classic/Pioneer agreement by alleging that it caused Rural to suffer damages as a result of losing the bid for the telephone system.

*Id.* at 1187.  The court summarily dismissed Rural's antitrust claim on grounds that "Rural's alleged injury does not result from a reduction in competition and, therefore, is not the type of injury for which the federal antitrust laws were intended to redress."  *Id.*  Rural was simply a sore loser and could make no allegation "that Classic's conduct hampered Rural's ability to compete" for the purchase of the Sprint/United assets.  *Id.*  In particular, the court found that:

> Rural's allegation that the nature of the [Classic/Pioneer] agreement was anticompetitive is contradicted by its allegation that, but for the agreement, Sprint/United <u>would have received a lower price for [the] telephone system offered for sale</u>.  Rural is essentially saying that, but for the agreement, <u>it would have had no serious competition</u> for the Sprint/United telephone system.

*Id.* (emphasis added).  The court correctly held that such a claim "<u>would thus be contrary to the purpose of the antitrust laws</u>" and that "the allegations in Rural's antitrust counterclaim, taken as true, are not sufficient to state antitrust standing."  *Id.* (emphasis added).

GSRG asserts that the *Classic Communications* decision is inapposite because in that case Rural Telephone was already an established firm in the geographical market at issue, but the other firm (Classic Communications) desired to enter the market through an acquisition of existing telephone exchanges being sold off by Spring/United.  In making that argument, GSRG misunderstands its status in this case.  Similar to Classic Communications, it is a firm that desired

to enter the marketplace at issue, but was stymied because it did not have the highest qualified bid. *See Classic Communications*, 995 F. Supp. at 1186.[17]

For the reasons outlined above, the court concludes that summary judgment in favor of Defendants is appropriate because GSRG cannot show causation-in-fact.

### B.   GSRG Did Not Suffer Any "Antitrust Injury" And, Therefore, Lacks Antitrust Standing

At its core, this lawsuit represents GSRG's attempt to undo its loss in a competitive, free, and open bankruptcy auction by exacting treble damages against the winning bidder. For this, and other reasons outlined below, GSRG has not shown that it suffered any "antitrust injury" and therefore, it lacks antitrust standing.

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue." 15 U.S.C. § 15(a). In order to recover for alleged violations of the antitrust laws, a plaintiff must establish that it has "antitrust standing." Of course, a mere reference to the broad language of Section 4 does not suffice to confer antitrust standing. *Associated Gen'l Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). Instead, courts must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen'l Contractors*, 459 U.S. at 535.

---

[17]It is important to understand in this regard that Gulf States Steel is not GSRG. Gulf States Steel, which operated the steel mill in Gadsden, Alabama until 2000, went into bankruptcy never to return. GSRG was formed in January 2001 (by persons formerly associated with Gulf States Steel) to purchase the Steel Mill Assets. It desired to reopen the closed plant. Thus, at the time GSRG was incorporated, the Gadsden steel mill was not operating in the market and GSRG's status is more like a new entrant who desired to enter the market by reopening the mill.

The Eleventh Circuit has adopted a two-prong approach in deciding whether a plaintiff has antitrust standing. *Florida Seed Co., Inc. v. Monsanto, Inc.*, 105 F.3d 1372, 1374 (11th Cir. 1997), citing *Municipal Utils. Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1499 (11th Cir. 1991). First, the plaintiff must establish that it has suffered "antitrust injury." *Municipal Utils. Bd. of Albertville*, 934 F.2d at 1499. Second, the plaintiff must establish that it is an efficient enforcer of the antitrust laws.

The concept of "antitrust injury" cited in *Todorov* derives from the Supreme Court's decision in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra*. In antitrust cases, a plaintiff:

> must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

*Brunswick Corp.*, 429 U.S. at 489; *see also Cargill, Inc. v. Montfort of Colo., Inc.*, 479 U.S. 104, 109 (1986) (summarizing *Brunswick Corp.*). An antitrust injury is one caused by action that the antitrust laws forbid. *See Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879, 882 (Fed. Cir. 1985). "As the Supreme Court has made clear, to have standing antitrust plaintiffs 'must prove more than injury causally linked to an illegal presence in the market [*i.e.*, but for causation]. Plaintiffs must prove antitrust injury, which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Florida Seed*, 105 F.3d at 1374, quoting *Brunswick Corp.*, 429 U.S. at 489. "[A]ntitrust injuries include only those injuries that result from interference with the freedom to compete." *Johnson v. University Health Servs., Inc.*, 116 F.3d 1334, 1338 (11th Cir. 1998).

25

In *Brunswick Corp.*, three small competing bowling centers charged Brunswick with antitrust violations because Brunswick, a large corporation with "deep pockets," was purchasing and operating bowling centers that had defaulted on loans from Brunswick. Instead of closing the bowling centers and selling off the assets, Brunswick kept many of the bowling centers open. According to the Court, the sole injury alleged by the plaintiffs was that the open centers continued to compete with them. *Brunswick*, 429 U.S. at 488.

In reversing the district court's denial of Brunswick's motion for judgment notwithstanding the verdict, the Court stated that the plaintiffs "would have suffered the identical 'loss' but no compensable injury had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents." *Id.* at 487. Therefore, the difference in profits that may have resulted from the plaintiffs not having any competitors (*i.e.*, if the centers had just gone out of business and had not been acquired and operated by Brunswick) "was not [injury] of 'the type that the [antitrust] statute was intended to forestall.'" *Id.* at 487-88 (quoting *Wyandotte Co. v. United States*, 389 U.S. 191, 202 (1967)). As the Court stated, antitrust plaintiffs must "prove more than injury causally linked to an illegal presence in the market." *Id.* at 489. The antitrust laws exist for "the protection of competition not competitors." *Id.* at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).[18]

Similarly, here, GSRG has not suffered any "antitrust injury" – the type of injury the antitrust laws stand to protect. Taking the evidence in the light most favorable to GSRG, all that can be shown is that GSRG was the losing bidder at a fair and open bankruptcy court-supervised auction.

---

[18]Palini é Bertoli did not bid after it and GSRG discussed their bidding strategy with one another. If GSRG's efforts to effectively exclude Park as a bidder were successful, it would have become the only firm to have bid on the Steel Mill Assets.

GSRG's failure to prevail at the auction is not an "antitrust injury."  If any other bidder in the bankruptcy auction (*e.g.*, Palini é Bertoli) had prevailed, its bid would have placed GSRG in the exact same position that it is in today – a corporation that failed in its attempt to acquire the Steel Mill Assets and was therefore, without any operating assets.[19]  GSRG's alleged "injury" stems not from an reduction or elimination of competition; rather it derives solely from a claim that there was "too much" competition at the auction and, because of that competition, it could not use taxpayer's money to appropriate the Steel Mill Assets for a below-market price.

Accordingly, for the reasons outlined above, GSRG cannot establish it suffered an antitrust injury and, for that reason, Defendants are entitled to summary judgment.

## C.   GSRG Has Failed To Show Any Conduct By Defendants That Violated the Antitrust Laws

As the court has already concluded, GSRG has pointed to no evidence of causation and has not shown that it has suffered any "antitrust injury."  These findings, no doubt, are a consequence of the unassailable conclusion that Defendants' decision to place a bid on the Steel Mill Assets and their win at the court-sponsored auction did not impair any competition nor GSRG's ability to compete for the purchase of those assets in any manner.  Competition was not injured by any action of the Defendants.  Rather, the auction, and Defendants' participation in it, fostered competition. This is yet another independent reason for granting Defendants' motion.

It is axiomatic that in an antitrust action, there must be some evidence that the defendant "caused" some harm to competition.  "Harm to competition is a necessary element of all private

---

[19]The Asset Purchase Agreement for the $5 million sale of the Steel Mill Assets – which was struck before the 2002 auction among GSRG, the senior secured creditor, and the bankruptcy Trustee – was by its very terms subject to bankruptcy court oversight, objections, and the triggering of a bankruptcy auction.

antitrust suits under Sections 1 and 2 of the Sherman Act." *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 n.8 (11th Cir. 1985) (quoting *Brunswick Corp.*, 429 U.S. at 488). "It is only when the market is being distorted by anticompetitive conduct that the antitrust laws should be invoked." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991). In this case, it has been shown that Park's $6.3 million bid caused Park to win the auction and to take possession of the Steel Mill Assets. Even assuming *arguendo* that this winning bid could be said to have "caused" GSRG's alleged injuries-in-fact, the record in no way shows any action by Defendants that hindered GSRG's ability to compete. Indeed, the parties' participation in an open bankruptcy court-sponsored auction – and the very existence of such a functionally proper and fair capital asset auction – aids competition, it does not impede it. In this factual context, participating and prevailing in a full and fair bankruptcy auction can only be described as "competition on the merits." *Cf. Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("Consumers would be worse off if a firm with monopoly power had a duty to extend positive assistance to new entrants"). Fair market bidding, in and of itself, cannot be the illegal act and cannot give rise to cognizable "antitrust injury." If GSRG's view prevailed in this case, the bankruptcy auction would not have been as functionally competitive and open, the bankruptcy creditors would have been disadvantaged,[20] and the purchase price[21] would have been artificially

---

[20]In fact, the Gulf States Steel bankruptcy creditors would effectively have subsidized GSRG's purchase of the Steel Mill Assets at a price of more than $1 million below the ultimate winning bid.

[21]The parties have spent some time in their briefs arguing about whether GRSG's offer of $5 million was "below market." The court does not believe that is a dispositive issue in this case. It is enough to say that GSRG's initial offer was well below the sales price achieved at a fair and competitive auction and, in any event, GSRG had the resources to still win the day by topping Park's bid with a higher conforming bid but, for business reasons, opted not to do so.

depressed.  That is, the price ultimately paid for the Steel Mill Assets would not have been as high because one of the interested bidders – indeed the winning bidder – would have been ineligible to bid.

The undisputed facts show that Casey and Nucor had been doing business together for many years and had previously bought and sold used steel-related equipment.  They learned about GSRG's below-market $5 million "stalking horse" bid for the Steel Mill Assets while reading the trade press in mid-2002.  Casey and Nucor concluded that price was low given the value of the assets, estimated that the salvage/scrap value of the assets was some $7-8 million, and predicted that a huge upside profit could be made by reselling the key equipment in the Asian market which they believed to be "very hot."[22]  Defendants entered a good faith business arrangement to participate in the auction – up to a fixed $8 million cap – that had little or no downside and huge potential profit upside when the assets were resold in Asia.  As GSRG admits, it could have bid $8.1 million to win the auction, but made a "business decision" not to do so.  Nucor and Casey are guilty of nothing more than attempting to make a profit by buying low and selling high in the market for used capital assets.[23]

_____

[22]Moreover, GSRG's assertion that Defendants' position is undermined because they could not sell to China at the time of the deal is without merit.  The undisputed testimony and underlying three-year contract make clear that Defendants *believed* they could make a substantial profit if they were patient and sold in Asia in the next few years.  (*See* Casey Dep. at 18; Rutkowski Dep. at 15, 22).  That is exactly what they did.  Such is the type of business acumen that the antitrust laws are designed to foster, not prohibit.  *See, e.g., United States v. Grinnell*, 384 U.S. 563, 570-71 (1966) (encouraging "growth or development as a consequence of . . . business acumen").  Moreover, the Defendants' reasonable (and time-proven) expectation that there would be an upturn in the global steel market is fully confirmed by GSRG's own expectations underlying its business plan.

[23]There is no allegation here that Park's bid was predatory, or involved "the immediate sacrifice of profits through unreasonable" prices or actions, as Professor Areeda has described it.  Phillip E. Areeda *et al.*, *Antitrust Law:  An Analysis of Antitrust Principals and their Application*, vol. III, § 723a, 272.  *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574, 584 n. 8 (1986).  In fact, the undisputed facts show a number of reasons why Park's winning $6.3 million

As the bankruptcy court concluded, the Casey-Nucor deal was thus an entirely sensible, good faith business arrangement between two companies (which operate in completely separate markets) to pursue jointly a business opportunity to buy and resell certain used assets at a substantial profit. As GSRG also admits, there is nothing wrong or illegal about such a deal or the use of non-recourse financing as the funding mechanism. Nowhere in the Rule 56 record is there any evidence or suggestion that there was a conspiracy among competitors, or that Defendants conspired with the Trustee to dupe GSRG, interfered with GSRG's financing, adversely affected GSRG's business operations or bidding strategy, or undertook any fraudulent, tortious, or otherwise illegal action, either in general or with respect to GSRG.[24] In fact, the bankruptcy court found otherwise. *See*

---

bid cannot be deemed predatory: (1) the original reserve price at the May 2001 auction was $7.1 million; (2) GSRG's subsequent, but nonconforming, bid was for $7 million; (3) an independent appraiser appraised the Steel Mill Assets at $19 million; (4) GSRG represented to potential investors that the assets were worth $19-22 million; and (5) Casey ultimately arranged for resale of the assets on the used capital asset market for some three times the purchase price paid in the auction.

[24]Without any evidence of duplicitous, fraudulent or tortious behavior on the part of Defendants, the court is left with the undisputed fact that Defendants' actions actually promoted competition. Defendants' actions added one bidder to the bankruptcy auction, thwarted an insiders' scheme to purchase the Steel Mill Assets at a below-market price, and increased the ultimate sale price received by the Trustee for the Steel Mill Assets. *See Classic Communications, Inc.*, 995 F. Supp. at 1187 (finding that the losing bidder's "alleged injury [did] not result from a reduction in competition"). Defendants' actions were neutral towards GSRG with one obvious and appropriate exception: as in any auction and in all robust markets, opposing bidders are competitors. Defendants' actions, then, did not distort the market or harm competition in the auction. Without any action that diminishes competition, there is no antitrust claim. *See, e.g., Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996) ("The Supreme Court long ago determined that section 1 prohibits only those agreements that <u>unreasonably</u> restrain competition."); 72 F.3d at 1549 (affirming summary judgment on price fixing allegation because there was no evidence that the alleged actions "facilitat[ed] any agreements among its provider panel members <u>to restrict price or any other forms of competition.</u>") (emphasis added); *Phillips Getschow Co. v. Green Bay Brown County Prof. Football Stadium Dist.*, 270 F. Supp. 2d 1043, 1048-49 (E.D. Wis. 2003) (dismissing antitrust claim by losing auction bidder where conduct actually increased competition and the increased competition caused plaintiff's alleged injuries).

Bankruptcy Order at 515 (finding that "there was no collusion or bad faith motive on the part of the Trustee or any bidder in connection with the Sale Motion").  Nor is there any evidence that Nucor used its market power to outbid GSRG at the bankruptcy auction.  Indeed, GSRG readily admits that (1) it had sufficient assets to have won the auction and (2) if it had used those assets it would have won the auction.  This is another indication that neither Nucor specifically, nor any of the other Defendants generally, used market power to act anti-competitively.[25]

When boiled down to its essence, GSRG's real complaint in this case relates to its failure to top Defendants' successful $6.3 million bid for the long-dead Gadsden assets.  That is its real protestation, and its market exclusion arguments cut no ice at all.[26]  An antitrust "foreclosure" theory

---

[25]GSRG's assertion that Nucor participated in the 2002 auction because it knew GSRG was going to re-open the mill is not only wholly unsupported in the record, but there is direct sworn testimony by both Nucor and Casey to the contrary.  *See* Deposition of Carrie Casey at 15-17, 36; Deposition of Joe Rutkowski at 12-15.  GSRG's argument is nothing more than an incantation that "we don't believe the testimony."  A party cannot defeat summary judgment on this basis.  *See, e.g., Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Monroe v. Children's Home Ass'n.*, 128 F.3d 591, 593 (7th Cir. 1997) ("[A] plaintiff must prove, and not just assert").  Rather, "the party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and . . . the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."  *Curl v. International Business Machines Corp.*, 517 F.2d 212, 214 (5th Cir. 1975) (citations omitted).  Indeed, a court "may not weigh evidence and evaluate the credibility of the witnesses at the summary judgment state."  *Ultimax Transp., Inc. v. British Airways, Inc.*, 231 F. Supp. 2d 1329, 1335 (N. Ga. 2002).

[26]Indeed, as noted by Defendants in their reply brief:

All of GSRG's cited cases revolve around either: (1) foreclosures arising from otherwise tortious or illegal acts or per se antitrust violations, *see, e.g., Perryton Wholesale, Inc. v. Pioneer Distrib. Co.*, 353 F.2d 618 (10th Cir. 1965) (tortious interference with existing contractual relations); *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980) (use of false, misleading and deceptive

requires that the alleged monopolist/conspirators take wrongful actions which actually preclude competition in relevant markets. *E.g., Santana Prods. Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132 (3d Cir. 2005) (noting that without a "restraint," there is "no restraint of trade;" summary judgment affirmed where no allegations of "coercive measures that prevented the [plaintiff]" from competing). Here, Defendants took no wrongful actions, but merely submitted an objectively reasonable, non-exclusionary bid in a court-supervised bankruptcy auction. To the extent that GSRG was "precluded" from entering the market, that occurred because of its own actions. GSRG's failure to meet the bid price arose out of either a deliberate commercial choice or a misunderstanding of bankruptcy procedure. But it was not due to any antitrust violation.

## V.   CONCLUSION

For the reasons outlined above, the court finds that there are no material factual disputes and that Defendants are entitled to judgment as a matter of law. Accordingly, the court will enter a separate order granting Defendants' Motion for Summary Judgment and dismissing this action with prejudice.

**DONE** and **ORDERED** this _____30th_____ day of September, 2005.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

advertising and threats of refusals to deal); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) (territorial allocation and refusal to deal); or (2) the destruction of existing competition by a conspiracy of horizontal competitors, often as part of trade association activities, *see, e.g., ES Dev., Inc. v. RWM Enters.*, 939 F.2d 547 (8th Cir. 1991) (parallel actions of nine existing competitors); *Am. Med. Ass'n v. United States*, 317 U.S. 519 (1943) (use of trade association.)

(Doc. #94 at p. 7).