FILED

2010 Sep-02  PM 01:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

|  |  |
|---|---|
| Gulf States Reorganization Group, Inc., | ) |
| Plaintiff, | ) |
| v. | )   Case No.: 1:02-cv-2600-RDP |
| Nucor Corp., et al., | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION OF THE SPECIAL MASTER REGARDING THE ADMISSIBILITY OF EXPERT TESTIMONY AND NUCOR'S MOTION FOR SUMMARY JUDGMENT

In 2002, Gulf States Reorganization Group, Inc. ("GSRG") filed suit against Nucor

Corporation ("Nucor"), Casey Equipment Corporation ("Casey"), and Gadsden Industrial Park,

LLC ("Park") alleging that they conspired to restrain trade and assist Nucor to monopolize the

hot rolled coil steel industry.[1]  This Court first dismissed GSRG's case upon the defendants'

motion to dismiss; however, on appeal, the Eleventh Circuit found that GSRG had pled a

cognizable antitrust injury and had standing to bring suit.[2]

GSRG's amended complaint alleges three counts.[3]  Count I alleges that Casey/Park and

Nucor violated Section I by agreeing to restrain competition in the market for hot rolled coil in

the Southeast.  Count II alleges that Nucor violated Section 2 of the Sherman Act by attempting

---

[1] Compl. (D.I. 1).

[2] *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961, 966-68 (11th Cir. 2006).

[3] Am. Compl. (D.I. 115).

to monopolize that market.  Count III alleges that Nucor and Casey/Park violated Section 2 of the Sherman Act by conspiring to monopolize that market.  Casey/Park previously moved for summary judgment on Counts I and III against them,[4] and the Special Master has recommended granting that motion.[5]

This matter is now before the Court on i) Nucor's motion to exclude the testimony of Dr. Robert Crandall; ii) Nucor's motion to exclude the testimony of Michael Locker; iii) Nucor's motion to exclude the testimony of John Correnti; iv) GSRG's motion to exclude the testimony of Andrew Dick; and v) GSRG's motion to exclude the testimony of Dr. Seth Kaplan.  Nucor has also moved for summary judgment on all of GSRG's claims.[6]  The Court has ordered each of these motions to be heard by the Special Master.

Having reviewed the record and the briefs submitted by the parties addressing these motions, and having conducted oral argument on May 18, 2010, Special Master James F. Rill respectfully submits this report and recommendation to U.S. District Judge the Honorable R. David Proctor.

## I.   STATEMENT OF CONTROLLING LEGAL PRINCIPLES FOR ADMITTING EXPERT TESTIMONY

The admissibility of expert testimony is governed by Federal Rule of Evidence ("FRE") 702, which reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[7]

---

[4] Casey/Park Mot. for Summary Judgment (D.I. 118).

[5] Report and Recommendation of Special Master (D.I. 249).

[6] Nucor Mot. for Summary Judgment (D.I. 269).

[7] Fed. R. Evid. 702.

FRE 702 is meant to reflect, and should be read in conjunction with, the Supreme Court's decisions on expert testimony.[8] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that district courts, before admitting expert scientific testimony, should ensure that the expert's testimony is reliable and relevant.[9] Subsequently, in *General Electric Co. v. Joiner*, the Supreme Court reaffirmed that the district court must act as a "gatekeeper" to ensure that unreliable testimony does not reach the jury.[10] Then, in *Kumho Tire Co. v. Carmichael*, the Supreme Court confirmed that *Daubert* applies to non-scientific expert testimony as well.[11] Further, the Supreme Court emphasized that the district court retains substantial discretion in deciding whether to admit expert testimony.[12]

Thus, under FRE 702, *Daubert*, and its progeny, the district court serves a gatekeeper function in determining whether expert testimony is allowed into evidence. To perform its role as a gatekeeper, the Court must consider whether (i) an expert is qualified to testify regarding the matters he intends to address, (ii) the expert's methodology is sufficiently reliable under *Daubert*, and (iii) the expert's testimony assists the trier of fact to understand the evidence or to determine a fact in issue.[13] These principles guide the consideration of each of the proffered testimony by the putative experts.

In any *Daubert* motion, the party offering the expert testimony bears the "burden of laying the proper foundation for the admission."[14] The expert testimony's "admissibility must be shown by a preponderance of the evidence."[15]

---

[8] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

[9] 509 U.S. at 589-92.

[10] 522 U.S at 148.

[11] 526 U.S. at 150-51.

[12] *Id.* at 152-53.

[13] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003).

[14] *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

### A.   John D. Correnti

GSRG has designated John D. Correnti as an expert witness on the commercial practices of the steel industry. Correnti earned an engineering degree and has worked in the steel industry for 39 years. During that time, he has overseen the construction and operation of several steel plants. Correnti also served as the President and CEO of three different steel companies, including Nucor.[16]

GSRG contends that Correnti will testify as an expert on commercial practices in the steel industry. Correnti's expert report consists of answers to the following six questions:

1.  To what extent, if any, is unprocessed hot rolled coil a separate and distinct product?

2.  To what extent, if any, are there regional markets for steel products generally, and specifically hot rolled coil, in the United States?

3.  How, if at all, did competitive conditions in the market for hot rolled coil in the Southeast change between 1999 and 2003?

4.  To what extent, if any, did Nucor gain the power to control price in 2003?

5.  What would the probable effect on competitive conditions in the Southeast market have been if Gulf States had reopened?

6.  Was GSRG's plan to revitalize and reopen the former Gulf States Steel mill feasible?[17]

Nucor disputes GSRG's characterization of Correnti's testimony, arguing that Correnti's testimony relates to the relevant geographic market, the relevant product market, and Nucor's market power. Thus, Nucor asks the Court to exclude Correnti's testimony under FRE 702 because i) he is not qualified to offer expert testimony on antitrust markets because he is not an economist; ii) he is not qualified to offer testimony about the hot rolled coil market during the

---

[15] *Id.*

[16] Correnti Expert Rep. at 1.

[17] *Id.* at 2-6.

2002-04 time period because he was not involved in the market; and iii) his opinions are unreliable.[18]

### 1.   Qualifications

#### a.   Is Correnti testifying about antitrust markets or commercial practices in the steel industry?

As an initial matter, it must be determined whether Correnti's testimony relates to the relevant antitrust markets and Nucor's market power, as Nucor claims, or to commercial practices in the steel industry, as GSRG claims.

Five of the six questions posed to Correnti relate to the relevant antitrust markets or to Nucor's market power. Issue 1 in Correnti's report addresses whether hot rolled coil is "a separate and distinct product," which relates to the relevant product market.[19] In Issue 2, Correnti opines that there are regional markets for hot rolled coil, which addresses the relevant geographic market.[20] Similarly, Issue 3, Issue 4, and Issue 5 address competitive conditions in the market for hot rolled coil in the Southeast, Nucor's ability to control price in 2003, and what effect Gulf States would have had on competitive conditions had it reopened, respectively.[21] Each of these issues relates to Nucor's market power.

Only Issue 6, whether GSRG had a feasible business plan, addresses an area not related to the relevant antitrust markets or Nucor's market power. That issue, however, relates to damages, which the Case Management Order (Dkt. No. 109) deferred until a later date.

Correnti's proposed testimony goes to antitrust economic issues, not to commercial practices of the industry. The Eastern District of Missouri faced similar facts in *Self v. Equilon*

---

[18] Nucor Mot. to Exclude Correnti at 7-15.

[19] Correnti Expert Rep. at 1.

[20] *Id.* at 3-4.

[21] *Id.* at 4-6.

*Enterprises.*[22]   In *Self*, the plaintiffs were gas station owners that brought discriminatory pricing and other claims against gasoline providers. The plaintiffs hired an executive from a gasoline company, Richard Berliner, to visit 29 different locations and offer expert testimony on which of those locations competed with the plaintiffs. The defendants moved to strike his testimony because the witness was not qualified to opine on antitrust economics. Like GSRG, the plaintiffs characterized their witness as an industry expert rather than an economic expert:

> In response, Plaintiffs contend that Berliner does not purport to be an antitrust economist, but he should be permitted to testify as an industry expert. Plaintiffs represent that Berliner's testimony would cover the scope of competition between gasoline retail outlets "as perceived" by those in the gasoline industry. Plaintiffs argue that Berliner is qualified to testify regarding the factors a gasoline marketing executive would consider in evaluating Plaintiffs' station locations, including the locations with which they competed.[23]

The court rejected plaintiffs' characterization of the witness's testimony. In reviewing the testimony, the court found "Berliner's expert report clearly purports to render an expert opinion defining the relevant geographic market."[24]   Thus, the court required that the plaintiffs demonstrate that Berliner was qualified to testify about antitrust economics.[25]   Here, Correnti should be held to the same standard.

### b.   Is Correnti qualified to testify about antitrust markets?

Correnti is not qualified to testify as an expert witness about the relevant product market, the relevant geographic market, or whether Nucor possesses market power. Generally, proving a relevant market, either product market or geographic market, requires providing expert testimony.[26]   Similarly, proving market power requires expert testimony.[27]   Thus, the witness

---

[22] *Self v. Equilon Enterprises*, No. 4:00-cv-1903, 2007 U.S. Dist. LEXIS 47381 (E.D. Mo. 2007).

[23] *Id.* at *7.

[24] *Id.* at *8.

[25] *Id.*

[26] *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1579 (11th Cir. 1985).

must be qualified to offer an opinion, not on the economic issues in the industry generally, but on the particular *antitrust* economic issues.[28]

Although Correnti has significant expertise in the steel industry, he has no economic training. Practical business experience does not qualify someone as an expert in antitrust economics.[29] In *Self*, discussed above, the plaintiff proffered Richard Berliner, as an expert on the gas stations/convenience stores industry. Berliner had eighteen years experience in the industry and worked as the chief operations manager for a firm that owned numerous gas stations/convenience stores. But Berliner's practical experience failed to qualify him to address the antitrust aspects of the industry:

> The record before the Court fails to establish how Berliner has specialized "knowledge, skill, experience, training, or education," regarding the subjects to which he proffered opinions as mandated by Rule 702. Accordingly, the Court finds that Berliner is unqualified to offer an opinion as to the relevant market due to his lack of training and expertise in economics and antitrust.[30]

Similarly, in *Berlyn, Inc. v. Gazette Newspapers, Inc.*, the plaintiffs alleged antitrust violations in the newspaper industry.[31] The proposed expert, Shaffer, had an MBA and had worked in the newspaper industry for 30 years, including as CFO of the Los Angeles Times, Executive Vice President for the Chicago Sun Times, and Chief Executive of Guy Gannett Communications. He had performed and analyzed predatory pricing analysis for different newspapers throughout his career, and taught courses on media economics, and newspaper costs and pricing.

---

[27] *Id.*

[28] *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir. Md. 1989).

[29] *Self*, 2007 U.S. Dist. LEXIS 47381; *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530 (D. Md. 2002), *aff'd*, 73 Fed. Appx. 576 (4th Cir. 2003).

[30] *Self*, 2007 U.S. Dist. LEXIS 47381 at *9.

[31] 214 F. Supp. 2d 530 (D. Md. 2002).

Despite his background, the court found him unqualified to testify as an expert witness on the relevant market definition. Although Shaffer unquestionably knew the newspaper industry, and the economic issues facing it, that did not qualify him to offer an opinion on antitrust issues: "The experience one has in a given trade, however extensive and however closely related to the 'business side' of that industry, does not render one presumptively qualified to define that industry's relevant markets."[32] Thus, the Court granted the motion to exclude his testimony.

Here, Correnti does not possess the relevant experience or training to serve as an expert on antitrust economic issues. Thus his testimony as proffered should be excluded.

### 2.   Reliability

Correnti has not offered a reliable methodology to opine on Nucor's alleged market power during 1999-2003. To be admissible, this opinion must be based on a reliable methodology to evaluate Nucor's market power, not simply on steel industry practices.

In both *Self* and *Berlyn*, the courts found that, in addition to being unqualified under FRE 702, the proposed expert witness failed to offer a reliable methodology.[33] In *Self*, the court noted that any expert opinion regarding antitrust markets must be based on a reliable methodology, not simply industry experience and knowledge:

> [T]he principles and methods used by Berliner in reaching his opinion are unreliable inasmuch as Berliner based his opinion on his own experience in the retail motor fuel field, drawing on his observations of the twenty-nine stations over a two-day period of time without properly formulating his methodology based on specific facts, research, and established economic principles. Indeed, the Report is devoid of any analysis of economic principles of customer buying patterns in relation to retail price differences between Plaintiffs' stations and the alleged competitor stations.[34]

The court in *Berlyn* reached the same conclusion, finding Shaffer's methodology unreliable because he "based this opinion to a great extent on his own experience in the newspaper

---

[32] 214 F. Supp. at 538.

[33] *Self*, 2007 U.S. Dist. LEXIS 47381, at *10; *Berlyn*, 214 F. Supp. 2d at 538-39.

[34] *Self*, 2007 U.S. Dist. LEXIS 47381, at **10-11.

industry, drawing on instinct and intuition to patch holes in his methodology that properly should be filled with specific facts, research, and established economic principles."[35]

GSRG has not identified any reliable methodology that Correnti used to evaluate Nucor's market power other than his business experience. Accordingly, Correnti's testimony about Nucor's market power should be excluded.[36]

### B.  Michael D. Locker

GSRG has identified Michael D. Locker as an expert witness. Locker earned an undergraduate degree in history and a master's degree in sociology. Locker currently is the President of Locker Associates, Inc., which performs consulting and analytical services for the steel industry. Locker also edits and publishes *Steel Industry Update*, a newsletter about the steel industry. Nucor moves to exclude Locker from testifying because he is unqualified under FRE 702 and because he employs an unreliable methodology.[37]

### 1.  Is Locker offering testimony on antitrust economic issues or commercial practices in the steel industry?

As with Correnti, the parties disagree on what topics Locker offers his opinion. Nucor characterizes Locker as offering opinions on the relevant antitrust markets and on Nucor's market power.[38] GSRG disagrees, claiming that it offers Locker as an expert on "commercial practices in the steel industry."[39]

---

[35] *Berlyn*, 214 F. Supp. 2d at 539.

[36] It should also be noted that Correnti had no involvement in the putative relevant market during the 2002-04 time frame. Thus, even were he qualified and had he employed a reliable methodology, he lacks a sufficient grounding in the facts related to the transaction in question to apply those facts to the method of analysis. *See* Correnti Dep. Tr. at 151-55, 250-52.

[37] Nucor's Mot. to Exclude Locker at 3-13.

[38] *Id.* at 4-6.

[39] GSRG Opp. to Nucor's Mot. to Exclude Locker at 2.

The substance of Locker's report demonstrates that he is offering an opinion on antitrust economic issues. Locker's report concludes:

> (a) The appropriate market in which to evaluate the impact of Nucor Corporation's acquisition and disposition of the assets of the former Gulf States Steel, thereby preventing Gulf States Reorganization Group from re-opening the plant, is the market for hot rolled coil steel in the Southeastern United States.
>
> (b) During the 2003-06 period, Nucor Corporation had the power to initiate and sustain increases in the price of hot rolled coil in the Southeastern region without losing sales to its competitors. In contrast, Nucor's competitors lacked the power to initiate price increases without Nucor's concurrence.[40]

These opinions expressly relate to product market and monopoly power, respectively.

Locker also opines that GSRG's business plan to reopen the Gulf States steel mill would have succeeded. That opinion does not invoke antitrust economic issues; consideration of that issue has been postponed.

### 2. Qualifications

Locker is unqualified to opine on the relevant geographic market or Nucor's market power. Assuming Locker's relevant experience is as GSRG contends – Nucor disputes the quality and quantity of Locker's experience[41] – that experience fails to qualify him to testify about antitrust economic issues.

As discussed above, a witness cannot rely on his business background or industry experience to offer an opinion on antitrust economic issues.[42] Locker's experience is similar to that of the expert witness in *Virginia Vermiculite*.[43] In *Virginia Vermiculite*, the plaintiff offered an expert report and testimony from Seth Schwartz, who worked as a consultant in the energy industry. He had provided advice to numerous energy companies that required market analysis

---

[40] Locker Expert Rep. at 5.

[41] Nucor Mot. to Exclude Locker at 4.

[42] *See* § II.A.2 above.

[43] *Virginia Vermiculite v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729 (W.D. Va. 2000).

and pricing forecasts.[44] Schwartz had even served as an expert witness in other, non-antitrust, cases.[45] But Schwartz had never performed any economic analysis required to determine a relevant antitrust market.[46]

The court granted the defendant's motion to exclude Schwartz under FRE 702. The court found that Schwartz's background analyzing the energy market for investment decisions did not qualify him to render an expert opinion on the energy market as required for antitrust issues:

> Schwartz' market analyses generally are utilized "to define a market for investment purposes to best understand the ability to earn profits on different investments in different market situations." . . . Though related to a relevant market determination in an antitrust issue, there are differences between an analysis for business investment and an analysis for antitrust purposes.[47]

For example, defining markets for industry analysis did not require the detail necessary to define an antitrust market.[48] Further, expertise in antitrust markets usually requires experience in industrial organization.[49] Because Schwartz lacked such experience and training, the court excluded Schwartz as unqualified under FRE 702.

In this case, Locker's background and experience suffer the same defects. At his deposition, Locker testified that he is not "an expert in the economic antitrust principles for market definition."[50] Instead, Locker's proffered qualifications arise from his consulting work in the steel industry. But Locker's steel industry clients use his market analysis to evaluate business plans and evaluate possible investments.[51] As the court explained in *Virginia*

---

[44] *Id.* at 731.

[45] *Id.*

[46] *Id.*

[47] *Id.* at 732.

[48] *Id.* at 733.

[49] *Id.*

[50] Locker Dep. Tr. at 22.

[51] Locker Dep. Tr. at 26.

*Vermiculite*, that market analysis does not provide the experience necessary to opine on antitrust economic issues.[52]

### 3.    Reliability

Nucor also moves to exclude Locker's testimony because his opinions fail to meet FRE 702's reliability requirement. Nucor argues that Locker's proposed testimony on the relevant markets and Nucor's market power are based on an unreliable methodology.

Locker's opinions are unreliable under FRE 702. Despite GSRG's characterization, Locker's expert reports opine on the relevant geographic market, and Nucor's ability to raise prices above the competitive level – market power. Thus, Locker's methodology must be reliable to perform antitrust analysis. [53]

Locker has not used any particular methodology other than relating his experience with the steel industry, which is insufficient. Locker bases his relevant market opinion on i) a "rule of thumb;" ii) hot rolled coil shipment data; iii) his knowledge about shipments from northern mills; and iv) telephone interviews. Similarly, Locker bases his opinion on Nucor's market power on public announcements about price increases in the industry, and his opinion that Nucor was a price leader.

Locker's "methodology" is based almost entirely on his experience in the steel industry, not applied antitrust economic principles. As discussed above, that fails to meet FRE 702's reliability requirement, and his testimony covering the conclusions he reaches should be excluded on grounds of both lack of qualification and lack of reliable methodology.

---

[52] *Virginia Vermiculite*, 98 F. Supp. 2d at 732.

[53] *Self*, 2007 U.S. Dist. LEXIS 47381, at *10; *Berlyn*, 214 F. Supp. 2d at 538-39.

### C.   Dr. Crandall

GSRG designated Dr. Robert W. Crandall as an expert witness. Dr. Crandall's expert report offers his opinion on the relevant geographic market, the relevant product market, and Nucor's market power.[54] Nucor moves to exclude Dr. Crandall's opinion on several grounds:

- *First*, Nucor argues that all of Dr. Crandall's testimony should be excluded because he bases his opinions on insufficient facts or data.

- *Second*, Nucor also argues that Dr. Crandall's testimony about the relevant product market should be excluded because his opinion is conclusory and unsupported by any data in the record.

- *Third*, Nucor argues that Dr. Crandall's testimony about the relevant geographic market should be excluded because it is based on insufficient facts or data, and because he did not reliably apply that data.

- *Fourth*, Nucor argues that Dr. Crandall's testimony about Nucor's market power should be excluded because it relies on market share alone, because it relies on insufficient data, and because the data he did rely on does not suggest market power.

- *Fifth*, Nucor argues that Dr. Crandall should not be permitted to testify that Nucor possesses monopoly power because Nucor abandoned their actual monopolization claim.[55]

### 1.   Sufficiency of Facts or Data

Nucor argues that the Court should exclude Dr. Crandall's testimony on 1) geographic market, 2) product market, and 3) market power – his entire report – because those opinions are based on insufficient data or testimony.[56]

Rule 702 allows an expert witness to testify only if that testimony is grounded in "sufficient facts or data."[57] When a court "review[s] the sufficiency of the facts, the court's role is to determine whether sufficient facts exist to support the witness's conclusion, not whether one

---

[54] Dr. Crandall Expert Rep. at 1-2.

[55] Nucor Mot. to Exclude Dr. Crandall's Testimony at 7-27.

[56] *Id.* at 3.

[57] Fed. R. Evid. 702.

party's version of the facts should be credited."[58]  Similarly, the expert's "data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury."[59]  Otherwise, "the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility."[60]

Courts recognize a difference between an expert lacking certain data, which Nucor alleges, and an expert relying on manipulated data, using irrelevant facts, or ignoring critical factors in determining market power or relevant market.[61]  For example, in *Bailey v. Allgas*, the court excluded an expert witness's testimony whose opinion "ignored the location, pricing practices, and transportation costs of plaintiffs' competitors." [62]  Similarly, in *NAACP v. Florida*, the court noted that *Daubert* concerns arise when "challenging an expert's opinion based on falsely manufactured data or data not ordinarily relied upon by experts."[63] Otherwise, the completeness of the data is "a determination left to the trier of fact and not the court as the gatekeeper."[64]  For example, in *Platypus Wear, Inc. v. Clark Modet & Co., Inc.*, the court rejected a *Daubert* challenge based on whether the expert used a sufficiently large data sample.[65]  Such a challenge "goes to the weight of the evidence and not its admissibility."[66]

---

[58] *Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 137 F. Supp. 2d 1283, 1289 (M.D. Ala. 2001).

[59] *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564-65 (11th Cir. 1998).

[60] *Allstate Ins.*, 137 F. Supp. 2d at 1289 (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir.1988)).

[61] *NAACP  v. Florida*, No. 5:00-cv-100Oc-10GRJ, 2002 WL 34419684, at *2 (M.D. Fla. 2002).

[62] *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1245 (N.D. Ala. 2000).

[63] *Id.*

[64] *Id.*; *see also Platypus Wear, Inc. v. Clarke Modet & Co., Inc.*, No. 06-cv-20976, 2008 WL 4533914, at *6 (S.D. Fla. Oct. 7, 2008).

[65] 2008 WL 4533914, at *6.

[66] *Id.*

### a.   Dr. Crandall did not admit that he could not perform his analysis without price to cost data

Nucor claims that Dr. Crandall admitted that he could not opine on whether Nucor had market power because he lacked price and cost data. Dr. Crandall, however, only conceded that he would have liked to have more data:

> A. Well, there's lots of different ways of approaching it. The way which I have approached it, because they're the only data I have, is to look at the degree of market concentration and the relevant product and geographic market. *It would be nice to have other indexes such as the relationship of price to cost, the ability to raise price without others expanding output and defeating the price increase, but there are no market price data in the market in these proceedings, so I couldn't use it.*[67]

This testimony is consistent with the other excerpts of Dr. Crandall's testimony that Nucor cites – Dr. Crandall would have liked more data, but worked with what he had.[68]

### b.   Specific facts or data Nucor alleges is missing

Nucor argues that Dr. Crandall should have considered pricing data, price-cost relationship, sales data from years other than 2004, and Nucor's competitors' ability to expand output.[69]

*Price data.* Nucor argues that Dr. Crandall's testimony about Nucor's market power should be excluded because he failed to consider any price data from Nucor or other hot rolled coil producers. According to Nucor, failure to consider this data renders his opinion on market power unreliable.[70]

*Price-cost relationship.* Nucor argues that Dr. Crandall's opinion about the product market definition is not based on sufficient facts or data because Dr. Crandall did not have data on the price-cost relationship between black hot rolled coil and "pickled and oiled" hot rolled

---

[67] Dr. Crandall Dep. Tr. at 21:4-13.

[68] Nucor Mot. to Exclude Dr. Crandall at 4 (citing Dr. Crandall Dep. Tr. at 53-54, 72-76, 120-21, 155-56).

[69] Nucor Mot. to Exclude Dr. Crandall at 4.

[70] *Id.*

coil. Without such data, according to Nucor, Dr. Crandall could not reliably determine the cross-elasticity of supply or cross-elasticity of demand between the two products.[71]

**Ability to expand output.**  Nucor states that Dr. Crandall failed to obtain any data about Nucor's competitors' ability to expand output.  According to Nucor, that lack of data means that Dr. Crandall cannot reliably testify about Nucor's market power.[72]

**2004-only market data.**  Nucor argues that Dr. Crandall's limiting his data to 2004 – two years after the alleged anticompetitive conduct – precludes him from testifying about Nucor's market power.[73]

\* \* \*

Nucor's criticisms of Dr. Crandall's report are certainly valid to varying degrees. Nucor's challenge to Dr. Crandall's supporting data goes beyond the situation in *Platypus Wear*, which involved a simple challenge to the size of the data sample.  But Nucor cites no authority to suggest that any of the deficiencies identified above justify excluding Dr. Crandall.  Further, this is not a case, like *Bailey v. Allgas*, where Dr. Crandall ignored data or refused to analyze relevant factors. [74]  Rather, Dr. Crandall obviously lacks some data that he would like to have had and that would be important in reaching a definitive antitrust economic conclusion.

The question before the Court, however, is whether "sufficient facts exist to support the witness's conclusion."[75]  Because, as discussed below, Dr. Crandall's opinions are based on reliable methodology, properly applied, Nucor's challenges to the facts or data underlying his opinions should not preclude his testimony.  Rather, they are "weaknesses in the underpinnings

---

[71] *Id.* at 4-5.

[72] *Id.* at 5-6.

[73] *Id.* at 6-7.

[74] *Bailey*, 148 F. Supp. 2d at 1245.

[75] *Allstate Ins.*, 137 F. Supp. 2d at 1289.

of the expert's opinion go to its weight rather than its admissibility."[76]  As the Eleventh Circuit

has said, to be admissible, Dr. Crandall's "data and testimony need not prove the plaintiffs' case

by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to

assemble."[77]

### 2.    Relevant product market opinion is not based on supply elasticity

Nucor argues that Dr. Crandall cannot testify about the relevant product market because

he "devotes only a few sentences to a discussion of relevant product market in his original

report."[78]  Nucor cites Dr. Crandall's conclusion that:

> This is a distinct antitrust product market – *i.e.*, it likely reflects the narrowest
> definition of the market in which a hypothetical monopolist of that product could
> raise the price of the product by a small but significant and non-transitory amount.
> While there may be other industrial materials that could be used as a substitute in
> some downstream uses, these substitutes are not likely to be sufficient to
> discipline a price increase imposed by the hypothetical markets.[79]

Although that particular passage appears conclusory, Dr. Crandall did consider some

appropriate factors to determine a relevant product market.[80]  In determining the product market,

an expert should take into account "the reasonable interchangeability of use or the cross-

elasticity of demand between the product itself and substitutes for it."[81]  Although he relies on

general principles regarding the steel industry, Dr. Crandall weighed both the elasticity of supply

and the elasticity of demand in his expert report.  Dr. Crandall explained that hot rolled coil

exhibits a low elasticity of demand because, as a producer's good used in manufacturing, it has

---

[76] *Allstate Ins.*, 137 F. Supp. 2d at 1289 (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir.1988)).

[77] *City of Tuscaloosa*, 158 F.3d at 565.

[78] Nucor's Mot. to Exclude Dr. Crandall at 7.

[79] Dr. Crandall Expert Rep. at 9.

[80] *Id.* at 5.

[81] *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

few ready substitutes.[82]  Similarly, he considered that hot rolled coil also has a low elasticity of supply due to its high fixed costs and other factors.[83]  Thus, he applied an appropriate methodology to address the relevant product market.

### 3.      Dr. Crandall's geographic market definition

Nucor next argues that Dr. Crandall's testimony that the relevant geographic market for black hot rolled coil consists of 10 Southeastern states must be excluded because it lacks a reliable methodology or sufficient data.

#### a.      Elzinga-Hogarty test

Nucor alleges that Dr. Crandall based his geographic market definition on a version of the Elzinga-Hogarty test which has been discredited.[84]  Under that test, an economist selects an area and measures what percentage of the relevant product made in the area is shipped outside of that area.  The economist then measures what percentage of goods bought within that area were made outside of that area.  If there is significant movement into and out of the region, the economist expands the area until the data shows that a low percentage of goods bought in that area came from outside the area ("little in from outside" or "LIFO"), and that a low percentage of goods made in the area are sold outside that area ("little out from inside" or "LOFI").

Although Dr. Crandall does not specifically refer to the Elzinga-Hogarty test, he bases his geographic market opinion on actual sales patterns.  Courts routinely recognize that actual sales patterns are a reliable method to address a relevant geographic market.[85]

---

[82] Dr. Crandall Expert Rep. at 5.

[83] *Id.*

[84] *See* Kenneth Elzinga & Thomas Hogarty, *The Problem of Geographic Market Delineation in Antitrust Suits,* 18 Antitrust Bull. 45 (1973).

[85] *See, e.g., United States v. Marine Bancorp.,* 418 U.S. 602, 619 (1974); *United States v. Pabst Brewing Co.,* 384 U.S. 546, 559 (1966) (fact that 90% of beer sold in state came from brewers in Wisconsin or Minnesota supported limitation of geographic market to Wisconsin); *United States v. Rice Growers Ass'n,* 1986 U.S. Dist. LEXIS 30507 (E.D. Cal. Jan. 13, 1986) (in light of transportation costs and low level of purchases from or sales to other areas, California is a relevant geographic market for purchase of paddy rice for milling).

Nucor is correct that some courts and commentators have questioned the Elzinga-Hogarty test, but it is not discredited to the point where its use would preclude Dr. Crandall from testifying. Some commentators have criticized specific applications of the Elzinga-Hogarty test, such as applying it to cases of heterogeneous goods, because the test was designed for commodity products. Other courts caution that the Elzinga-Hogarty test, by itself, cannot support a relevant geographic market.[86] The Elzinga-Hogarty test, however, is an accepted tool in evaluating a relevant geographic market. For example, in *United States v. Oracle*, the court applied the Elzinga-Hogarty test to determine that the relevant geographic market for software sales was a global market.[87] That court found the test to be "an appropriate method of determining the area of effective competition."[88] Other courts similarly have found it appropriate to use the Elzinga-Hogarty test to help define the relevant geographic market.[89]

Moreover, Dr. Crandall did not rely exclusively on sales patterns or the Elzinga-Hogarty test. Dr. Crandall referred to transportation costs, albeit generally, noting that "[t]ransportation costs limit the geographic scope of the market."[90] Dr. Crandall also considered the industry concentration and locations of potentially competing steel producers.[91] Both of these are proper factors to include in addressing the relevant geographic market.[92]

---

[86] *See California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1072 (N.D. Cal. 2000) ("Plaintiff's E-H test results do not end the Court's analysis, in any event, as the E-H test is only a starting point in analyzing a geographic market.")

[87] 331 F. Supp. 2d 1098, 1164-65 (N.D. Cal. 2004).

[88] *Id.* at 1165.

[89] *United States v. Rockford*, 717 F. Supp. 1251 (N.D. Ill.), *aff'd*, 898 F.2d 1278 (7th Cir. 1989); *In re Coca Cola Bottling Co.*, 118 F.T.C. 452, 581-82 (1994).

[90] Dr. Crandall Expert Rep. at 3.

[91] *Id.* at 3-4.

[92] *United States v. General Dynamics Corp.*, 415 U.S. 486, 491 (1974) (observing that a geographic market for coal must consider freight and delivery costs).

Thus, Dr. Crandall used a reliable methodology in addressing the relevant geographic market.

### 4.    Market Power

Nucor moves to exclude Dr. Crandall from testifying about whether Nucor possesses market power.  Nucor argues that i) market share data alone is insufficient to establish market power; ii) Dr. Crandall failed to consider imports in his analysis of market power; iii) a single year market share calculation is insufficient to determine market power, or its ability to obtain market power; and iv) Nucor's market share under Dr. Crandall's analysis is insufficient for Dr. Crandall to conclude that Nucor possesses market power.

Although Nucor makes valid criticisms of the sufficiency of Dr. Crandall's report, his methodology is sufficiently reliable so that it should not be excluded.  The criticisms are appropriate in evaluating the weight to be accorded Dr. Crandall's conclusions.

### a.    Market share only

Nucor is correct that market share alone cannot support a finding of market power, but Dr. Crandall does not rely only on market share to determine monopoly power.  Dr. Crandall considered several other factors in reaching his opinion on Nucor's market power, or its potential to obtain market power.  Dr. Crandall's report lists several general factors about the steel industry that effect whether Nucor could obtain monopoly power:

- High transport costs that limit the geographical scope of the market
- Industry consolidation through bankruptcies and mergers
- A low price elasticity of demand
- A low price elasticity of supply
- Substantial barriers to entry
- Ready availability of information about rivals' costs and capabilities
- A cost advantage over principal rivals

- Restrictions on the supply of imported steel[93]

Although he does not go into great detail, Dr. Crandall discusses each of these factors in support of his opinion about whether Nucor has market power or the ability to obtain market power.[94] Thus, Dr. Crandall's methodology does not rely on market share alone.

### b.    Competition from imports

Nucor argues that Dr. Crandall improperly excluded 1.3 million tons of imported hot rolled coil from his calculation of market share in the relevant geographic market. As an initial matter, whether Dr. Crandall failed to consider 1.3 million tons of hot rolled coil or a different, much smaller, number is open to question. The 1.3 million tons figure comes from Nucor's expert, Dr. Kaplan. But Dr. Crandall argues that Dr. Kaplan erroneously arrived at that figure because he assumed that all imports that reach a region are consumed in that region.[95]

Further, Dr. Crandall considered whether imports would affect Nucor's market power. Dr. Crandall discussed that the International Trade Commission restricted importing steel within the relevant time period.[96] Dr. Crandall also evaluated data provided by Beddows & Company, and concluded that very little imported steel remained in the Southeastern region.[97] Moreover, Dr. Crandall's expert report that addressed imports in his proposed geographic market.[98] Thus, Dr. Crandall refers to imports in determining whether Nucor possessed market power.

---

[93] Dr. Crandall Expert Rep. at 3.

[94] *Id.* at 3-8.

[95] Dr. Crandall Dep. Tr. at 204:11-19.

[96] Dr. Crandall Expert Rep. at 6-7.

[97] Dr. Crandall Dep. Tr. at 205:16-20.

[98] Dr. Crandall Expert Rep. at 7-8; Dr. Crandall Dep. Tr. at 150-52.

- 22 -

### c.    Single year market share

As noted above, Dr. Crandall's ability to review market data from years other than 2004 does not render his methodology, or its application, unreliable.[99] Rather, it affects the weight that might be given to those opinions.

### d.    Market share too low as a matter of law

Nucor moves to exclude Dr. Crandall's testimony because Nucor's market share is too low as a matter of law to support a finding of market power. According to Nucor, Dr. Crandall's expert report shows that Nucor possessed market shares of 26% in 2002, 35% in 2003, and 36% in 2004. Thus, Nucor argues he should be precluded from testifying about Nucor's ability to obtain monopoly power because courts often find a 30% market share too low as a matter of law to support an attempted monopolization claim.

Nucor is correct that courts often find such market shares of 30% too low as a matter of law to support an attempted monopolization claim.[100] Further, other courts have excluded expert testimony regarding market power where the expert found a market share at levels presumed too low to find monopoly power.[101] GSRG, however, disputes Nucor's characterization of Dr. Crandall's findings. In fact, Nucor's brief implicitly acknowledges that by stating that Dr. Crandall asserted in his revised report that Nucor's market share was 56%.[102] GSRG also argues that Dr. Crandall's report suggests a market share of up to 76%.[103]

---

[99] *See* §V.A.II above.

[100] *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("When the claim involves attempted monopolization, most cases hold that a market share of 30 percent is presumptively insufficient to establish the power to control price."); *Bailey*, 148 F. Supp. 2d at 1246 (excluding expert's opinion on market power when market share was too low as a matter of law to find market power).

[101] *Bailey*, 148 F. Supp. 2d at 1245-46.

[102] Nucor Mot. to Exclude Dr. Crandall's Testimony at 25.

[103] GSRG Opp. to Mot. to Exclude Dr. Crandall's Testimony at 25 (citing Dr. Crandall Expert Rep. at p. 12, Table 4).

Further, those cases that find a market share below 30% insufficient as a matter of law stop short of imposing a bright-line rule. For example, the Ninth Circuit has observed that a market share below 30% is *presumptively* invalid, suggesting that the presumption can be overcome: "most cases hold that a market share of 30 percent is presumptively insufficient to establish the power to control price."[104] Leading treatises similarly stop short of declaring a bright line rule: "Although there are no precise market share boundaries, and while other factors discussed below affect the analysis, courts . . . virtually never find shares of less than 30% sufficient."[105]

Although it is an extremely close question, the fact that parts of Dr. Crandall's report suggest market shares around 30% should not require excluding his testimony but goes to the weight to be accorded it.

### 5.  Testimony as to actual monopolization

Finally, Nucor argues that Dr. Crandall should not be able to offer testimony in support of an actual monopolization claim because GSRG abandoned that claim.[106] Nucor then argues that, because Dr. Crandall admitted that Nucor's alleged actions could only sustain, but not create, monopoly power, Dr. Crandall has admitted that Nucor's alleged attempted monopolization could not work.[107] Thus, GSRG has no attempted monopolization claim.

Of course, Dr. Crandall should not be permitted to offer irrelevant testimony.[108] But nothing in Dr. Crandall's report or testimony suggests that he will testify about an abandoned theory. If he does, that will be an issue for the trial court when and if this case gets to trial. Further, Dr. Crandall's deposition testimony that Nucor cites does not concede that Nucor could

---

[104] *Rebel Oil*, 51 F.3d at 1438.

[105] ABA Antitrust Law Developments, 313-14 (6th ed. 2007).

[106] Nucor Mot. to Exclude Dr. Crandall's Testimony at 26-31.

[107] *Id.* at 28-30.

[108] Fed. R. Evid. 402.

not obtain monopoly power. Nucor's characterization of his testimony is an argument going to the weight of that testimony.

* * *

In conclusion, there are significant gaps in the data underlying Dr. Crandall's report, but those gaps should go to the weight that should be given to his opinions, not their admissibility. The purpose of FRE 702 is "to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[109] Here, Dr. Crandall used the appropriate rigor in formulating his opinions; the deficiencies in his report relate to the lack of data, not to a poor methodology. Thus, those gaps should be evaluated at the summary judgment stage.

### D.    Dr. Andrew Dick

Nucor submitted an expert report from Andrew R. Dick. Dr. Dick served with the United States Department of Justice's Antitrust Division ("DOJ") from 1996 to 2003.[110] Dr. Dick worked, first, as a staff economist and later as Assistant Chief and Acting Chief of the Competition Policy Section.[111] During that time, Dr. Dick oversaw the Steel Industry Task Force that the DOJ established in 2001 to address what it expected to be a wave of consolidation in the steel industry.[112]

On March 14, 2002, Nucor submitted a Hart Scott Rodino Act filing in connection with its Trico purchase. After the Steel Industry Task Force reviewed the filing, the DOJ granted early termination to the transaction review.

Although Dr. Dick did not work on the Nucor transaction himself, he reviewed the case file and is familiar with the Steel Industry Task Force's operation, policies, and procedures. Dr.

---

[109] *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167.

[110] Dick Expert Rep. at 3.

[111] *Id.*

[112] *Id.* at 4-5.

- 25 -

Dick proposes to testify about why the DOJ decided to grant early termination for the transaction.[113] Specifically, Dr. Dick concludes as follows:

> Based on my direct knowledge and experience with the DOJ's merger review practices and procedures, I conclude that the grant of early termination reflected a conclusion by the Steel Task Force and senior DOJ officials that Nucor's proposed acquisition of Trico did not raise any significant antitrust concerns requiring further investigation or enforcement action.[114]

GSRG moves to exclude Dr. Dick's testimony on two grounds. First, GSRG argues that Dr. Dick's opinion lacks reliability under FRE 702.[115] Second, GSRG argues that Dr. Dick's testimony is not relevant under FRE 402 or, if relevant, its probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury under FRE 403.[116]

## 1.    Federal Rule of Evidence 702

Dr. Dick's testimony does not meet the requirements of FRE 702. Dr. Dick is not qualified to offer an opinion on a specific decision made by the DOJ, nor does he possess sufficient data or facts to offer that opinion.

The case cited by GSRG, *Kunz v. City of Chicago*, is on point.[117] In that case, the defendant offered as an expert witness George Andrews, a former prosecutor from the Cook County State's Attorney's office. The witness proposed to testify about why the prosecutor's office would have entered a *nolle prosequi* plea in a particular case. Andrews had not worked on the case, but had reviewed the case file. The defendant moved to exclude Andrews because he was not qualified to opine on why the Cook County State's Attorney's office made a decision in a particular case.

---

[113] Dick Expert Rep. at 17.

[114] *Id.*

[115] GSRG Mot. to Exclude Dick.

[116] *Id.*

[117] No. 01 C 1753, 2004 WL 2980642, at *5-6 (N.D. Ill. Dec. 23, 2004).

The court agreed with the defendant and precluded the witness's testimony. The court acknowledged that Andrews was intimately familiar with the Cook County State's Attorney's office as well as their practices and procedures.[118] Nevertheless, the court found him unqualified to opine on a particular decision made in a specific case:

> However, Andrews is attempting to offer an expert opinion on the practices of that department as they related to a specific case arising after his tenure . . . Andrews's experience does not provide the necessary qualifications under Rule 702 to opine on the reasons for the Assistant State's Attorney's decision to change its election in Kunz's case; Andrews is simply not in a position to determine with any reliability why prosecutors chose to enter a *nolle prosequi* on the PSMV charge[119]

The court further found that Andrews lacked sufficient facts or data to opine on why the County State's Attorney's office made any particular decision. Despite the fact that Andrews had reviewed the case file, his opinion on the reasons that the prosecutors took any particular action would be mere speculation: "Despite his qualifications, I believe that Andrews's opinion that the State entered a *nolle prosequi* because it believed it could not prove its case is simply too speculative to be relied upon as evidence."[120]

Dr. Dick's proposed testimony suffers from the same defect. Although Dr. Dick has considerable experience at the DOJ, he is not qualified to opine on why his colleagues granted early termination in a particular case. Further, even though he reviewed the case file, he cannot have sufficient facts or data to opine on the reasons behind his colleagues' decision in a particular case.

---

[118] *Id.* at *5.

[119] *Id.*

[120] *Id.* at *6.

### 2.    Federal Rules of Evidence 402 and 403

Dr. Dick's testimony should also be excluded under FRE 403. Even if Dr. Dick's testimony would be relevant under FRE 402, relevant evidence is still inadmissible if its "probative value is substantially outweighed by the danger of unfair prejudice."[121]

Here, there is a substantial risk that Dr. Dick's testimony would imply to a jury that the DOJ tacitly approved of Nucor's actions and, thus, the merger could not form the basis for any civil liability.

### E.    Dr. Seth Kaplan

Nucor has offered Dr. Seth Kaplan as an expert witness on antitrust economic issues, including his rebuttal report and testimony to Dr. Crandall's expert report. GSRG moves to exclude his testimony and report on the grounds that the rebuttal report was substantially prepared by Nucor's counsel, Wiley Rein.

Under FRE 702, expert testimony cannot be reliable if the proffered opinions are those of counsel rather than the expert.[122]  GSRG claims that Wiley Rein provided the substance of Dr. Kaplan's rebuttal report because Wiley Rein provided Kaplan with an outline for the rebuttal report, and provided a draft "suggested approach" for the report's introduction. Further, the draft outline contains a date stamp suggesting that it was prepared prior to Wiley Rein's meeting with Dr. Kaplan to discuss the rebuttal report. These communications, along with Wiley Rein's long-standing relationship with Kaplan, suggest that Kaplan is merely repeating Wiley Rein's opinion and arguments rather than his own.

In response, Wiley Rein explained that the communications that GSRG cites were routine interaction between counsel and an expert witness. With regard to the outline, Wiley Rein submitted a declaration from John Wyss, a Wiley Rein attorney. Mr. Wyss declared that, after receiving Dr. Crandall's expert report from GRSG, he made notes on possible rebuttal points, but

---

[121] Fed. R. Evid. 403.

[122] *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 294 (E.D. Va. 2001).

he never showed those notes to Dr. Kaplan.[123]  Two days later, he and two other Wiley Rein attorneys met with Dr. Kaplan to discuss the rebuttal report.[124]  Wyss stated that he took notes at the meeting and, at Dr. Kaplan's request, memorialized them in a bullet point outline.[125]  Wyss used his own original notes, dated "5/20/08", to make the outline, and then sent that outline to Dr. Kaplan the next day.[126]

Regarding the draft introduction, Wiley Rein submitted a declaration from Bert Rein. Rein stated that he received draft sections of Dr. Kaplan's rebuttal report for review.[127]  Based on those sections, Rein drafted a suggested introduction and provided it to Dr. Kaplan.[128]  Rein says that he relied on Dr. Kaplan's own material for the substance of the introduction.[129]

At a meet and confer session on GSRG's motion to exclude Dr. Kaplan, Wiley Rein identified each fact in GSRG's motion with which it disagreed.  GSRG filed the motion anyway, and now Nucor asks for sanctions under FRCP 11.

### 1.    Motion to exclude

Although the documents that GSRG attaches to its motion to exclude appear to raise a question as to Wiley Rein's preparation of the report, the firm's affidavits reveal that they reflect the routine interaction between counsel and an expert witness.  Further, Dr. Kaplan testified that the report was his work, not Wiley Rein's.[130]  Thus, nothing indicates that Dr. Kaplan's expert

---

[123] Nucor Opp. to GSRG Mot. to Exclude Dr. Kaplan, at Ex. A, Wyss Decl. ¶¶ 2-3.

[124] Id.

[125] Id. at ¶ 4.

[126] Id. at ¶¶ 5-6.

[127] Nucor Opp. to GSRG Mot. to Exclude Dr. Kaplan, at Ex. B, Rein Decl. ¶ 3.

[128] Id.

[129] Id.

[130] Dr. Kaplan Dep. Tr. at 23-24.

report was "drafted entirely by counsel" or otherwise represents Wiley Rein's desired opinion rather than Dr. Kaplan's own analysis.[131]

### 2.      Motion for sanctions

Wiley Rein has asked for sanctions under FRCP 11(c). Sanctions are appropriate under FRCP 11 if a motion is filed, *inter alia*, for an improper purpose, or without any legal or factual support.[132] Here, GSRG was not required to accept Wiley Rein's explanation about its communications with Dr. Kaplan. The fact that the outline was dated before Wiley Rein's meeting with Dr. Kaplan, and Dr. Kaplan's long-standing relationship with Wiley Rein, made GSRG's motion plausible.

### F.      Conclusion regarding expert witnesses

Correnti and Locker should be precluded from offering expert testimony because they would offer opinions for which they are not qualified. Similarly, Dick should be precluded from offering expert testimony because he cannot opine on a particular decision made by the DOJ. He would be speculating as to the basis of that decision, and any probative value to his testimony would be outweighed by its unfair prejudice.

Dr. Crandall has significant omissions with respect to his expert report, but those gaps are from a lack of data, not a poor methodology. Based on his qualifications, and the fact that he has a legitimate factual basis for the opinions that he reaches, he should not be precluded from testifying.

Finally, the motion to exclude Dr. Kaplan should be denied, as should the cross-motion for sanctions. What, at first, looked like problematic documents, turned out to be legitimate back-and-forth between counsel and an expert witness.

---

[131] *Bekart Corp. v. City of Dyersburg*, 256 F.R.D. 573, 578-79 (W.D. Tenn. 2009).

[132] Fed. R. Civ. P. 11(b).

- 30 -

## II.   NUCOR'S MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standard for Summary Judgment

Nucor has moved for summary judgment on all counts of GSRG's First Amended Complaint. Summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [133] As the moving party, Nucor must identify an essential element of GSRG's case that GSRG cannot establish based on the evidence in the record.[134] To meet that burden, Nucor must either i) submit affirmative evidence that negates an essential element of the nonmoving party's claim, or ii) demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.[135]

In determining whether any evidence could support GSRG's claim, the Court "must construe all reasonable inferences in favor of the nonmoving party."[136] To defeat Nucor's motion for summary judgment, however, GSRG may not rely "merely on the allegations or denials in its own pleadings; rather its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial."[137] "Where the record taken as a whole could not lead a rational trier of fact to find for [GSRG], there is no 'genuine issue for trial.'"[138]

Nucor bases its motion for summary judgment on three grounds. First, Nucor argues that GSRG failed to produce sufficient evidence to prove a relevant product market, which is an

---

[133] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. Proc. 56(c)).

[134] *Id.* at 322-23.

[135] *Anderson v. Liberty Lobby, Inc.,* 477 US 242, 249 (1986); *Celotex,* 477 U.S. 332-33 (Rehnquist, J., dissenting).

[136] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

[137] FED. R. CIV. P. 56(e).

[138] *Matsushita,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253 (1968)).

essential element for all of GSRG's claims.[139]  Second, Nucor argues that all of GSRG's claims

should be dismissed because GSRG cannot prove its alleged relevant geographic market.[140]

Finally, Nucor argues that GSRG cannot prove its claim for attempted monopolization claim

under Count II because GSRG cannot establish that Nucor possessed a dangerous probability of

achieving monopoly power.[141]

### B.    Admission of Dr. Crandall's testimony would not in itself create a genuine issue of material fact

Dr. Crandall's testimony, even if admitted under FRE 702, does not preclude summary

judgment.[142]  The Eleventh Circuit has acknowledged that the Federal Rules permitting expert

testimony are "not intended … to make summary judgment impossible whenever a party has

produced an expert to support its position."[143]  A motion to exclude under FRE 702 and *Daubert*

tests only the expert's "principles and methodology, not on the conclusions that they

generate."[144]  Thus, "[w]hether [an expert's] analysis is an economically valid method is [a]

different question from whether it is legally sufficient to support [an antitrust] claim."[145]

Based on these principles, Dr. Crandall's testimony could be admissible under FRE 702,

yet insufficient to create an issue of material fact precluding summary judgment.  In an antitrust

case, "a motion for summary judgment where the relevant economic testimony has not been

---

[139] Nucor Mot. for Summary Judgment at 7-9.

[140] *Id.* at 9-11.

[141] *Id.* at 11-15.

[142] This Report recommends excluding the testimony of Correnti and Locker for lack of qualification and for lack of a reliable methodology.  Even if admitted, their testimony is too conclusory to support a finding for GSRG's proposed relevant geographic market, GSRG's proposed product market, or a finding regarding Nucor's market power.  *See Bailey*, 148 F. Supp. 2d at 1246 (finding that excluded expert's unreliable opinions, "even if admissible, are insufficient evidence to support a finding of market power").

[143] *Evers v. General Motors Corp.*, 770 F. 2d 984, 986 (11th Cir. 1985).

[144] *Daubert*, 509 U.S. at 595.

[145] *Id.*

excluded presumes that the economist's methodology is acceptable," but the Court still may find "that the [expert's] conclusions do not follow, are not appropriate to the facts of the case, demonstrate that there is no 'issue of material fact,' or draw a factual conclusion that is impermissible as a matter of law."[146]  As the Ninth Circuit observed in *Rebel Oil*, an expert's testimony may be admissible, but insufficient to support a jury verdict on the elements of the claims about which the expert is testifying:

> The district court's conclusion at summary judgment that [the expert's] testimony was not legally sufficient evidence to create a question of material fact ... is not inconsistent with its conclusion following the *Daubert* hearing that [the expert's] methodology was sound. An expert witness may be qualified to testify even though the expert's conclusions are legally incorrect.[147]

Dr. Crandall, therefore, may be permitted to testify about the relevant geographic market, the relevant product market, and Nucor's market power, yet that testimony may fail to support a jury verdict on those issues.  In short, while Dr. Crandall's testimony, if admitted, may supply "a piece of the puzzle," it is not, standing alone, sufficient to provide the answer to the puzzle and, therefore, not enough to prevent the entry of summary judgment, as herein below discussed.[148]

In the event that the Court does exclude Dr. Crandall's testimony under Rule 702, Nucor would be entitled to summary judgment.  The Eleventh Circuit requires expert testimony to establish a relevant product market and a relevant geographic market, which are essential elements of GSRG's claim.[149]  Thus, without Dr. Crandall's expert testimony, GSRG cannot prove a relevant geographic market or a relevant product market as a matter of law.

---

[146] IIB Phillip E. Areeda & Herbert H. Hovenkamp, Antitrust Law ¶ 309 (3d ed. 2007).

[147] *Rebel Oil*, 146 F.3d at 1097.

[148] *Cf. City of Tuscaloosa*, 158 F.3d at 565 ("As circumstantial evidence, [the expert's] data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury.").

[149] *See, e.g., Bailey*, 284 F.3d at 1246; *American Key*, 762 F.2d at 1279.

C.    **Relevant Geographic Market**

GSRG alleges that the relevant geographic market consists of 10 states in the Southeast:
Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina,
Tennessee, and Texas (the "Southeast"). The relevant geographic market is "the area of effective
competition ... in which the seller operates, and to which the purchaser can practicably turn for
supplies."[150] In other words, "[t]he relevant geographic market for antitrust purposes is some
geographic area in which a firm can increase its price without 1) large numbers of its customers
quickly turning to alternative supply sources outside the area; or 2) producers outside the area
quickly flooding the area with substitute products."[151] The boundaries of the relevant
geographic market depend on a number of factors, including "[p]rice data and such corroborative
factors as transportation costs, delivery limitations, customer convenience and preference, and
the location and facilities of other producers and distributors."[152]

1.    **Shipments from domestic producers**

The critical question in testing Dr. Crandall's proposed geographic market is whether his
conclusion is based on record evidence about whether steel mills located outside the Southeast
could defeat a small but significant nontransitory increase in price ("SSNIP") by Nucor by
expanding capacity or diverting production to ship hot rolled coil into the Southeast.[153] Despite
GSRG's claim that proving potential competitors' response to a price increase would prove
difficult and require speculation, courts and federal regulators consistently require and evaluate

---

[150] *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *see also Bailey*, 284 F. 3d at 1247 (same).

[151] Herbert H. Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* § 3.6, at 113 (2d ed. 1999).

[152] *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir.1991).

[153] *Id.*; *see also* U.S. Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4.2.2 (Aug. 19, 2010) ("Merger Guidelines"); *see also*, *FTC v. Tenet Health Care Corp.*, 186 F.3rd 1045 (8th Cir. 1999); *United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669 (D.Minn 1990); IIB Areeda & Hovenkamp, Antitrust Law ¶¶ 538-538b (3d ed. 2007).

such evidence.[154]  In *T. Harris Young*, the Eleventh Circuit explained that a "geographic market is only relevant for monopoly purposes where [the evidence] show[s] that consumers within the geographic area cannot realistically turn to outside sellers *should prices rise within the defined area*."[155]  Thus, to survive summary judgment, GSRG must present "evidence that could support an inference that consumers within the [proposed geographic market] could not turn to outside sellers if the prices increased within [that] area."[156]

GSRG concedes, however, that Dr. Crandall does not know whether steel mills outside the Southeast could respond to a price increase by Nucor.[157]  In its response to Nucor's statement of facts, GSRG states that Dr. Crandall "could not analyze the ability of mills located outside the postulated 10-state area to increase or divert production in response to an increase in hot rolled coil prices in that area."[158]  As a consequence, a critical element in the establishment of a geographic market is absent.

Moreover, undisputed evidence in the record suggests that several steel mills outside the Southeast could, in fact, respond to a SSNIP by Nucor by increasing production or diverting capacity into the Southeast.  Dr. Crandall's expert report identifies several steel mills outside the Southeast that shipped large quantities of hot rolled coil into the Southeast during the relevant period.[159]  For example, in 2004, U.S. Steel's mill in Granite City, Illinois, shipped 381,000 tons (27% of its total production) of steel into the Southeast.[160]  Thus, the Granite City mill shipped a greater volume of hot rolled coil into the Southeast than two mills – Nucor's mill in Berkeley,

---

[154] *Id.*

[155] *T. Harris Young*, 931 F.2d at 823.

[156] *Id.* at 824.

[157] *Id.*

[158]  GSRG's Revised Objections to Nucor's Statement of Facts ¶ 53.

[159] Dr. Crandall Revised Expert Rep. at p.3, Table 2.

[160] *Id.*

South Carolina, and U.S. Steel's mill in Fairfield, Alabama – that are actually located in the Southeast.[161]  Similarly, in 2004, Arcelor-Mittal's mill in IWH-West, Indiana, shipped 246,000 tons (22% of its production) of hot rolled coil into the Southeast, and U.S. Steel's plant in Gary, Indiana, shipped 143,000 tons (10% of its production) of hot rolled coil into the Southeast.[162]

In fact, Dr. Crandall identifies 21 different steel mills outside the Southeast that shipped some hot rolled coil into the Southeast during 2004, compared to six mills actually located in the Southeast.[163]  Similar shipments occurred in 2002 and 2003.  In 2002, 14 steel mills outside the Southeast shipped hot rolled coil into the Southeast, and, in 2003, 15 steel mills located outside the Southeast made shipments into the Southeast.[164]

The number of steel mills located outside the Southeast that shipped hot rolled coil into the Southeast is strong evidence that one or more of those firms could prevent Nucor from sustaining a price increase in the Southeast.[165]

Eleventh Circuit precedent is directly on point and supports this conclusion.[166]  In *T. Harris Young*, the plaintiff prevailed at trial on its claim that the defendant attempted to monopolize the market for paper used in electrocardiograph machines.  The jury found that the plaintiff had proven a relevant geographic market of a nine-state area in the southeast based on evidence that customers often needed emergency deliveries and that customers paid the delivery charges for the paper.[167]  Those factors, according to the plaintiffs, demonstrated a customer preference for regional suppliers.

---

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.* at 14, Table 6.

[165] *T. Harris Young*, 931 F.2d at 824.

[166] *Id.*

[167] *Id.* at 820.

On appeal, the Eleventh Circuit overturned the jury verdict because the evidence was insufficient to support the geographic market. In overturning the verdict, the court found that "the evidence indicated that consumers could and did turn to outside suppliers."[168] That evidence included the fact that 6 of the 13 firms that supplied customers inside the proposed geographic market were located outside that market.[169] As explained above, the evidence in Dr. Crandall's expert report and revised expert report similarly indicates that consumers in the Southeast could and did turn to outside suppliers to purchase hot rolled coil.

GSRG argues that the Southeast is a proper geographic market because the majority of producers in the Southeast ship the majority of their hot rolled coil to consumers in the Southeast,[170] but this approach fails to take account of the equally important pattern of shipments into the Southeast from mills located outside the 10-state area. Table 3 in Dr. Crandall's revised expert report shows that for 2004, approximately 40% of the hot rolled coil shipped to locations in the Southeast was produced by steel mills located outside the Southeast.[171] Similarly, GSRG concedes that "21% of commercial black HRC product produced at mills located in the postulated 10-state area in 2004 was shipped to customers located outside that area."[172]

Thus, even if current shipment data were a significant indicator of a relevant market, courts require a higher percentage of a product's sales to originate from suppliers in that area than appears from the evidence in the record.[173] For example, the Elzinga-Hogarty test, which

---

[168] *Id.* at 824.

[169] *Id.*

[170] As noted above, Dr. Crandall's analysis relies on actual shipment patterns to determine the relevant geographic area.

[171] Dr. Crandall Revised Expert Rep. at 3, Table 2. Dr. Crandall does not calculate this percentage, but it can be easily calculated by adding the total shipments for Southeastern Plants and for Non-Southeastern Plants listed in Table 2.

[172] GSRG's Revised Objections to Nucor's Statement of Facts ¶ 30.

[173] *See, e.g., Marine Bancorp.*, 418 U.S. at 619; *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 230-31 (2d Cir. 2006).

relies on actual shipment patterns, arose from an article proposing that "an area *could not* be a relevant geographic market if more than 25 percent of the product produced in the area was sold outside, or if buyers inside purchased more than 25% from outside [that market.]"[174] Elzinga & Hogarty published a follow-up article suggesting that if less than 10% of the product produced in the area was sold outside, or if buyers inside purchased less than 10% from outside, the area likely constituted a geographic market.[175] Crossover percentages between 10% and 25% are sometimes referred to as "weak" markets.[176]

The Eleventh Circuit does not appear to have accepted evidence of a "weak" market to establish a relevant geographic market. Courts in other Circuits frequently reject percentages suggesting a "weak" market under the Elzinga-Hogarty test as insufficient evidence to support a geographic market. For example, in *Gordon v. Lewistown Hospital*, the Third Circuit rejected a two-county market for hospital services because more that 20% of patients came from outside those two counties.[177] Similarly, in *California v. Sutter Health System*, the plaintiffs proposed defining a relevant geographic market based on less than 15% crossover, where the defendants argued that the proper test required showing less than 10% crossover.[178] The court rejected the 15% threshold, noting that "[c]ourts have generally acknowledged the 90% level of significance."[179]

As a result of Dr. Crandall's failure to consider fully both the likely response of domestic mills outside the proposed market to make sufficient shipments into the market to defeat a

---

[174] IIB Areeda & Hovenkamp, Antitrust Law at ¶ 550 at p.314 (citing Kenneth G. Elzinga & Thomas F. Hogarty, *The Problem of Geographic Market Delineation in Antimerger Suits*, 18 Antitrust Bull. 45 (1973)).

[175] *Id.* at p. 314 (citing Kenneth G. Elzinga & Thomas F. Hogarty, *The Problem of Geographic Market Delineation Revisited: The Case of Coal*, 23 Antitrust Bull. 1 (1978).

[176] Areeda & Hovenkamp, Antitrust Law at ¶ 550 at p.314.

[177] 423 F.3d 184 (3d Cir. 2005).

[178] 84 F. Supp. 2d 1057, 1069-70 (N.D. Cal. 2000).

[179] *Id.* at 1070.

Nucor-imposed SSNIP, as well as the undisputed evidence that current shipments from such domestic mills are sufficient to defeat the price increase, there is insufficient evidence in the record to support GSRG's geographic market and Nucor's motion for summary judgment should be granted on these grounds.

2.  **Shipments from foreign producers**

The shipment data presented by Dr. Crandall suffers in another respect in that he did not include foreign imports in his calculations. The parties differ on the amount of hot rolled coil that was imported into the Southeast from foreign producers, but Dr. Crandall concedes that at least some foreign-produced hot rolled coil enters the Southeast. For example, Dr. Crandall's report includes two charts reflecting foreign imports, one taken from Nucor's brief submitted to the ITC, and another derived from an ITC publication.[180] Although the amounts from the two tables do not correspond, both show that some hot rolled coil was imported into the United States from 2001 through 2004. Dr. Crandall's report acknowledges that at least some amount of that hot rolled coil remains in the Southeast, noting that "a large share of these imports move north" and that "imports appear to be well restrained in the Southeast."[181] Thus, the share of hot rolled coil shipped to destinations in the Southeast that was produced outside the Southeast is even higher than Dr. Crandall originally calculated, since those calculations consider only shipments from domestic steel mills.

* * *

Although Dr. Crandall considered other factors in determining the geographic market, such as transportation costs and the location of competing mills,[182] those factors cannot change the uncontested facts that i) customers regularly purchased hot rolled coil from outside Dr.

---

[180] Dr. Crandall Expert Rep. at 8, Figure 1 & Table 2.

[181] Dr. Crandall Expert Rep. at 8. Significantly, Dr. Crandall does not provide factual support for his statement that a "large share" of foreign imports are exported north from the 10-State area.

[182] Dr. Crandall Expert Rep. at pp. 3-4.

Crandall's proposed relevant geographic market, and ii) Dr. Crandall cannot determine whether competing steel mills outside the Southeast could increase capacity or divert production to ship even more hot rolled coil in the Southeast if Nucor tried to implement a price increase. The evidence in the record, therefore, is insufficient to support a finding that the Southeast constitutes the relevant geographic market, and in the absence of such evidence, summary judgment for Nucor should be granted.

### D.     Dangerous probability of Nucor's achieving market power

Nucor also moves for summary judgment on Count II alleging attempted monopolization because GSRG cannot prove that Nucor possessed a dangerous probability of obtaining market power.  To prove attempted monopolization under Section 2 of the Sherman Act, the plaintiff must establish "a dangerous probability that the defendant might have succeeded in its attempt to achieve monopoly power."[183]

In determining the "dangerous probability of success element, the estimate of market power is necessarily speculative to some extent because it requires an evaluation of future behavior by market participants, viewed at the time the alleged attempt began."[184]  Courts recognize, however, that "[t]he principal measure of actual monopoly power is market share, and the primary measure of the probability of acquiring monopoly power is the defendant's proximity to acquiring a monopoly share of the market."[185]

---

[183] *US Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F. 3d 986, 993 (11th Cir. 1993).

[184] *Id.*

[185] *Id.* at 999; *see also NicSand, Inc. v. 3M Co.*, 457 F3d 534, 542 (6th Cir. 2006) (noting that "a dangerous probability of achieving monopoly power is normally measured through an analysis of market share"); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F. 2d 683, 694 (10th Cir. 1989) ("The likelihood of successful monopolization is typically evaluated by examining the defendant's share of the relevant market.").

### 1.    Nucor's market share of GSRG's proposed market

Nucor's statement of material facts claims that "[e]ven assuming a hypothetical 10-state Southeastern area, Nucor's share of black HRC shipments into that area was 42.7% in 2004."[186] GSRG admits this fact, but states that it must be put into the context of Nucor's share of available production capacity.[187]  Further, GSRG concedes that it does not have a reliable estimate of Nucor's market share for 2002 and 2003, but says that fact is not material.[188]  Nucor argues that these facts prevent GSRG from establishing that Nucor possessed a dangerous probability of achieving market power.[189]

Given these undisputed facts about Nucor's market share, GSRG as a matter of law cannot establish from the record that Nucor possessed a dangerous probability of achieving market power.[190]  In *U.S. Anchor*, the plaintiff obtained a jury verdict on its claim that the defendant attempted to monopolize the market for a type of boat anchor.  On appeal, the defendant argued that the evidence was insufficient to establish that the defendant ever achieved a dangerous probability of achieving market power.  The Eleventh Circuit agreed.

The court noted that "[t]he principal measure of actual monopoly power is market share, and the primary measure of the probability of acquiring monopoly power is the defendant's proximity to acquiring a monopoly share of the market." [191]  The court further observed that, "a dangerous probability of achieving monopoly power may be established by a 50% share," and that "it is usually necessary to evaluate the prospects for monopolization as they existed when the alleged attempt began."[192]  The evidence in the record suggested that the defendant had a

---

[186] Nucor's Statement of Facts ¶ 51.

[187] GSRG's Objections to Nucor's Statement of Facts ¶ 51.

[188] GSRG's Objections to Nucor's Statement of Facts ¶ 52.

[189]  Nucor Mot. for Summary Judgment at 11-15.

[190] *U.S. Anchor Mfg.*, 7 F3d. at 1000-01.

[191] *Id.*

[192] *Id.* at 999, 1000.

61.5% market share immediately before the alleged anticompetitive activity began, but that it dropped below 50% during the relevant period of the alleged anticompetitive conduct.[193] The court found, therefore, that the defendant "was never able to maintain a majority position in the market."[194] That fact meant that the defendant lacked a dangerous probability of success as a matter of law:

> Accordingly, because [defendant] possessed less than 50% of the market at the time the alleged predation began and throughout the time when it was alleged to have continued, there was no dangerous probability of success … as a matter of law.[195]

Other courts have similarly found that, as a matter of law, a market share less than 50% is insufficient to create a dangerous probability of success.[196]

Like the plaintiffs in *U.S. Anchor*, GSRG cannot prove that Nucor's market share ever surpassed 50% during the relevant time period, even on the basis of current shipments into GSRG's proposed 10-State market. GSRG concedes that it cannot show Nucor's market share at the inception of the alleged anticompetitive activity in 2002, or in 2003, and that Nucor's market share had only reached 42.7% by 2004 – two years after the alleged anticompetitive activity began.[197] Thus, GSRG cannot demonstrate that Nucor ever held a majority position in the market and, like the plaintiff's claim in *U.S. Anchor*, its attempted monopolization claim fails as a matter of law.

---

[193] *Id.*

[194] *Id.* at 1001.

[195] *Id.*

[196] *See, e.g., M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.*, 981 F.2d 160, 168 (4th Cir. 1993) ("claims involving between 30% and 50% shares should usually be rejected"); *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 112-14 (3d Cir. 1992) (50% share insufficient); *Indiana Grocery v. Super Valu Stores*, 864 F.2d 1409, 1415 (7th Cir. 1989) (50% market share insufficient); *Broadway Delivery Corp. v. UPS*, 651 F.2d 122, 129 (2d Cir. 1981) (market share below 50% precludes finding of dangerous probability absent "significant evidence concerning the market structure to show that the defendant's share ... gives it monopoly power"); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 841 (2d Cir. 1980) (33%-55% market share insufficient); *United States v. Empire Gas Corp.*, 537 F.2d 296, 306-07 (8th Cir. 1976) (47%-50% market share insufficient).

[197] GSRG's Revised Objections to Nucor's Statement of Facts ¶ 51-52.

In response, GSRG claims that Nucor's market share should be considered on the basis of Nucor's share of productive capacity, stated to be from 58.6% to 77.4%, for 2004, depending on whether certain mills are excluded from the calculations. Although productive capacity of incumbent firms is a factor in whether a firm can assert market power, it is not sufficient by itself. Rather, to establish market power, the plaintiff must also show that "existing competitors lack the capacity to expand their output to challenge the [defendant's] high price."[198] As noted above,[199] GSRG concedes that Dr. Crandall cannot testify about the ability of domestic firms outside the proposed market or foreign firms to divert existing capacity or expand capacity to serve the 10-state area in the event of a Nucor-instigated price increase.[200] Thus, his capacity-based shares substantially overstates the shares assigned to Nucor.

As discussed above, the critical question in testing Dr. Crandall's proposed geographic market is whether "consumers within the geographic area cannot realistically turn to outside sellers *should prices rise within the defined area*."[201] The evidence in the record demonstrates that several steel mills outside the Southeast could respond to a price increase by Nucor by expanding capacity or diverting production to compete with Nucor, and Dr. Crandall cannot exclude the possibility that several other mills throughout the United States could do the same.[202] Accordingly, Nucor's market share is likely much lower than GSRG alleges because it faces competition from a broader market than GSRG claims.

GSRG's failure to take the undisputed evidence regarding shipments of foreign firms into account or consider their divertible capacity to serve the 10-state area is an independent ground for the Court's granting Nucor's motion for summary judgment. Based on the undisputed facts

---

[198] *Bailey*, 148 F. Supp. 2d at 1242 (quoting *Rebel Oil*, 51 F.3d at 1439).

[199] *See* Section II.C.1.

[200] GSRG's Revised Objections to Nucor's Statement of Facts ¶ 53.

[201] *T. Harris Young*, 931 F.2d at 823.

[202] *Id.*

in the record, GSRG cannot prove that Nucor possessed a dangerous probability of obtaining market power.

### E.    Relevant Product Market

Dr. Crandall states that the relevant product market is black hot rolled coil steel. Nucor, however, argues that the relevant market should also include pickled and oiled hot rolled coil. At a minimum, Nucor argues that Dr. Crandall's failure to consider pickled and oiled hot rolled coil renders his opinion insufficient as a matter of law to establish his proposed relevant market.

The relevant product market is not limited to the defendant's product.[203] Rather, "it is necessary to examine both the product at issue and all reasonable substitutes available to consumers."[204] It is also necessary to include any product from which a competitor could quickly shift production to offer a competing product in response to a price increase. [205]

Courts often determine the relevant product market based primarily, or solely, on the cross-elasticity of demand without any analysis of the cross-elasticity of supply.[206] Moreover, in this case, Dr. Crandall did consider cross-elasticity of supply, but only with regard to the steel industry generally, not the cross elasticity of supply between different types of steel.

Here, GSRG does not dispute Nucor's statement of material fact that pickled and oiled hot rolled coil is simply hot rolled coil subjected to one additional process.[207] Indeed, GSRG's brief states that pickled and oiled steel is "simply unprocessed coil that is further processed, for an additional fee."[208]

---

[203] *Bailey*, 284 F.3d at 1246.

[204] *Id.*

[205] *Rebel Oil*, 51 F.3d at 1436.

[206] *See* I ABA, Antitrust Law Developments (Sixth), at 576 (6th ed. 2007) (collecting cases).

[207] GSRG Revised Objections to Nucor's Statement of Facts at ¶ 12 (admitting that pickled and oiled steel is black hot rolled coil steel passed through an acid bath and then lightly oiled).

[208] GSRG Opp. to Mot. for Summary Judgment at 7-8.

Where the undisputed evidence suggests that switching production from one product to another would be relatively easy, the product market definition must take that fact into account.[209] For example, in *Rebel Oil*, the plaintiff alleged that the product market consisted of full service gasoline sales.[210] The court rejected the plaintiff's proposed product market because the expert witness failed to consider how easily a producer could switch from full serve to self serve gasoline in response to a price change:

> The affidavit of Rebel's expert fails to account for the fact that sellers of full-serve gasoline can easily convert their full-serve pumps, at virtually no cost, into self-serve, cash-only pumps, expanding output and thus constraining any attempt by ARCO to charge supracompetitive prices for self-serve gasoline. The ease by which marketers can convert their full-serve facilities to increase their output of self-serve gasoline requires that full-serve sales be part of the relevant market; it is immaterial that consumers do not regard the products as substitutes, that a price differential exists, or that the prices are not closely correlated.[211]

Similarly, producers of "pickled and oiled" hot rolled coil need only refrain from running black hot rolled coil through the additional process to change production in response to a price increase for black hot rolled coil.

In response, GSRG asserts that "as a practical matter, it makes little difference whether Nucor's market share is calculated on the basis of unprocessed hot rolled coil or all forms of hot rolled coiled, since the share of productive capacity that he used for his market share determination automatically includes both."[212] In fact, it does make a difference because GSRG must prove market power in the proper relevant product market. For that reason, in *Bailey v. Allgas*, the Eleventh Circuit upheld summary judgment, in part, because an expert witness vacillated between product market definitions, finding that the expert's "affidavit is fundamentally flawed because [the expert] did not estimate market shares for the purportedly

---

[209] *Bailey*, 284 F.3d at 1247.

[210] *Rebel Oil*, 51 F.3d at 1436.

[211] *Id.*

[212] GSRG Opp. to Motion for Summary Judgment at 7.

relevant market."[213]  GSRG has no evidence that Nucor would possess market power in a product market that includes pickled and oiled hot rolled coil; as discussed above, production capacity does not, in and of itself, establish market power.

In this case, the cross-elasticity of supply between black hot rolled coil and pickled and oiled hot rolled coil must be considered to support a product market definition involving hot rolled coil.  Without such consideration, GSRG's proposed market definition fails as a matter of law.

### F.    GSRG's Conspiracy Claims

Nucor previously moved for summary judgment on Counts I and III of GSRG's amended complaint which assert claims for conspiracy to monopolize in violation of Section 1 of the Sherman Act.  On September 29, 2009, the Special Master previously recommended that the Court grant Nucor's motion.[214]   In addition to the grounds stated in the September 29, 2009, Report and Recommendation, Counts I and III of the amended complaint should be dismissed because GSRG cannot prove on the basis of the record a relevant geographic or product market, or that Nucor possessed a dangerous probability of achieving market power.

---

[213] *Bailey*, 284 F.3d at 1250.

[214] Dkt. No. 249.

- 46 -

III.     CONCLUSION

WHEREFORE, THE PREMISES CONSIDERED, the Special Master hereby
recommends that this Honorable Court grant summary judgment in favor of Nucor on Counts I,
II, and III of GSRG's Amended Complaint.[215]

Date: September 2, 2010.

_____

JAMES F. RILL
SPECIAL MASTER

---

[215] Amended Complaint (D.I. 115), pp. 11-13.

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Report and Recommendation of Special

Master were served by regular United States mail, postage prepaid, this 2nd day of September,

2010, upon each of the parties listed below:

Bert W. Rein
Wiley Rein & Fielding LLP
1776 K Street, NW
Washington, DC  20006

Michael R. Borasky
Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA  15219

Philip C. Jones
Bell, Boyd & Lloyd, LLC
1615 L Street, NW
Suite 1200
Washington, DC  20036

JAMES F. RILL
SPECIAL MASTER