FILED

2010 Oct-29  PM 04:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Gulf States Reorganization Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:02-cv-2600-RDP |
| | ) | |
| Nucor Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE OF NUCOR CORPORATION TO GSRG'S OBJECTIONS TO REPORT OF SPECIAL MASTER REGARDING SUMMARY JUDGMENT

R. Marcus Givhan, Esq.
Joseph W. Carlisle, Esq.
Clark R. Hammond, Esq.
Johnston Barton Proctor & Rose LLP
Colonial Brookwood Village, Suite 901
Birmingham, Alabama 35209

Bert W. Rein, Esq.
John B. Wyss, Esq.
Josh Abbott, Esq.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

*Attorneys for Defendant Nucor Corporation*

October 29, 2010

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   GSRG's Objections To The Special Master's Summary Judgment Report
     Mischaracterize Both The Legal Issues And The Factual Record. . . . . . . . . . . . 2

     A.   Nucor Expressly Contests The "Conduct" Element Of GSRG's Attempted
          Monopolization Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.   Nucor Also Contests The "Specific Intent" Element Of GSRG's
          Attempted Monopolization Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     C.   GSRG Cannot Blame Nucor For GSRG's Failure To Obtain Critical
          Transactional Price Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     D.   GSRG Improperly Cites So-Called "SOF" Materials That Were Stricken
          From The Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.  The Court Should Adopt And Confirm The Special Master's Report
     Recommending Summary Judgment On Multiple Independent Grounds. . . . . . 6

     A.   GSRG Failed To Present Triable Evidence That Could Support A
          Relevant Geographic Market Limited To Ten Southeastern States. . . . . . 6

     B.   GSRG Failed To Present Triable Evidence That Nucor Ever Possessed A
          Dangerous Probability Of Achieving Monopoly Power. . . . . . . . . . . . 10

     C.   GSRG Failed To Present Triable Evidence That Could Support A
          Relevant Product Market Limited Solely To Black Hot Rolled Coil. . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TABLE OF AUTHORITIES

**Cases**

*Bailey v. Allgas, Inc.,* 284 F.3d 1237 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 14, 15

*Brown Shoe Co. v. United States,* 370 U.S. 294 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

*Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.,* 294 F. Supp.2d 1291
 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16

*Little Rock Cardiology Clinic PA v. Baptist Health,* 591 F.3d 591 (8th Cir. 2009) . . . . . . . . . . 12

*Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . 11, 14, 16

*T. Harris Young & Assocs., Inc. v. Marquette Elects., Inc.,* 931 F.2d 816 (11th Cir. 1991) . . . 6-9

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 993 (11th Cir. 1993) . . . . . . . . . . . 10, 14

*United States v. Bethlehem Steel Corp.,* 168 F. Supp 576 (S.D.N.Y. 1958) . . . . . . . . . . . . . 12,13

*United States v. Oracle Corp.,* 331 F. Supp. 2d 1098, 1164-65 (N.D. Cal. 2004) . . . . . . . . . . . 9

**Other Authorities**

Dept. Of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) . . . . . . . . . . . 13

III B Areeda & Hovenkamp, *Antitrust Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pursuant to the Court's September 20, 2010 Order (Doc. #308), Defendant Nucor Corporation ("Nucor") responds to "Plaintiff Gulf States Reorganization Group's Objections to Report of Special Master Regarding Summary Judgment" (Doc. #312), filed by Plaintiff GSRG on October 12, 2010 (hereinafter "Obj.").

## INTRODUCTION

The "Report and Recommendation of the Special Master Regarding the Admissibility of Expert Testimony and Nucor's Motion for Summary Judgment" (Doc. #305) (hereinafter "Fourth Report") recommends summary judgment in favor of Defendant Nucor on all three counts alleged in GSRG's amended complaint.  Specifically, the Special Master ruled that GSRG's evidence is insufficient to establish each of the three following essential elements of its claims: (a) relevant geographic market; (b) dangerous probability of achieving monopoly power (two separate grounds); and (c) relevant product market.[1]

GSRG attempts to obfuscate the summary judgment issues by including in its objections numerous mischaracterizations of the Special Master's Report, Nucor's position, the legal issues presented and the contents of the factual record.   As shown below, all of GSRG's mischaracterizations are baseless and should be disregarded.

---

[1]Each of these is an essential element of GSRG's Section 2 "attempted monopolization" claim.  In addition, relevant geographic market and relevant product market are each an essential element of GSRG's Section 1 claim.  The Special Master previously recommended summary judgment in Nucor's favor on the Section 1 claim on the alternative ground that GSRG had failed to establish an "agreement to restrain trade" between Nucor and Casey/Park.  *See* Third Report and Recommendation of Special Master Regarding Summary Judgment on Counts I and III of the Gulf States Reorganization Group's Amended Complaint (Doc. #249), filed on September 29, 2009.  The Special Master's Fourth Report thus provides two additional, independent grounds for dismissing GSRG's Section 1 claim.

As for the multiple grounds on which he actually based his summary judgment recommendation, in each instance the Special Master correctly articulated and applied established Eleventh Circuit precedent to the undisputed facts in the record.  His analysis and conclusions regarding each separate ground for summary judgment in Nucor's favor are eminently sound and should be adopted and confirmed by the Court.

I.   **GSRG's Objections To The Special Master's Summary Judgment Report Mischaracterize Both The Legal Issues And The Factual Record.**

Before turning to the specific grounds on which the Special Master based his most recent summary judgment recommendation, it is necessary to clear away a number of mischaracterizations set forth in GSRG's objections.

A.   **Nucor Expressly Contests The "Conduct" Element Of GSRG's Attempted Monopolization Claim.**

GSRG's objections repeatedly assert that "Nucor has not contested that its conduct met the anticompetitive conduct element of attempt to monopolize" (*e.g.*, Obj. at 1).  This is not true.

Nucor's companion summary judgment motion to its Crandall *Daubert* motion specified five separate and independent grounds for summary judgment, including GSRG's failure to provide triable evidence establishing the essential element of "conduct which, if successful in achieving its goal, was reasonably capable of creating . . . monopoly power" (Doc. #269 at 2).  Nucor's supporting memorandum includes an entire section demonstrating that GSRG failed to present any triable evidence that the acquisition of the defunct Gulf States Steel assets was reasonably capable of creating monopoly power in any relevant market (Doc. #270 at 13-15).  Nucor's argument was based squarely on Dr. Crandall's concession that the Casey/Park acquisition, even if attributed to Nucor did not increase Nucor's market share of any relevant market and could not give Nucor market power

2

in any relevant market in which Nucor did not already posses market power prior to that acquisition. *See* Nucor's Statement of Undisputed Facts (Doc. #271 (under seal) at ¶¶ 1-3); GSRG's Revised Response (Doc. # 283 at ¶¶ 1-3). These arguments, to which GSRG never responded, establish yet another independent ground for summary judgment on GSRG's attempted monopolization claim:

> Regardless of the defendant's power or intent, <u>its conduct may be incapable of producing monopoly and thus unable to satisfy the attempt requirement.</u> Indeed, many common attempt claims can be rejected on the basis of [insufficient] conduct alone, without reaching the difficult issues of intent and power.

III B Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶806a (2008) (emphasis added).

The Special Master found in Nucor's favor and recommended summary judgment on the other four independent grounds advanced in Nucor's motion for summary judgment.[2] As a result, he did not reach Nucor's additional ground that GSRG had failed to satisfy the "conduct" element of its attempted monopolization claim. That ground, however, remains an alternative basis for granting summary judgment dismissing GSRG's Section 2 attempted monopolization claim.

**B.  Nucor Also Contests The "Specific Intent" Element Of GSRG's Attempted Monopolization Claim.**

GSRG again misstates the record when it asserts that Nucor has supposedly "conceded" that GSRG has established the "specific intent" element of an attempt to monopolize (*see* Obj. at 4, 22). Under the Court's "Order Regrading Special Master" (Doc. #181 at ¶¶ 5-6), Nucor cannot file its final dispositive motion on liability issues until after the *Daubert* motions are decided by the Special Master and reviewed by the Court. Nucor requested and obtained special permission to file its

---

[2]As discussed *infra*, pp.6-16, the Special Master determined that GSRG had failed to present triable evidence regarding the following essential elements of its claims: (a) geographic market; (b) product market; (c) sufficient market share to establish a dangerous probability of successful monopolization; and (d) inability of existing suppliers to expand or divert output, which is also necessary to establish a dangerous probability of achieving monopoly power.

"companion" summary judgment motion limited to the five grounds that were already substantially briefed in the co-pending Crandall *Daubert* motion (Doc. #268). Because Dr. Crandall's proposed testimony had nothing to do with the "specific intent" element, this additional ground could have been included in the companion summary judgment motion.

The Special Master has now properly recommended summary judgment dismissing all of GSRG's Section 1 and 2 claims on multiple separate grounds (*i.e.*, no conspiracy, no geographic market, no product market and no dangerous probability of successful monopolization). Consequently, it is unlikely that Nucor will ever need to file a further dispositive motion regarding "specific intent." The record should be clear, however, that Nucor has preserved this issue and categorically denies that GSRG can provide triable evidence establishing the required "specific intent" to monopolize element.[3]

C.   **GSRG Cannot Blame Nucor For GSRG's Failure To Obtain Critical Transactional Price Data.**

GSRG's assertion that Nucor supposedly "denied the existence of the price and price change data" (Obj. at 7-8) is demonstrably incorrect. The circumstances concerning GSRG's deliberate decision not to obtain transactional price data from Nucor and other domestic hot rolled coil suppliers are set forth at pages 1-2 of "Nucor's Reply Memorandum in Support Of Its Crandall *Daubert* Motion" (Doc. #290), which are incorporated herein by reference. The undisputed facts are as follows:

- Dr. Crandall specifically requested that GSRG obtain transactional price data as part

_____

[3]If still necessary, Nucor will file a dispositive motion on any remaining grounds (*e.g.*, no "specific intent," lack of causation, superseding cause, renewal of missing "conduct" element for attempt to monopolize) consistent with the schedule set forth in the Order Regarding Special Master (Doc. #181).

of its industry-wide discovery.

- As a result of GSRG's failure to do so, Dr. Crandall admitted that he could not offer opinions on various key economic issues, including whether hot rolled coil mills located outside the postulated 10-state area would expand shipments into that region in response to a significant price increase.

- Early in the post-remand discovery period, GSRG took the Rule 30(b)(6) deposition of Nucor's corporate IT manager on the designated topic of "[t]he extent to which [Nucor's information management] system is capable of compiling data on sales and prices extending back to the year 2000."

- Nucor's IT manager testified repeatedly and unequivocally that the computer systems at each Nucor sheet mill could report transactional prices for all sales from 2000 to date.

Accordingly, GSRG knew from the outset that detailed transactional price data were readily available from Nucor and, presumably, other domestic hot rolled coil suppliers. Indeed, Dr. Crandall specifically asked GSRG to obtain that data during discovery. GSRG cannot evade the consequences of its own decision not to request transactional price data by misrepresenting the record. *See* Crandall Dep. 72 (admitting that transactional price data "were never asked for").

**D.     GSRG Improperly Cites So-Called "SOF" Materials That Were Stricken From The Record.**

In objecting to the Special Master's recommendation regarding relevant geographic market, GSRG relies on "[a] review of the facts offered in Gulf States' Statement Of Facts ('SOF') and supporting exhibits" (Obj. at 12-13). None of these materials, however, are part of the record.

Apparently, GSRG sent hard copies of certain unidentified materials to the Special Master on February 12, 2010, which it characterized as relating to Nucor's "Statement of Facts." *See* Special Master's "Notice of Filing of Non-Conforming Brief" (Doc. #277 at ¶ 3). The Special Master ruled that GSRG had violated the procedures established by this Court for summary judgment

briefing and directed that "GSRG shall file a statement of facts in opposition to summary judgment

in conformance with the Court's Order as soon as practicable" (*id.* at ¶¶ 5-6). Pursuant to the Special

Master's directive, GSRG filed and served "Plaintiff Gulf States Reorganization Group's Revised

Objections to Nucor Corporation's Statement of Facts" (Doc. #283) on February 19, 2010. This is

the only GSRG "Statement of Facts" that was ever properly filed as part of the summary judgment

record.

     Accordingly, all discussion in GSRG's objections based on unidentified "SOF" materials is

improper and should be disregarded.

**II.**    **The Court Should Adopt And Confirm The Special Master's Report Recommending Summary Judgment On Multiple Independent Grounds.**

    **A.**    **GSRG Failed To Present Triable Evidence That Could Support A Relevant Geographic Market Limited To Ten Southeastern States.**

    The Special Master's Fourth Report contains a detailed, thorough and eminently correct

analysis of the relevant geographic market issue, which is an essential element of both GSRG's

Section 1 "agreement in restraint of trade" claim and its Section 2 "attempted monopolization"

claim. He correctly applied the fundamental test for geographic market definition articulated by the

Eleventh Circuit in *T. Harris Young:*

> A geographic market is only relevant for monopoly purposes where [the evidence]
> show[s] that consumers within the geographic area cannot realistically turn to outside
> sellers should prices rise within the defined area.

*T. Harris Young & Assocs., Inc. v. Marquette Elects., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991); Fourth

Report at 34.

    First, the Special Master examined the record evidence regarding whether steel mills located

outside the Southeast could defeat an attempted price increase in that area by expanding capacity or

diverting production to ship hot rolled coil into the Southeast.  Fourth Report at 33-34.  On this

point, GSRG had conceded that its economic expert, Dr. Crandall, simply "could not analyze the

ability of mills located outside the postulated 10-state area to increase or divert production in

response to an increase in hot rolled coil prices in that area."  *Id.* at 34.  As a result of this

concession, "a critical element in the establishment of a geographic market is absent."  *Id.*

Second, the Special Master also analyzed the "undisputed evidence in the record"

establishing that various steel mills located outside the Southeast had, in fact, shipped large

quantities of hot rolled coil into the Southeast during the relevant time period (*id.* at 34).  GSRG's

economic expert's own data shows that some 21 different steel mills located outside the Southeast

shipped hot rolled coil into the Southeast during 2004, compared to only six mills actually located

in the Southeast (*id.* at 35).  *See T. Harris Young*, 931 F. 2d at 824 ("evidence indicated that

consumers could and did not turn to outside suppliers" where 6 of 13 firms that supplied customers

in proposed geographic market were located outside that market).[4]

Third, the Special Master examined the quantitative shipment data showing flows of hot

rolled coil product both into and out of GSRG's postulated 10-state area.

> Dr. Crandall's revised expert report shows that for 2004, approximately <u>40%</u> of the
> hot rolled coil shipped to locations in the Southeast was produced by steel mills
> located outside the Southeast.  Similarly, GSRG concedes that "<u>21%</u> of commercial
> black hot rolled coil product produced at mills located in the postulated 10-state area
> in 2004 was shipped to customers located outside that area."

Fourth Report at 36 (footnotes omitted and emphasis added).  These levels of "crossover

percentages" far exceed the 10% level that courts generally require when applying the "Elzinga-

---

[4]The Special Master found the Eleventh Circuit's *T. Harris Young* decision to be "directly
on point."  Fourth Report at 35-36.  Remarkably, GSRG's objections fail to discuss that
controlling precedent.

Hogarty" shipment patterns analysis to define relevant geographic market. *Id.* at 36-37.

Fourth, the Special Master also found that GSRG's shipment data was further flawed because Dr. Crandall failed to consider foreign imports in his calculations. Thus, the share of hot rolled coil shipped to destinations in the Southeast that was produced outside the Southeast is, in fact, substantially greater than the 40% calculated by Dr. Crandall, further negating GSRG's claim of a postulated Southeast geographic market. *Id.* at 38.

GSRG's claim that the Special Master erred by relying solely on a so-called "SSNIP" test (Obj. 5-7) mischaracterizes the Special Master's decision. To the contrary, the Special Master's Report applies the fundamental *T. Harris Young* test requiring evidence "that consumers within [GSRG's proposed] geographic area cannot realistically turn to outside sellers should prices rise within the defined area." 931 F.2d at 823. He correctly concluded that GSRG could not establish this essential element of its claim based on: (a) GSRG's own concession that its economic expert "could not analyze" the issue; (b) undisputed evidence of numerous mills located outside GSRG's postulated 10-state area shipping large quantities of hot rolled coil into that area during the relevant time period; and (c) undisputed evidence of huge shipment "crossover" percentages (40% or more in from outside; 21% out from inside) that clearly negate the existence of a separate "Southeast" geographic market. Fourth Report at 34-38; *see also T. Harris Young*, 931 F.2d at 823-24 (rejecting "Southeast" geographic market because customers could and did regularly turn to outside suppliers); *Bailey v. Allgas, Inc.,* 284 F.3d 1237, 1247-49 (11th Cir. 2002) (plaintiff failed to prove relevant geographic market where its expert conducted no analysis of prices and was inconsistent in assessing

shipment patterns).[5]

GSRG's further claim that Nucor supposedly "denied the existence of the price and price change data [which] Special Master Rill criticizes Dr. Crandall for not having" (Obj. 7-8) flatly misstates the record. GSRG made a deliberate decision not to obtain readily available transactional price data, even though Dr. Crandall specifically requested that information. (Crandall Dep. 72-76). As a result, GSRG itself disabled Dr. Crandall from addressing the key issue specified in *T. Harris Young*—*i.e.*, whether customers within GSRG's postulated 10-state area could turn to outside sellers should prices rise in that area. *See supra*, pp.4-5,7.

GSRG's objection to the Special Master's discussion of uncontested shipment pattern data and the "Elzinga-Hogarty" test (Obj. 8-11) is particularly disingenuous. It was GSRG's own economic expert, Dr. Crandall, who relied almost exclusively on shipment pattern data, rather than address the key *T. Harris Young* issue. (*See* Revised Crandall Report at pp. 2-3). Further, and contrary to GSRG's assertion, the Elzinga-Hogarty test, which examines shipment flows both into and out of a postulated geographic area, is not confined solely to hospital cases and has a broader application. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1164-65 (N.D. Cal. 2004)

---

[5] GSRG's reliance (Obj. at 6) on *Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 294 F. Supp.2d 1291 (M.D. Fla. 2003), to attack the Special Master's geographic market analysis is curious, to say the least. The *Gulfstream Park* decision concerns relevant product market, not relevant geographic market. 294 F. Supp.2d at 1306-10. Moreover, the court in that case rejected the plaintiff's proposed relevant product market because its economist's testimony was purely "conclusory," was not based on "a measure of supply or demand elasticity or some other survey or any detailed economic analysis," and provided "no explanation or analysis" why substitute products should not also be included in the relevant product market. *Id.* at 1308. Indeed, the court granted summary judgment for the defendant because plaintiff could not establish the essential "relevant product market" element of its antitrust claim. *Id.* at 1310. As discussed *infra*, pp. 14-17, the *Gulfstream Park* decision is fully consistent with the Special Master's determination that GSRG failed to establish its relevant product market in this case.

9

("the Court holds that the [Elzinga-Hogarty] test is an appropriate method of determining the 'area of effective competition'" with respect to computer software products).

Finally, GSRG's assertion that Special Master Rill's geographic market analysis "ignored" various "*Brown Shoe* factors" (Obj. 11-14) is specious. The so-called "*Brown Shoe* factors" concern relevant <u>product</u> market definition and have nothing to do with proof of relevant geographic market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (dealing exclusively with "product market" definition). Moreover, most of GSRG's discussion in this regard (Obj. 12-13) is based upon so-called "SOF" materials that are not part of the summary judgment record. *See supra*, pp. 5-6.

In sum, the Special Master properly applied controlling Eleventh Circuit precedent regarding geographic market definition to the undisputed facts. His determination that the evidence in the record cannot support GSRG's alleged "Southeast" market is correct and requires summary judgment for Nucor on this essential element of GSRG's Section 1 and Section 2 claims.

**B.      GSRG Failed To Present Triable Evidence That Nucor Ever Possessed A Dangerous Probability Of Achieving Monopoly Power.**

GSRG does not contest that an essential element of its Section 2 "attempted monopolization" claim is proof that Nucor possessed a "dangerous probability" of achieving monopoly power. *See* Fourth Report at 39; *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 993 (11th Cir. 1993). In analyzing this element, the Special Master gave GSRG every benefit — *i.e*, he accepted for purposes of analysis GSRG's alleged relevant market limited to sales of black hot rolled coil in the "Southeast" area. Fourth Report at 40. Nonetheless, the Special Master identified two independent grounds on which GSRG failed to establish a dangerous probability of successful monopolization.

First, the Special Master analyzed GSRG's proffered market share data in light of the

10

Eleventh Circuit's controlling decision in *U.S. Anchor Mfg.* *See* Fourth Report at 40-41. In that case, the Court of Appeals held that — as a matter of law — there could be no "dangerous probability of success" if the defendant "was never able to maintain a majority position in the market." *U.S. Anchor Mfg.*, 7 F.3d at 1001.

> [B]ecause [defendant] possessed less than 50% of the market at the time alleged predation began and throughout the time it was alleged to have continued, there was no dangerous probability of success . . . as a matter of law.

*Id.*; *see* Fourth Report at 41 & n. 196 (quoting *U.S. Anchor* and citing other decisions holding that a market share less than 50% is insufficient as a matter of law to create a dangerous probability of successful monopolization).

Applying *U.S. Anchor* to the undisputed facts in this case, the Special Master correctly found that:

> Like the plaintiffs in *U.S. Anchor*, GSRG cannot prove that Nucor's market share ever surpassed 50% during the relevant time period, even on the basis of current shipments into GSRG's postulated 10-State market. GSRG concedes that it cannot show Nucor's market share at the inception of the alleged anticompetitive activity in 2002, or in 2003, and that Nucor's market share had only reached 42.7% by 2004 - two years after the alleged anticompetitive activity began [and was completed]. Thus, GSRG cannot demonstrate that Nucor ever held a majority position in the market and, like the plaintiff's claim in *U.S.Anchor*, its attempted monopolization claim fails as a matter of law.

*Id.* at 41 (footnote omitted) (emphasis added).

Second, the Special Master also held that GSRG could not establish a "dangerous probability" of successful monopolization in its alleged "Southeast" hot rolled coil market because it failed to prove that firms located outside that area could not expand or divert capacity to serve the 10-state area in the event of a Nucor-instigated price increase. *Id.* at 42; *Bailey v. Allgas*, 284 F.3d at 1256 (plaintiff failed to demonstrate the inability of existing

firms to expand their output in response to defendant's attempts to raise prices above competitive levels); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995) (to establish dangerous probability of monopolization, plaintiff must establish inability of existing firms to expand output); *accord* Crandall Dep. 130, 228-29 (even a 90% market share does not constitute market power if other competitors can rapidly expand output should the dominant firm attempt to raise prices by reducing its own output).

In this case, GSRG expressly <u>conceded</u> that it had no evidence regarding the ability of either domestic firms outside the 10-state area or foreign firms to divert or expand output to serve the "Southeast" if Nucor attempted to raise prices. Fourth Report at 42 & n. 200. Moreover, the undisputed evidence affirmatively established that various steel mills outside the Southeast, as well as numerous foreign suppliers, could responsd to a price increase by Nucor by expanding capacity or diverting shipments to serve the 10-state area. *Id.* at 42. Taken together, these undisputed facts provide "an independent ground" establishing that GSRG cannot prove a "dangerous probability" of successful monopolization. *Id.*

GSRG seeks to evade the Special Master's analysis of the "dangerous probability" element by asserting that he used the "wrong measure of market share" (Obj. 15-18). According to GSRG, the Court should draw an arbitrary boundary around its contrived 10-state and then consider only the productive capacity of plants <u>physically located within that gerrymandered area</u> to postulate a 77.4% Nucor market share (*id.* at 15). There is no legal or economic basis for such a calculation. Dr. Crandall never testified that he, or any other reputable economist, would ever calculate antitrust market shares in this way. Indeed, this very same argument was flatly rejected more than 50 years ago in a leading steel industry

antitrust decision by Judge Weinfeld which GSRG cited to the Special Master. *United States v. Bethlehem Steel Corp.*, 168 F. Supp 576 (S.D.N.Y. 1958); *accord Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009),[6] *cert. denied*, 130 S. Ct. 3506 (2010).

Likewise, the "Horizontal Merger Guidelines," cited by GSRG (Obj. 16), also reject GSRG's attempt to calculate market shares based solely on capacity of plants physically located in its postulated 10-state area. The Guidelines make clear that "[a]ll firms that currently earn revenues in the relevant market are considered market participants."[7] As the Special Master found, the evidence is undisputed that numerous domestic steel mills located outside the 10-state area regularly shipped substantial volumes of hot rolled coil into that area. Fourth Report at 34-38. These mills earned revenues in the alleged "market" and therefore, under the Guidelines, must be considered as market participants in calculating market shares. Once those mills are included, Nucor's share of domestic capacity serving the 10-state area is only about 20% and, under even the most extreme assumptions, no more than 30%.[8]

---

[6] The *Bethlehem Steel* and *Little Rock Cardiology* decisions are discussed in detail at pp. 6-9 of "Nucor's Reply Memorandum in Support of Its Crandall *Daubert* Motion" (Doc. #290), which are incorporated herein by reference.

[7] Section 5.1. Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (Aug. 19, 2010), available at http://www.ftc.gov/os/2010/08/100819hmg.pdf.

[8] The undisputed record evidence regarding Nucor's production capacity market share of the putative 10-state "Southeast" market is cited and discussed at page 13 of "Nucor's Reply Memorandum in Support of Its Crandall *Daubert* Motion" (Doc. #290), which is incorporated herein by reference.

Finally, GSRG's attempt to limit market share calculations solely to the capacity of plants physically located in the postulated 10-state area fails to respond to the Special Master's second, alternative ground for finding no "dangerous probability" of successful monopolization. As the Special Master pointed out, such artificial local capacity shares are meaningless where, as here, the undisputed evidence shows that both domestic and foreign mills located outside the Southeast can readily expand and/or divert capacity to serve that area. Fourth Report at 42.

Accordingly, the Special Master correctly determined that, even accepting GSRG's artificial 10-state area as the relevant market, the undisputed evidence shows that there never was a "dangerous probability" that Nucor could successfully monopolize that market for two separate and independent reasons. Either ground is fatal to GSRG's Section 2 "attempted monopolization" claim.

### C. GSRG Failed To Present Triable Evidence That Could Support A Relevant Product Market Limited Solely To Black Hot Rolled Coil.

The Special Master's Fourth Report correctly identified the fundamental flaw in GSRG's attempt to limit the relevant product market solely to so-called "black" hot rolled coil, which would artificially exclude "pickled and oiled" hot rolled coil from the relevant market. *See id.* at 43-45. GSRG expressly admitted that pickled and oiled hot rolled coil is simply black hot rolled coil that has been subjected to one additional process. *Id.* at 43 & n. 207. Accordingly, it is undisputed that there is effectively total "supply substitution" between black and pickled and oiled, since producers at no extra cost can readily increase black hot rolled coil output by simply foregoing the additional acid bath process step.

As the Eleventh Circuit and other courts of appeals have recognized, an economically meaningful relevant product market definition must take into account such undisputed evidence of virtually complete "supply substitution." *See U.S. Anchor Mfg.*, 7 F.3d at 995 ("cross-elasticity of production facilities may also be an important factor in defining a product market"); *Bailey v. Allgas, Inc.*, 284 F.3d at 1247 (affirming failure of proof on relevant product market where plaintiff's expert failed to consider costs of switching); *Rebel Oil,* 51 F.3d at 1436 (citing Areeda & Turner treatise for proposition: "If producers of product X can readily shift their production facilities to produce product Y, then the sales of both should be included in the relevant market.").

The Special Master compared the undisputed facts in the present case with the factual circumstances in *Rebel Oil* and found that decision to be directly on point. Fourth Report at 44. The plaintiff in *Rebel Oil* attempted to define an artificial "self-serve, cash-only gasoline" relevant product market, even though suppliers could readily switch from full serve to self service at virtually no cost. The court of appeals rejected this argument, holding that:

> The ease by which marketers can convert their full-serve facilities to increase their output of self-serve gasoline <u>requires</u> that full-serve sales be part of the relevant [product] market; it is <u>immaterial</u> that consumers do not regard the products as substitutes, that a price differential exists, or that the prices are not closely correlated.

51 F.3d at 1436 (citing Areeda & Turner treatise) (emphasis added). For the same reason, because producers of pickled and oiled hot rolled coil can readily and costlessly increase their black hot rolled coil output by simply foregoing an additional process step, both pickled and oiled product and black product must be part of the relevant product market in this litigation. Fourth Report at 44-45.

GSRG never addresses the Special Master's factual and legal analysis. Instead, GSRG cites to conclusory and irrelevant assertions in the Locker and Correnti reports suggesting that there may be some unspecified customers who have special needs for only black product or pickled and oiled product. (Obj. 14-15). Both reports, however, were properly excluded by the Special Master. *See* Fourth Report at 4-12 (Locker and Correnti lack qualifications, have no reliable methodology and present only speculation unsupported by any specific facts or data). In addition, the Special Master found that, even if the Locker and Correnti reports were considered, "their testimony is too conclusory to support a finding for . . . GSRG's proposed product market . . ." Fourth Report at 31 n. 142 (emphasis added). Neither individual conducted a survey, undertook any research, or offered any specific facts to support his purely conclusory assertions. *See Bailey v. Allgas*, 284 F.3d at 1247 (rejecting conclusory assertions regarding product market unsupported by facts and data); *Gulfstream Park*, 294 F. Supp. 2d at 1308 (same).

More fundamentally, the conclusory statements in the Locker and Correnti reports simply do not address the Special Master's product market analysis. There is no dispute — and, indeed GSRG has conceded — that hot rolled coil suppliers can costlessly switch from pickled and oiled product to black product. Fourth Report at 43. As a result, black hot rolled coil cannot be a separate product market, because any attempt by a would-be black hot rolled coil "monopolist" to raise the price of black by unilaterally reducing its own output would immediately be defeated by other suppliers shifting pickled and oiled production to black by simply foregoing additional processing. *See Rebel Oil*, 51 F.3d at 1436 (alleged consumer perceptions and price differentials are "immaterial" where production can be readily switched

at virtually no cost).

In sum, the Special Master correctly found that the admitted "cross-elasticity of supply" between black hot rolled coil and pickled and oiled hot rolled coil defeats GSRG's proposed "back-only" product market definition as a matter of law.  Fourth Report at 45. Like GSRG's failure of proof regarding relevant geographic market, failure to establish relevant product market constitutes a separate and independent ground for summary judgment in Nucor's favor on <u>all</u> of GSRG's Section 1 and Section 2 claims.[9]

---

[9]GSRG's final "non-market share indicators" argument (Obj. at 18-21) is unsupported by Eleventh Circuit precedent, either ignores or mischaracterizes the Special Master's decision, and has no evidentiary support in the summary judgment record.  Thus, contrary to GSRG's assertion (*Id.* at 19), the Special Master expressly relied upon the undisputed evidence that there were <u>no barriers</u> that prevented domestic and foreign firms located outside GSRG's postulated 10-state area from expanding or diverting production to serve that area (*see supra*, pp.11-12).  Similarly, GSRG's assertions regarding alleged "industry concentration" in the U.S. Steel industry as a whole (*Id.* at 20-21) are irrelevant to any issue addressed by the Special Master.  Finally, GSRG's claim regarding the "severely anticompetitive nature of Nucor's conduct" (*Id.* at 21) is baseless; indeed, although not reached by the Special Master, GSRG's failure to establish the "conduct" element of its attempted monopolization claim constitutes yet another alternative and independent basis for granting summary judgment dismissing GSRG's attempted monopolization claim.  *See supra*, pp. 3-4.

## CONCLUSION

For the foregoing reasons, the Special Master's Report and Recommendation regarding summary judgment should be summarily adopted and confirmed by the Court.

Dated: October 29, 2010                    Respectfully submitted,


                                           /s/ R. Marcus Givhan
                                           R. Marcus Givhan, Esq.
                                           Joseph W. Carlisle, Esq.
                                           Clark R. Hammond, Esq.
                                           Johnston Barton Proctor & Rose LLP
                                           Colonial Brookwood Center
                                           569 Brookwood Village, Suite 901
                                           Birmingham, Alabama 35209

                                           Bert W. Rein, Esq.
                                           John B. Wyss, Esq.
                                           Josh Abbott, Esq.
                                           Wiley Rein LLP
                                           1776 K Street, NW
                                           Washington, DC 20006

                                           *Attorneys for Defendant Nucor Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 29th day of October, 2010, I have filed the above and foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record, including:

Philip C. Jones, Esq.
Greenburg, Spence & Taylor, PC
51 Monroe Place, Suite 707
Rockville, Maryland 20850-2406

Special Master James F. Rill, Esq.
HOWREY LLP
1299 Pennsylvania Ave. N.W.
Washington, DC  20004-2402

s/ R. Marcus Givhan
Of Counsel

19