FILED

2011 Sep-30  AM 08:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **GULF STATES REORGANIZATION GROUP, INC.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 1:02-CV-2600-RDP** |
| | } | |
| **NUCOR CORPORATION, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This matter is presently before the court on the Third Report and Recommendation of the Special Master Regarding Summary Judgment on Counts I and III of Gulf States Reorganization Group's Amended Complaint[1] ("Third Report") (Doc. #249), and the Report and Recommendation of the Special Master Regarding the Admissibility of Expert Testimony and Nucor's Motion for Summary Judgment ("Fourth Report") (Doc. #305).

---

[1]The Special Master also issued two other reports: (1) a Report and Recommendation of the Special Master Regarding Summary Judgment on Counts I and III of GSRG's Amended Complaint ("First Report") (Doc. #188) in which he recommended that the court grant summary judgment to Defendants Casey Equipment Corporation and Gadsden Industrial Park, LLC ("Casey/Park"); and (2) a Report and Recommendation of the Special Master ("Second Report") in which he recommended that Plaintiff be permitted to supplement the Rule 56 record in this case but indicated that his recommendation in the First Report would not be changed after consideration of the new evidence. (Doc. #207). However, except to the extent that the recommendations in the Special Master's First and Second Reports affects the court's analysis of the claims against Nucor, those reports are moot.  Plaintiff voluntarily dismissed its claims against Casey/Park, leaving Nucor the sole remaining Defendant.  (Doc. #209).  Accordingly, only those aspects of those Reports that dealt with Nucor's liability are at issue here.  And that analysis has been re-adopted by the Special Master in his Third Report.  (Doc. #249 at 3).

## I.      Introduction

### A.      Appointment of the Special Master

In light of the novelty of Plaintiff's theories in this case,[2] and with the full consent of the parties (*see* Federal Rule of Civil Procedure 53(a)(1)(A)), the court appointed James F. Rill, Esq. as Special Master and referred certain matters – including the motions addressed herein – to him for report and recommendation.  (Doc. #181).  The parties had jointly proposed Mr. Rill as the best qualified candidate for Special Master.  (Doc. #180).  Mr. Rill has served as Assistant Attorney General in charge of the U.S. Department of Justice's Antitrust Division and as the Chairman of the ABA's Antitrust Section.  (Doc. #180).  He is without question one of the leading antitrust lawyers in the United States.  The court is indebted to him for his high quality service and excellent work in this case.

### B.      Procedural History

In 2002, Gulf States Reorganization Group, Inc. ("GSRG" or "Plaintiff") filed suit against Nucor Corporation ("Nucor"), Casey Equipment Corporation ("Casey"), and Gadsden Industrial Park, LLC ("Park") alleging that they conspired to restrain trade and assist Nucor to monopolize the hot rolled coil steel industry.  (*See* Doc. #17).  This court first dismissed this case upon Defendants' motion to dismiss; however, on appeal, the Eleventh Circuit found that Plaintiff had pled a cognizable antitrust injury and had standing to bring suit.  *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961, 966-68 (11th Cir. 2006).

---

[2]Although the background and facts of this case are novel, as will be seen below, the elements Plaintiff must establish are well-established and analyzed both in the Special Master's Report and herein.

Upon remand, the court permitted Plaintiff to amend its complaint. (*See* Doc. #115). GSRG's Amended Complaint alleges three counts.  Count I alleges that Casey/Park and Nucor violated Section 1 of the Sherman Act by entering a contract or combination in restraint of trade**.** (Doc. #115 at ¶¶ 39-42).  Count II alleges that Nucor violated Section 2 of the Sherman Act by an "attempt to monopolize."  (Doc. #115 at ¶¶ 43-45)*.*  Count III alleges that Nucor and Casey/Park violated Section 2 of the Sherman Act by a conspiracy to monopolize.  (Doc. #115 at ¶¶ 46-48).  The First Amended Complaint makes no claim of "actual monopolization" in violation of Section 2 of the Sherman Act.[3]

---

[3]This is the case despite GSRG's previous repeated assertions – to this court, the Eleventh Circuit, and the Supreme Court – that Nucor is a monopolist.  *See, e.g.,* Opposition to Defendants' Motion for Summary Judgment at 4, *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, No. 02-2600 (N.D. Ala. 2005) ("propounding . . . well established principals [sic] of antitrust law which establish liability where a dominant firm protects its *monopoly position* (emphasis added)); *id.* (contending that "end users of hot rolled coil steel [] are being forced to pay a *monopoly price*" (emphasis added)); *id*. at 23 (discussing the "social cost[s]" of "protecting the marketplace from the negative effects of abuse of *monopoly power*" (emphasis added)); Appellant's Corrected Brief at 24, *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961, 965 (11th Cir. 2007) (11th Cir. 2006) (No. 05-15976) (contending "there is but one producer in the market"); *see* Respondents' Brief in Opposition to the Petition for Writ of Certiorari at 3, *Nucor Corp. v. Gulf States Reorganization Group, Inc.*, 127 S. Ct. 2920 (2007) (No. 06-1383 (arguing that "this case is about suppression of potential competition by a *monopolist*" (internal quotation marks and brackets omitted) (emphasis added)).

To the contrary, GSRG's original Complaint never asserted any unambiguous claim of actual monopolization under the Sherman Act, Section 2.  Nevertheless, GSRG repeatedly argued an "actual monopolization" theory at each prior stage of this litigation.  Indeed, the court of appeals, in reversing this court's order granting summary judgment to Defendants, appeared to understand (or perhaps misunderstand) that GSRG's case arose from actual monopolization under Section 2. *See Gulf States Reorganization Group, Inc.*, 466 F.3d at 965 (understanding GSRG to have "alleged that . . . Nucor violated Section 2 of the Sherman Act, prohibiting monopolization"); *id*. (stating that GSRG "alleges that Nucor enjoys a monopoly in the relevant market"); *id*. at 969 (Cudahy, J., concurring in part and, perhaps, dissenting in part) (discussing GSRG's allegation that Nucor sought "to protect its 85 percent market share and hence its effective monopoly").  Moreover, the panel (or at least the concurring judge) appears to have based its conclusions about causation and antitrust standing on the premise that Nucor enjoyed a monopoly and therefore caused GSRG's antitrust

The Special Master reviewed the record and the briefs submitted by the parties, and entertained oral argument. Thereafter, the Special Master submitted his Reports and Recommendations. (Docs. #249, 305). After intense motions practice in this case, the court conducted a thorough review of the copious materials submitted in support of, and in opposition to, those motions.

The Special Master issued his First Report on Casey/Park's Motion for Summary Judgment recommending summary judgment in favor of Casey/Park. (Doc. #188). Thereafter, GSRG sought to have the Special Master consider supplemental evidence in connection with Casey/Park's Motion. (Doc. #199). The Special Master then re-considered Casey/Park's motion in light of the supplemental evidence, and issued his Second Report and Recommendation affirming that summary judgment was still appropriate on Counts I and III even in light of the additional evidence. (Doc. #207). Thereafter, GSRG and Casey/Park resolved all issues between them. (Doc. #208).

Remaining to be decided, however, was Nucor's motion for summary judgment (or, rather, Nucor's joinder in Casey/Park's motion). (Docs. #124, 210). On September 29, 2009, the Special Master issued his Third Report and Recommendation recommending that Nucor be awarded summary judgment on Counts I and III, the Section 1 and Section 2 conspiracy claims. (Doc. #249).

The Special Master then considered the following motions: Nucor's motion to exclude the testimony of Robert Crandall (Doc. #261); Nucor's motion to exclude the testimony of Michael

---

injury by participating in the court-supervised bankruptcy auction to protect that monopoly. *See id.* at 969 (Cudahy, J., concurring in part and, perhaps, dissenting in part) (describing the case as "about suppression of potential competition by a monopolist"); *id.* at 970 (stating that "Nucor and its co-conspirators allegedly took an action having the effect of excluding [GSRG] from the market and maintaining Nucor's monopoly, which injured [GSRG] and is the source of its damages"). In its First Amended Complaint, filed five years after this litigation began, GSRG has now unambiguously abandoned any claim of actual monopolization under the Sherman Act, Section 2.

Locker (Doc. #172); Nucor's motion to exclude the testimony of John Correnti (Doc. #175); GSRG's motion to exclude the testimony of Andrew Dick (Doc. #235); GSRG's Motion to exclude the testimony of Dr. Seth Kaplan (Doc. #237); and Nucor's motion for summary judgment on all claims (Doc. #269). In his Fourth Report, the Special Master recommended the following: Nucor's motion to exclude the testimony of Robert Crandall (Doc. #261) be denied; Nucor's motion to exclude the testimony of Michael Locker (Doc. #172) be granted; Nucor's motion to exclude the testimony of John Correnti (Doc. #175) be granted; GSRG's motion to exclude the testimony of Andrew Dick (Doc. #235) be granted; GSRG's Motion to exclude the testimony of Dr. Seth Kaplan (Doc. #237) be denied; and that Nucor's Motion for Summary Judgment (Doc. #269) be granted. (Doc. #305).

Having now carefully reviewed and considered *de novo* all of the materials in the court file, including the Third Report and the Fourth Report, the objections, responses, and replies thereto, and oral argument by the parties on the objections to the Third Report,[4] the court has made its own independent determination that the Third and Fourth Reports of the Special Master are due to be adopted and accepted. The court writes further to address some of Plaintiff's objections.

## II.    Standard of Review

This case is before the court on objections filed by GSRG as to the Reports filed by the Special Master. The court reviews *de novo* all objections to legal conclusions recommended by the Special Master. *See* Fed. R. Civ. P. 53(f)(4). A different standard of review applies to the Special

---

[4]GSRG also requested oral argument on its objections to the Special Master's Fourth Report, but the court deems further argument unnecessary. Therefore, GSRG's Requests (Docs. #318, 319) are due to be denied.

Master's decisions regarding procedural matters. Those rulings may only be set aside for an abuse of discretion. *See* Fed. R. Civ. P. 53(f)(5).

The principal legal issues presented here are the propriety of summary judgment and the admissibility and effect of certain expert witnesses proffered by GSRG.

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[5] "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)). In making this assessment, the court must view the evidence "in the light most favorable to the nonmoving party." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1357 (11th Cir. 1999)). But while that is the case, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize*, 93 F.3d at 743 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592-94 (1986)).

---

[5] "As of December 1, 2010, Federal Rule of Civil Procedure 56(a) now contains the summary judgment standard. It reads, in pertinent part, '[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gortemoller v. Int'l Furniture Mktg., Inc.*, 2011 WL 2899338 at *2 n.2 (11th Cir. July 20, 2011). Because the motions for summary judgment were filed, and the Special Master's Reports and Recommendations were issued, prior to December 2010, we apply the version of the rule effective during that time. *See Gortemoller*, 2011 WL 2899338, at *2 n.2; *see also Siggers v. Campbell*, 2011 WL 3134354 n.6 (6th Cir. 2011).

Alternatively, there is no genuine issue of material fact if "the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Jones v. Gerwens*, 874 F.2d 1534, 1538 (11th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)).  Consequently, the court "must view the evidence presented through the prism of the [movant's] substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

To respond, the non-moving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).  Importantly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 250.

Contrary to GSRG's suggestion,[6] Rule 56 is no longer a disfavored procedural shortcut. *Celotex Corp.*, 477 U.S. at 327 ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'") (quoting Fed. R. Civ. P. 1). This is true even in antitrust cases, "where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."

---

[6]GSRG has flatly misstated the law in suggesting that antitrust conspiracy cases "are [still] particularly ill-suited to disposition on motions for summary judgment."  (Doc. #251 at 28).  The Supreme Court's subsequent decisions in *Monsanto* and *Matsushita* effectively disavowed the broad language from its 1962 opinion in *Poller v. Columbia Broad Sys., Inc.*, 368 U.S. 464 (1962), on which GSRG relies.  *See e.g., Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997) ("In antitrust law . . . early decisions pronouncing it a field inapt for summary judgment were later repudiated.").

*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962). *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984).

The court candidly acknowledges that, historically, summary judgment was disfavored in antitrust litigation. For example, in *Poller*, the Supreme Court concluded that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Id.* at 473. However, the cases which indicated that summary judgment is disfavored in antitrust cases have been disavowed.

In 1986, the Supreme Court reversed the denial of summary judgment in a major predatory pricing decision, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "The Supreme Court's reversal was based on its conclusions: 1) that the predatory pricing conspiracy was so economically implausible that the defendants had no motive to engage in it; and 2) that the evidence of an agreement to enter into this conspiracy was indirect and ambiguous." *Instructional Systems Development Corp. v. Aetna Casualty & Surety Co.*, 817 F.2d 639, 646 (10th Cir. 1987). Although *Matsushita* upheld the traditional view that on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, the opinion is important because it held that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588. Also it held that to survive a motion for summary judgment the plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto Co.*, 465 U.S. at 764).

To be sure, while the summary judgment standard of Rule 56 to be applied in an antitrust suit is the same as that for any other action, the application of the rule to antitrust cases is somewhat unique: "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case . . . conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 587 (citing *Monsanto Co.*, 465 U.S. at 764); *see also Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) ("[I]nferences which may be drawn vary from one substantive area of the law to another. . . ."). Thus, in the antitrust context, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588 (citing *Monsanto*, 465 U.S. at 764).

"[S]ummary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition." *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1493 (11th Cir. 1988), *cert. denied*, 490 U.S. 1084 (1989) (citing *Matsushita*, 475 U.S. at 595). Therefore, an antitrust plaintiff must present evidence that tends, when interpreted in a light most favorable to plaintiff, to exclude the possibility that defendant's conduct was consistent with permissible competition as with illegal conduct. *Id.* Indeed, *Matsushita* stands for the proposition that summary judgment in the antitrust context is equally as valid as in other types of cases.

**B.     Admissibility of Expert Testimony Standard**

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The Supreme Court has instructed that Rule 702 compels the district court to act as a "gatekeeper" in determining the admissibility of expert scientific evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 n.7, 597 (1993); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). "This function 'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Frazier*, 387 F.3d at 1260 (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)).

The Eleventh Circuit employs a "rigorous three-part inquiry" in assessing whether to admit expert testimony: (1) the expert must be qualified to testify competently regarding the matters he intends to address, (2) the methodology must be reliable under Daubert, and (3) the testimony must assist the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or determine a fact in issue. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *accord Frazier*, 387 F.3d at 1260. The proponent of the expert testimony bears the burden of proving that the testimony satisfies each prong by a preponderance of the evidence. *Hendrix*, 609 F.3d at 1194; *Frazier*, 387 F.3d at 1274.

In *Daubert* the Supreme Court provided a list of relevant factors to consider in making a determination that an expert's methodology was reliable: (1) whether the theory or technique "can

be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "in the case of a particular scientific technique, . . . the known or potential rate of error," and (4) whether the theory or technique is generally accepted in the relevant scientific community.  *Daubert*, 509 U.S. at 592-94; *accord Frazier*, 387 F.3d at 1262. Even so, this list is non-exhaustive and district courts have "substantial discretion" in determining how to test an expert's reliability. *Hendrix*, 609 F.3d at 1194 (quotation marks omitted).[7]

The admissibility of an expert witness' testimony is undoubtedly a procedural matter governed by federal rules.  *Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1396 (11th Cir. 1997); *Wood v. Morbark Indus., Inc.*, 70 F.3d 1201, 1207 (11th Cir. 1995).  Rule 53(f)(5) provides that "[u]nless the appointing order establishes a different standard of review, the court may set aside a master's ruling on a procedural matter only for an abuse of discretion."  Fed. R. Civ. P. 53(f)(5).

---

[7]"Unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "[T]his relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* A trial court assessing the reliability of an expert's evidence must therefore perform a "gatekeeping" function by conducting "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. The Eleventh Circuit has offered district courts the following general guidance in determining whether to admit scientific evidence under *Daubert*:

> Given time, information, and resources, courts may only admit the state of science as it is. Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles. "The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it."

*Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (*quoting Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)).  This same analysis applies to expert testimony in the area of economics.

*United States v. Douglas*, 489 F.3d 1117, 1124 (11th Cir. 2007) (when reviewing a district court's ruling on the admissibility of expert testimony for an abuse of discretion and the circuit court will "defer to the district court's ruling unless it is manifestly erroneous."). Further, "[t]he subordinate role of the [special] master means that the trial court's review for abuse of discretion may be more searching than the review that an appellate court makes of a trial court." Fed. R. Civ. P. 53 Advisory Committee's Note, 2003 amendments; *Maine People's Alliance v. Holtrachem Mfg. Co., LLC*, 2009 WL 1844990, at *2 (D. Me. June 25, 2009).

## III.    Background

Plaintiff's allegations in this case have previously been set forth by this court (Doc. #96) and summarized by the Eleventh Circuit.  *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961 (11th Cir. 2006).  "This is a Sherman Act antitrust case, alleging a contract and combination in restraint of trade and an attempt and conspiracy to monopolize the market for hot-rolled coil steel in the Southeastern United States." (Doc. #115).  Specifically, GSRG maintains the following claims against Defendant Nucor Corporation in this case:  (1) a claim that Nucor violated Section 1 of the Sherman Act by entering into a contract or combination in restraint of trade (Count I); (2) a conspiracy to monopolize claim under Section 2 of the Sherman Act (Count II); and (3) an attempted monopolization claim under Section 2 (Count III).

In his Third Report, the Special Master addressed Nucor's potential liability on Counts I and III, despite Casey/Park's dismissal from the case.  (Doc. #249).  In that Third Report, the Special Master recommended that summary judgment be granted in favor of Nucor on Counts I and III of the Complaint.  (Doc. #249 at 3).  The Special Master based this recommendation on his conclusion that the record was devoid of evidence that Casey/Park shared with Nucor a common objective to

restrain trade, and that Casey/Park was neither aware of, nor acquiesced in, Nucor's alleged anticompetitive intent. (Doc. #249 at 12).[8]

In his Fourth Report, the Special Master considered various motions to exclude expert testimony and Nucor's Motion for Summary Judgment on all of Plaintiff's claims. (Doc. #305). The Special Master recommended: (1) that the testimony of Dr. Robert Crandall, GSRG's expert, be allowed; (2) that the testimony of John Correnti and Michael Locker, GSRG's experts, be excluded; (3) that the testimony of Andrew Dick, Nucor's expert, be excluded; (4) testimony of Dr. Seth

_____

[8]On June 1, 2010, GSRG moved for leave to submit a supplemental filing addressing a new Supreme Court antitrust case, *American Needle, Inc. v. National Football League*, 130 S.Ct. 2201 (2010). GSRG asserts that *American Needle* is "directly relevant to the issues raised in the pending Motion for Summary Judgment filed by Nucor." (Doc. #297 at 2). Nucor responded to GSRG's Supplemental Brief by stating that although it had no objection to *American Needle* being considered as supplemental authority, GSRG's supplemental brief "misrepresents the issue decided in *American Needle*." (Doc. #299 at 1). The court agrees with Nucor. The sole question addressed by *American Needle* was whether the defendants in that case were "*capable* of engaging in a 'contract, combination . . ., or conspiracy' as defined by Section 1 of the Sherman Act, 15 U.S.C. § 1 . . . ." *American Needle*, 130 S.Ct. at 2208 (emphasis added). There is no question that Nucor and Casey/Park are separate entities which would be *legally capable* of conspiring under Section 1. Thus, the holding of *American Needle* really has no application here.

Nonetheless, some of the analysis employed by the Supreme Court in *American Needle* reiterates legal principles which support the Special Master's conclusions in this case. For example, "[n]ot every instance of cooperation between two people is a potential 'contract, combination . . ., or conspiracy, in restraint of trade'" and "therefore, an arrangement must embody concerted action in order to be a 'contract, combination . . . or conspiracy' under § 1." *Id.* at 2208-09 (emphasizing the distinction between an agreement and whether it embodies concerted action). These principles are consistent with and, in fact, support the Special Master's conclusion that the "contract" between Nucor and Casey/Park does not, in and of itself, establish a "contract, combination . . ., or conspiracy, in restraint of trade" under Section 1. "[T]here is not necessarily concerted action simply because more than one legally distinct entity is involved." *American Needle*, 130 S.Ct. at 2209. As explained at the outset of the opinion in *American Needle*, "[t]he question [of] whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade." *Id.* at 2206.

Kaplan, Nucor's expert should be allowed.  (Doc. #305 at 29).  Thereafter, considering only the

expert testimony he believed properly admitted, including that of GSRG's primary expert, the

Special Master recommended that summary judgment be granted in favor of Nucor on all claims.

(Doc. #305 at 38-45).  The reasons for this recommendation set forth in the Fourth Report are *in

addition to* the grounds that he previously recommended granting summary judgment on Counts I

and III in his Third Report.  (Doc. #305 at 45).

## IV.   The Court's Review of the Special Master's Third Report

On December 12, 2007, Casey/Park moved for summary judgment on Counts I and III of

GSRG's First Amended Complaint, the Section 1 and Section 2 Conspiracy Claims.  (Doc. #118).

Before considering the motion, the Special Master afforded the parties the opportunity to present any

additional evidence and argument that they wished the Special Master to consider in issuing his

report and recommendation.  (Doc. #249 at 2).  The parties presented oral argument to the Special

Master on the motion on November 19, 2008.  (*Id.*)  The Special Master issued his First Report and

Recommendation on Casey/Park's motion on January 5, 2009 recommending summary judgment

on Counts I and III.[9]  (Doc. #188).

---

[9]That is, even before he issued his Third Report, the Special Master considered Casey/Park's
motion for summary judgment in this case.  (Doc. #118).  After affording the parties the opportunity
to present additional evidence or arguments, and after conducting an in-person meeting (Doc. #188
at 2), the Special Master issued his Report and Recommendation.  (Doc. #188).  In his Report, the
Special Master recommended that summary judgment be granted in favor of Casey/Park both as to
GSRG's Section 1 claim (*id*. at 16-20) and Section 2 conspiracy claim (*id*. at 20-21).  GSRG filed
objections and also moved to supplement the Rule 56 record.  (Doc. #199).   The motion to
supplement the record was referred to the Special Master (Doc. #205), and thereafter the Special
Master filed another Report and Recommendation.  In that Report, the Special Master recommended
that GSRG be permitted to supplement the Rule 56 record with a contract between Casey and Zibo
Wanji Section Co., Inc. of Shandog, China.   (Doc. #207 at 2).  Casey/Park objected to the
supplementation, and also proffered a different contract, this one between Casey and ACS
International.  (*Id*.).   GSRG did not challenge that supplementation.  (*Id*.).  After permitting

After the Special Master's Second Report and Recommendation, GSRG and Casey/Park resolved all issues between them.  (Doc. #208).  Remaining to be decided however was Nucor's Motion for Summary Judgment (or, rather, Nucor's joinder in Casey/Park's motion).  (Docs # 124 and 210).  GSRG briefed the issue of Nucor's potential liability under Counts I and III despite Casey/Park's dismissal, and the parties were afforded the opportunity to argue the issue to the Special Master on July 30, 2009.  (Doc. #249 at 3).  GSRG argued that Nucor could be held liable under Counts I and III despite Casey/Park's dismissal.  GSRG further presented a new theory of liability, *i.e.,* that Nucor could be held liable for Section 1 conspiracy based upon agreements with parties other than Casey/Park.  (Doc. #249 at 3).  On September 29, 2009, the Special Master issued his Third Report and Recommendation recommending that Nucor be awarded summary judgment on Counts I and III, the Section 1 and Section 2 conspiracy claims.

## A.    GSRG's Argument That Summary Judgment is Precluded by the Law of the Case Doctrine is Meritless

One of GSRG's objections to the Special Master's Reports on summary judgment is that his recommendations are foreclosed by the law of the case doctrine.  In particular, GSRG argues that

---

supplementation of the record, the Special Master concluded that such supplementation of the record did not alter his recommendation that Casey/Park be granted summary judgment.  (*Id*. at 3-4) ("the Chinese contract does not show that Casey/Park joined with or surrendered its 'resources, rights, or economic power' to Nucor as required for Section 1 claims [*Virginia Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277 (4 th Cir. 2002)], nor does the Chinese contract demonstrate that Casey/Park and Nucor had formed 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" [*Monsanto*, 465 U.S. at 764.].  Although GSRG argues that the Chinese contract shows that Casey/Park reaped "supranormal profits" on the deal [Doc. #199 at 3], the agreement cannot reasonably be read to prove that Casey/Park had a stake in whether Nucor would be successful in achieving or maintaining monopoly power in the hot rolled coil market."). [7 P. Areeda & H. Hovenkamp, *Antitrust Law*, ¶ 1474(a) (2007)].  The court fully agrees with both components of the Special Master's recommendation: (1) it is appropriate to supplement the record, but (2) that supplemented Rule 56 evidence does not preclude summary judgment in this case.

the Eleventh Circuit's opinion issued prior to remand, *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961 (11th Cir. 2006), *cert denied*, 551 U.S. 1003 (2007), previously decided, on the merits, the issues which the Special Master addressed in his Reports. The argument is frivolous.

The law of the case doctrine "operates to create efficiency, finality, and obedience within the judicial system." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1363 (S.D. Fla. 2005) (quoting *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1511 (11th Cir. 1987)). Under the doctrine, "the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That & the Other Gift & Tobacco, Inc. v. Cobb County*, 439 F.3d 1275, 1283 (11th Cir. 2006) (quoting *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990)).

The law of the case doctrine encompasses issues previously "*decided by necessary implication* as well as those decided explicitly." *Wheeler v. City of Pleasant*, 746 F.2d 1437, 1440 (11th Cir. 1984) (quoting *Dickinson v. Auto Center Mfg. Co.*, 733 F.2d 1092, 1098 (5th Cir. 1983))[10]; *see also Schiavo v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005) ("The doctrine operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal.").

The issue addressed by the Eleventh Circuit panel prior to remand was whether GSRG had satisfied the requirement of demonstrating antitrust standing, *Gulf States*, 466 F.3d at 968, not whether Nucor and Casey/Park engaged in concerted activity that could violate Section 1, conspired

---

[10]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

to monopolize, or attempted to monopolize. *Id*. at 967-68. This court's decision, which was reversed by the Eleventh Circuit, concluded that: "(1) The Group lacked Article III standing because it did not show that the defendants had caused its injury; (2) the Group lacked 'antitrust standing' because it failed to demonstrate 'antitrust injury,' that is to say injury of the sort that the antitrust laws are meant to redress; and (3) the defendants' actions could not constitute a violation of the antitrust laws because they increased competition in the bankruptcy auction." *Id*. at 965. What is abundantly clear, however, is that this court's decision, which was reversed by the Eleventh Circuit, was based on the fact that GSRG's injury was essentially self-inflicted. GSRG had the available cash to make a conforming cash bid to purchase the steel mill assets ("Assets") at issue and chose to make a non-conforming bid, despite knowledge that such a bid would be rejected. The bankruptcy trustee even gave GSRG additional time to make a conforming bid. This court's prior decision was issued at an early stage in the litigation after only limited discovery as to most of the factual issues that were eventually presented to the Special Master to consider.

The Eleventh Circuit panel considered only the issues of causality and antitrust injury. The issues addressed by the Special Master were not before the Eleventh Circuit - directly or indirectly. Indeed, as the Eleventh Circuit opinion made absolutely clear: "Our intention is to express no opinion at all with respect to the merits . . . ." *Id*. at 969, n.7; *id.* at 967 ("We decline to address the merits"). Notably, the Eleventh Circuit states that its opinion is based on "assertions" made by GSRG that "if it can prove" might establish that the effect of its conduct lessened competition. *Id*. at 967. Specifically, the Eleventh Circuit's opinion[11] states as follows:

---

[11]Throughout its opinion, the panel referred to GSRG as "the Group."

*The Group asserts the following*: (1) Nucor is by far the dominant producer in the relevant market, enjoying a market share of 85%; (2) the Group wanted to and had the ability both to purchase the Assets and to compete with Nucor in the relevant market; (3) the Assets would constitute substantially all of the assets necessary for a potential entrant into the market to begin operations and compete; (4) Nucor was thus obliged not to bid against the Group, the preferred purchaser for the Assets; (5) Appellees violated the merger laws by having Nucor participate in the bidding by funding Park's bid; and (6) Appellees' conduct was a proximate cause of the Group's failure to purchase the assets and its exclusion from the relevant market.

...

*The Group contends that, if it can prove these assertions*, this would mean that Nucor maintained its purported near-monopoly and denied consumers in the relevant market the benefit of the pressure to lower prices that would likely come about if the Group became a viable competitor, thus substantially lessening competition and violating the antitrust laws.

*We decline to address the merits; that is, we decline to address whether the foregoing contentions of the Group would in fact substantially lessen competition in the relevant market and violate the antitrust laws.* However, we conclude that the district court erred in concluding that the Group had failed to show antitrust standing.

*Id*. at 967 (emphasis added and footnote omitted).[12]

And just to drive the point home, the Eleventh Circuit's opinion included footnote 4 which

states:

> We decline to address the merits *because the district court has not addressed this issue* as it is properly framed, *and because resolution of the issue will require further development of the record and further fact-finding* with respect to whether the challenged acquisition had the effect of substantially lessening competition in the relevant market. Thus, we vacate the district court's holding on the merits.

---

[12] Legally and logically, the court of appeals did not - and could not - hold that an exclusion of GSRG, standing alone, was "in restraint of trade." As the Special Master pointed out in his First Report (Doc. #188 at 12), the exact same "exclusion" could have arisen if Casey/Park and anyone other than Nucor had purchased the assets, but such purchase by anyone other than an alleged monopolist would not have caused the injury to competition necessary for an antitrust violation.

18

*Id*. at 968, n. 4 (emphasis added).[13]

GSRG's "law of the case" argument assumes that the Eleventh Circuit's decision implicitly decided issues which the Court of Appeals, specifically and by the very terms of its opinion, did not address.  Therefore, GSRG's "law of the case" argument is off base.

**B.      Count I - GSRG's Sherman Act Section 1 Claim**

**1.      Legal Standards**

Section 1 of the Sherman Act provides as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. Thus, by its own terms, Section 1 condemns every contract, combination, or conspiracy when these concerted actions are "in restraint of trade or commerce."  GSRG frequently uses the words "contract" and "combination" instead of "conspiracy."  However, as the Eleventh Circuit has noted that "[d]espite the different terminology, there is no magic unique to each term.  Courts use the words 'contract,' 'combination,' and 'conspiracy' interchangeably, and sometimes

---

[13]As the panel also stated:

> *Our intention is to express no opinion at all with respect to the merits-i.e., whether the actions of appellees substantially lessened competition in the relevant market and violated the antitrust laws.* See note 4, supra. Thus, we express no opinion with respect to the remarks in Judge Cudahy's separate opinion, except to say that we agree with Judge Cudahy that if the Group proves on remand that "Nucor substantially lessened competition in the relevant market" for hot rolled coil, the Group will have proved a violation of the antitrust laws. However, we express no opinion on that issue; *we prefer for the district court to conduct the appropriate analysis in the first instance and on a more fully developed record. Nor do we intend to express an opinion on or preempt the district court's discretion with respect to the nature of the appropriate course of action on remand, e.g., immediate trial or further summary judgment proceedings. See* Fed. R. Civ. P. 56(d).

Id. at 969, n. 7 (emphasis added).

simply refer instead to an 'agreement.'" *Tidmore Oil Co. v. BP Oil Co./Gulf Products Div.*, 932 F.2d

1384, 1388 (11th Cir. 1991) (citing 6P. Areeda, *ANTITRUST LAW* ¶ 1403 (1978)).  Moreover, in his

treatise, Professor Areeda notes that in virtually every case, it is not necessary to distinguish these

terms from one another:

> The courts sometimes speak of "combination," sometimes of
> "conspiracy," or sometimes simply of the nontstatutory term
> "agreement."  They usually use these terms interchangeably, and the
> use of one term does not imply any distinction between them.  When
> there is sufficient concert of action to implicate the purposes of the
> Sherman Act, the statute is applied without any need or attempt to
> classify that concerted action as a contract, a combination, or a
> conspiracy.  This is the consistent course of the decisions, and
> generally it seems correct.

6 P Areeda & H. Hovenkamp, *Antitrust Law*, ("Areeda") ¶1403 at 20 (3d ed. 2010) (*citing Bogosian*

*v. Gulf Oil Corp.*, 561 F.2d 434, 445 (3d Cir. 1997), *cert. denied*, 434 U.S. 1086 (1978) ("We

perceive no distinction between the terms combination and conspiracy. . . .")).

To be sure, the Sherman Act distinguishes unilateral from concerted action.[14]  The Sherman

Act contains a "basic distinction between concerted and independent action . . .  The conduct of a

single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization

. . .  Section 1 of the Sherman Act, in contrast, reaches unreasonable restraints of trade effected by

a 'contract, combination . . . or conspiracy' between separate entities.  It does not reach conduct that

is 'wholly unilateral.'" *Copperweld Corp.*, 467 U.S. at 767-68 (citations and footnote omitted).

Accordingly, while different courts have expressed the elements of a Section 1 claim in different (but

---

[14]7 Areeda at ¶ 1474 at 307.  Unilateral action is "unlawful under the Sherman Act when anti
competitive conduct is accompanied by monopoly power or its prospect."  *Id*. at 307-08.

not necessarily inconsistent) ways,[15] this much is clear: an essential element of any Section 1 claim is a showing of concerted action.  That is, Section 1 applies only to agreements between two or more businesses or persons; it does not cover unilateral conduct.  *Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986) ("Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement.").[16]  *See also Monsanto Co.*, 465 U.S. at 761 (noting that it is fundamental that a plaintiff establish an agreement between two or more persons to restrain trade; unilateral conduct is not prohibited by § 1); *American Key Corp. v. Cole*, 762 F.2d 1569, 1579 n. 8 (11th Cir. 1985) ("conspiracy is an essential element of all Section 1 violations"); *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1455 (11th Cir. 1991) ("Liability will only attach to *agreements* designed unreasonably to restrain trade in, or affecting, interstate commerce; thus, before analyzing the reasonableness of any alleged restraint on trade, courts must first ensure that an agreement to restrain trade exists.").  To be sure, the Supreme Court has cautioned lower courts that  Section 1 "does not declare every combination between two 'persons' to be illegal," but only those "'hereby declared to

---

[15]For example, the Special Master defined the elements as follows:

> Thus, the elements of a Section 1 claim are widely recognized to be (i) the existence of a contract, combination, or conspiracy among two or more separate entities that (ii) unreasonably restrains trade and (iii) affects interstate or foreign commerce.

(Doc. #188 at 3 (footnote omitted)).

[16]However, while concerted action must be shown, not every agreement that restrains competition will violate the Sherman Act.  The Supreme Court long ago determined that Section 1 prohibits only those agreements that unreasonably restrain competition, *Standard Oil Co. v. United States*, 221 U.S. 1, 58-64 (1911); therefore, the unreasonableness of the agreement is the second element of a Section 1 claim.

be illegal.'" *Copperweld Corp.*, 467 U.S. at 769 n.15.  Thus, concerted action within the meaning of Section 1 conspiracy "cannot be understood as it might be in ordinary parlance, to reach any and all forms of joint activity by two or more persons," *Virginia Vermiculite, Ltd. v. Historic Green Springs*, 307 F.3d 277 (4th Cir. 2002), *cert. denied*, 538 U.S. 998 (2003), but "must be construed in a [] refined manner" and "defined consonant with its role in the antitrust analysis." *Id.* at 281-82. To determine whether a given joint activity is an antitrust conspiracy, the Supreme Court has directed courts to "explain the logic underlying Congress' decision to exempt unilateral conduct from [Section] 1 scrutiny, and to assess whether that logic similarly excludes the conduct" challenged by the plaintiff.  *Copperweld*, 467 U.S. at 776.

The "logic" underlying the Section 1 ban on collusion between marketplace competitors is that such combinations "deprive[] the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Id.* at 768-69.  That is why Section 1 treats concerted activity between multiple actors "more strictly" than Section 2 treats single-party conduct – "[i]n any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction." *Id.* at 768-69.  The danger is obvious.  When "parties combine (*i.e.*, bring into concert) their resources, rights, or economic power in such a way as to counteract naturally competing interests that would otherwise set them at odds," *Virginia Vermiculite*, 307 F.3d at 282, they are able "to avoid . . . market choices that would set them at odds" in the asserted market, *id.* at 283 n.*, to the detriment of competition and consumers. The "core concern" of Section 1 thus is when

"competitors cooperate to substitute common action for competition and thereby effect an anticompetitive restraint that could not otherwise be achieved."  Areeda, ¶ 1402a3, at 10.

Thus, for example, in *Virginia Vermiculite*, a non-profit historic preservation entity, which was the donee of a gift deed of land containing valuable vermiculite deposits, was the second party that allegedly "conspired" with another defendant that operated in the vermiculite market.  307 F.2d at 279-80.  Judge Luttig, writing for the Fourth Circuit, held that such joint action did not satisfy the "concerted activity" requirement under Section 1, because, "[f]irst and foremost, [the donee's] receipt of the gift did not reflect a merging of the two defendants' rights, resources, or economic power."  *Id*. at 283.  The court concluded that the mere act of accepting the donation did not create the concerted action required to support a Section1 claim, because no evidence was presented that the organization – as opposed to the monopolist – had "exercised any form of right, resource, or economic power" of its own to implement the monopolist's allegedly anticompetitive scheme. In so holding, the court "reaffirm[ed] what was made clear by *Copperweld*, that concerted activity susceptible to sanction by section 1 is activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing interests (by way of profit-maximizing choices)."  *Id*. at 282; *see Copperweld*, 467 U.S. at 769.  In such circumstances there is no basis for antitrust conspiracy liability.  *Id.*; *see also Golden v. Kentile Floors, Inc*., 475 F.2d 288, 290-91 (5th Cir. 1973) ("Supreme Court precedents make clear that participation in a combination is illegal only when, at the minimum, it manifestly results from the family of procompetitive or anticompetitive objectives related to the relevant market.").  Here, just as in *Virginia Vermiculite, Ltd.,* there is simply no showing that "the parties combine[d] (*i.e.*, [brought] into concert) their resources, rights, or

economic power in such a way as to counteract naturally competing interests that would otherwise set them at odds . . . ." *Virginia Vermiculite, Ltd.,* 307 F. 3d at 282.

The clear prerequisites to avoiding summary judgment in antitrust conspiracy cases have been established by the Supreme Court and consistently applied by our circuit court. *See Matsushita*, 475 U.S. at 588 ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy"); *Monsanto*, 465 U.S. at 764 ("the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that [the alleged conspirators] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective'") (quoting *Edward J. Sweeney*, 637 F.2d at 111).

These standards were summarized by the Eleventh Circuit in *Seagood Trading Corp.*:

> The threshold requirement of every conspiracy claim, under both Section 1 and Section 2, is an agreement to restrain trade. To prove that such an agreement exists between two or more persons, a plaintiff must demonstrate "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810 1575 (1946). We recognize that it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators. *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989), *cert. denied*, 494 U.S. 1081 (1990). Antitrust law, however, limits the range of inferences that may be drawn from circumstantial evidence to prove an unlawful conspiracy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). To make out a conspiracy, and thus survive a motion for summary judgment, the circumstantial evidence must reasonably "tend[ ] to exclude the possibility" that the alleged conspirators acted independently. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). This means that "conduct as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588. For example, the mere opportunity to conspire among antitrust defendants does not, standing alone, permit

> the inference of conspiracy. *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810, 827 (11th Cir. 1990), *cert. denied*, 495 U.S. 924 (1990). Thus, when the defendant puts forth a plausible, procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991).

*Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573-74 (11th Cir. 1991) (parallel citations omitted). *See also U.S. Anchor*, 7 F.3d at 1002 ("Federal antitrust law requires a plaintiff to introduce evidence that tends to exclude the possibility that the defendants acted independently or legitimately."); *Todorov*, 921 F.2d at 1456 ("Thus, when the defendant puts forth a plausible, procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred; the plaintiff must produce more probative evidence that the law has been violated."); *Bolt*, 891 F. 2d at 819 ("When relying on circumstantial evidence to prove the existence of a conspiracy, a plaintiff must first show a non-legitimate motive for entering into such a conspiracy.") These are precisely the evidentiary standards applied by the Special Master here. (*See* Doc. #188 at 4-5, 16-19). Thus, the first element of a Section 1 claim is proof of an agreement to restrain trade, and significant probative evidence of a conspiracy is an essential element of all Section 1 violations. *First National Bank v. Cities Service Co.*, 391 U.S. at 290.

## 2.    Analysis of GSRG's Conspiracy Claim

As noted above, "[a] key inquiry in any case brought under Section 1 is whether the challenged conduct consists of concerted action or of the merely unilateral behavior of separate actors . . ." William C. Holmes, *Antitrust Law Handbook* § 2:2 *(2008-2009 Edition)*. "For an agreement to constitute a violation of Section 1 of the Sherman Act, a 'conscious commitment to a

common scheme designed to achieve an unlawful objective' must be established." *Toscano v. Professional Golfers Association*, 258 F.3d 978, 983 (9th Cir. 2001) (quoting *Monsanto*, 465 U.S. at 764). As the Special Master aptly noted "[t]he facts of this case present the infrequent, but not unprecedented, question of whether a company's agent [here, Casey/Park][17] should be held liable for Section 1 conspiracy where the agent had some role in facilitating the restraint."[18] (Doc. #188 at 5). The Areeda treatise draws a distinction between "pawns" and "principal actors" due to the pawn's "subordinate role in performing a discrete, designated task at the direction of [its] principal." 7 Areeda ¶ 1474 at 308. As is the case here with Casey/Park, "[t]he pawn is not a competitor whose rivalry is being coordinated. Nor is the pawn a marketplace actor whose . . . behavior is being constrained. Rather, the pawn is relevant to antitrust policy only because it assists the principal actor's marketplace behavior." *Id*. The Areeda treatise also explains why findings of pawn liability under Section 1 are rare.

> In our economy sales through brokers or other intermediaries are ubiquitous, and they are not complicity in vertical restraints simply because they were employed in a transaction later challenged as anticompetitive.

---

[17]Again, although Casey/Park have resolved their differences with GSRG, the question of whether they can be liable under Section 1 is still at the forefront. This is the case because Plaintiff's theory for holding Nucor liable under Section 1 is the claim that Nucor and Casey/Park conspired with one another.

[18]Contrary to GSRG's assertion, the Special Master's legal analysis is plainly not misdirected advocacy expounding on "why . . . 'pawns' are not liable for their conduct." (*See* Doc. #190 at 23-24). What GSRG misunderstands (or perhaps fails to acknowledge) is that the Special Master's "pawn liability" analysis is simply another way to analyze the courts' respective decisions in *Copperweld* and *Virginia Vermiculite*. (Doc. #188 at 5-6) (citing 7 P. Areeda, *ANTITRUST LAW*, ¶ 1474 (2007)). The key point is this – if GSRG's analysis is correct, Section 1 liability would potentially attach to a broad range of ancillary service providers – bankers, lenders, lawyers, and accountants to mention a few – who lack the requisite competitive interest and stake in the relevant market and who do not have any conscious commitment to achieve the alleged restraint of trade in that market.

*Id. at* ¶ 1474(c), p. 317.[19]

Simply put, GSRG's claim that Casey/Park conspired with Nucor does not trigger the "core concern" addressed by Sherman Act Section 1. That is the case because Casey/Park and Nucor do not compete with each other and Casey/Park lacks any economic interest in the state of competition in the relevant market. The Special Master correctly determined that Section 1 only prohibits "activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing interests (by way of profit-maximizing choices)."[20]  (Doc. #188 at 7, quoting *Virginia Vermiculite Ltd.*, 307 F.3d at 282).  GSRG has expressly admitted that neither Casey nor Park have ever had an economic interest in any market for the sale of hot rolled coil steel or in the state of competition in

---

[19]To be clear, while Areeda considers that an essential element of proving pawn liability is a showing that the pawn intended to restrain trade, *id*. at ¶ 1474, p. 308, the Special Master recognized that this requirement is inconsistent with Eleventh Circuit precedent.  (Doc. #188 at 6, n.31).  If this court were writing on a clean slate, it would conclude Areeda has the better reasoned position.  However, the Eleventh Circuit's case law is clear and the Special Master applied it faithfully.

[20]GSRG's objections do not challenge the Special Master's determination that GSRG failed to provide substantial evidence that Nucor and Casey/Park ever "join[ed] their resources, rights, or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing interests (by way of profit-maximizing choices)."  (Doc. #249 at 12, quoting *Virginia Vermiculite Ltd.*, 307 F.3d at 282). This requisite combination of rights, resources or economic power can only occur when the combination "diminshe[s] competing interests of the two entities."  (Doc. #188 at 8, quoting *Virginia Vermiculite Ltd.*, 307 F.3d at 283).  The Special Master restated this principle somewhat differently:  concerted activity is unlawful under Section 1 if it "deprives the marketplace of the independent centers of decision-making that competition assumes and demands."  First Report at 6 (quoting *Copperweld Corp.*, 467 U.S. at 769).

any such market.[21] (Doc. #120 ¶¶ 3-15).  And notwithstanding GSRG's strained arguments[22] that Casey contributed "resources" in the transaction with Nucor (Doc. #190 at 6, 16), there is no evidence that Casey or Park ever acted in a way that was inconsistent with their respective usual business activities or contributed resources that reflected any economic power or other interest in the purported relevant market.  "[T]he Sherman Act does not prohibit unreasonable restraints of trade as such — but only restraints effected by a contract, combination, or conspiracy . . . ."  *Copperweld Corp.*, 467 U.S. at 775.  The Special Master properly held that part of the proof of the "contract, combination, or conspiracy" requires proof of a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co.*, 465 U.S. at 764. Under the circumstances of this case, the Special Master properly concluded that this required some showing of Casey/Park's objective, separate and apart from the fact of entering into the facially neutral contract with Nucor.  Eleventh Circuit precedent is in agreement, despite GSRG's attempts to distinguish the relevant cases.  *See U.S. Anchor Mfg.*, 7 F.3d at 1002; *Seagood Trading Corp.*, 924 F.2d at 1573-74. In both of these cases, evidence of written agreements between the alleged conspirators was insufficient to obviate the need for some proof of an objective to restrain trade on the part of the alleged pawn or subordinate.  The same is true here as to Casey/Park's objective.  As

---

[21]The claim that Nucor exploited its otherwise routine business arrangement with Casey/Park to effect an anticompetitive result – in a market in which Casey did not participate – simply does not transform that ordinary business arrangement into an antitrust conspiracy.

[22]It is not surprising, therefore, that GSRG has not cited to a single case upholding a Section 1 claim based on an agreement between an agent (*i.e.*, a pawn) who does not participate in or have any economic interest in the state of competition in the relevant market and a single principal that operates in that market.  Extending Section 1 under circumstances like this to parties outside the relevant market would dramatically alter the scope of the antitrust laws by "presag[ing] liability for a host of servicing agents only fortuitously connected with Sherman Act defendants."  *Golden*, 475 F.2d at 290.

the Third Circuit explained in *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 212 (3d Cir. 1992), "the emphasis is upon the participant's '*commitment to [the] scheme* [which is] designed to achieve an unlawful purpose' which is crucial." Thus, the Special Master properly recommended summary judgment based on the lack of proof of Casey/Park's "commitment to the scheme."

The court concludes that the Special Master applied the proper standards in assessing summary judgment, requirements that are firmly established by controlling Supreme Court and Eleventh Circuit precedent, and which call upon GSRG to present evidence (1) that tends to exclude the possibility that the alleged unlawful conduct of Casey and Park was the result of legitimate business activity rather than an unlawful conspiracy and (2) that demonstrates that those companies made a conscious commitment to a common scheme designed to achieve an unlawful objective. *See, e.g.*, *Matsushita*, 475 U.S. at 588; *Seagood Trading*, 924 F.2d at 1573-74.

Perhaps sensing the difficulty it would have in meeting the requirements of *Monsanto* and *Matsushita*, GSRG makes the astounding argument that the written contract between Nucor and Casey/Park is itself direct evidence of concerted conduct causing anticompetitive harm.[23] (*See* Doc.

---

[23]The former Fifth Circuit noted over thirty years ago the infrequency of an antitrust case with direct evidence:

> [A] major factual question in this case is whether there was a conspiracy. Even a successful antitrust plaintiff will seldom be able to offer a direct evidence of a conspiracy and such evidence is not a requirement. *See, e.g., Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 703-04 (1969). However, to survive a motion for summary judgment the evidence must suggest reasonable inferences of conspiracy. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 266-70 (1968); *American Telephone & Telegraph Co. v. Delta Communications Corp.*, 590 F.2d 100, 102 (5th Cir. 1979), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 F.Ed.2d 182 (1979). "Rarely, if ever, can a plaintiff point to a 'smoking gun' in (conspiracy) cases such as this. Yet, a plaintiff must convince the

#255 at 4-5).  The Special Master rejected that argument and this court similarly finds that it is off

the mark.[24]  That is, the court concludes that the contract at issue does not in itself restrain trade.

Again, in *Seagood Trading*, the Eleventh Circuit made clear that analyzing concerted action

is the starting point in assessing a Section 1 claim:

> The threshold requirement of every conspiracy claim, under both
> Section 1 and Section 2, *is an agreement to restrain trade*.  To prove
> that such an agreement exists between two or more persons, a
> plaintiff must demonstrate "a unity of purpose or a common design
> and understanding, or a meeting of minds in an unlawful
> arrangement."

924 F.2d at 1573 (emphasis added) (quoting *American Tobacco Co. v. United States*, 328 U.S. 781,

810 (1946)).

As GSRG has indicated in its briefing, "[t]he primary legal issue in this case . . . concerns

how the requirement of proof of a common 'objective' should be applied" in the context of this

_____

court that it is reasonable to infer the existence of the gun from the
facts shown."  *Alladin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1117
(5th Cir. 1979).

*General Chemicals, Inc. v. Exxon Chemical*, 625 F.2d 1231, 1233 (5th Cir. 1980).

[24]Not only is the contract between Casey/Park not direct evidence of a Section 1 violation,
for the reasons already explained, it does not provide "circumstantial" evidence of Casey's conscious
commitment to monopolize the alleged relevant hot rolled coil steel market.  GSRG's contention
otherwise cannot withstand analysis under the well-established antitrust summary judgment standard
that circumstantial evidence "must be strong in order to survive summary judgment, because
'antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case,'"
*Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007)
(quoting *Matsushita*, 475 U.S. at 588 (emphasis added)).  The key point here is that "conduct as
consistent with permissible competition as with illegal conspiracy does not, standing alone, support
an inference of antitrust conspiracy."  *Matsushita*, 475 U.S. at 588 (citing *Monsanto*, 465 U.S. at
764).  Imposing Section 1 liability on the basis of conduct that is "consistent with conspiracy, but
just as much in line with a wide swath of rational and competitive business strategy," *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 544, 554 (2007), would "often [] deter procompetitive conduct,"
*Matsushita*, 475 U.S. at 593.

case.[25]  (Doc. #251 at 8).  Plaintiff argues that the *objective* of the contract[26] between Nucor and

Casey/Park was anticompetitive, *i.e.*, to exclude GSRG from the hot rolled steel coil market.  (*Id*.

at 8, 9).  More specifically, GSRG argues that "the apparent objective of the Nucor-Casey contract

was dismantling and export of the former Gulf States Steel plant.  Where the objective of a contract

is the elimination of nascent competition in the relevant market, Section 1 is properly invoked."  (*Id*.

at 10).  And it is that passage from GSRG's written argument that demonstrates the critical flaw in

its argument on this point.  That is, GSRG has made a leap in logic that is simply not supported by

the record because the contract's purpose is to purchase goods, not eliminate competition or restrain

trade.

    In other words, the contract's purpose was to define the relationship between Nucor and

Casey regarding the acquisition of the steel mill assets, and the terms under which that asset

_____

[25]Plaintiff argues that the context of this case involves an "anticompetitive acquisition which is accomplished by means of an express, written contract with a third party."  (Doc. #251 at 8).  Plaintiff's argument is off the mark.  And not surprisingly, GSRG has offered no precedent or authority whatsoever to support its position that Section 1 criminal and treble damages liability may be automatically imposed on ancillary service providers that have no knowledge, stake or interest regarding another party's alleged anticompetitive objective.

[26]GSRG's lengthy analysis (Doc. #251 at 11-13) of the Third Circuit's decision in *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171 (3d Cir. 1992), misstates both the holding and the facts of that case.  As the Special Master correctly noted in his First Report, *Fineman* stands for the proposition that, in order to be liable under Section 1, "co-conspirators need not share the same *motive* for the restraint of trade so long as they both share the *objective* to restrain trade."  (Doc. #188 at 14 (original emphasis); *accord* Doc. #249 at 9).  Indeed, *Fineman* expressly confirms the Special Master's discussion of "objective" – as opposed to motive and intent.  *See Fineman*, 980 F.2d at 212 (although motives may differ, a Section 1 claim requires proof that alleged conspirators must share a "conscious commitment to a common scheme designed to achieve an unlawful objective.").  In this manner, the Special Master's analysis is wholly consistent with Eleventh Circuit law, and contrary to GSRG's assertions, the *Fineman* opinion also confirms the Special Master's ruling that:  "At a minimum, a determination of a common objective to restrain trade would require the Court to find that the subordinate party *has knowledge* of the principal party's anticompetitive goal and *acquiesce* in its realization."  (Doc. #249 at 10 (emphasis added)).

acquisition would take place.  *That* was the objective of the contract – the purchase of the steel mill assets.  Nucor may well have had an ulterior objective in entering the contract – to exclude GSRG from the market.  But there is nothing in the contract, its terms, or the circumstances of its agreement that indicates (much less presents substantial evidence that) *Casey's* objective was anything other than the acquisition of steel assets for resale.[27]

Obviously there is no requirement that GSRG establish "an intent on the part of the co-conspirators to restrain trade or to build a monopoly" for a Section 1 conspiracy claim.  *Bolt*, 891 F.2d at 819-20 (internal citation omitted).  To avoid the swing of the summary judgment axe, however, GSRG is required to present "evidence that reasonably tends to prove" that Casey/Park and Nucor "had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co.*, 465 U.S. at 764.  And while GSRG is certainly permitted to rely upon circumstantial evidence to support its Section 1 claim, Supreme Court precedent has limited the "range of inferences that may be drawn from circumstantial evidence to prove an unlawful conspiracy."  *Seagood*, 924 F.2d at 1574.

It bears repeating that "[c]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Matsushita*, 475

---

[27]GSRG takes issue with the Special Master's statement that "[t]he written agreement between Casey/Park and Nucor . . . appears neutral on its face."  (Doc. #190 at 20; *see also id.* at 12-14).  Each provision of that agreement questioned by GSRG, however, readily can be explained as part of an entirely reasonable and appropriate business deal, and accordingly provides no evidence that tends to exclude the possibility that the agreement derived from legitimate business conduct, which resulted in multi-million-dollar profits for Casey/Park upon resale of the key Gulf States Steel assets.

U.S. at 588.[28]   Indeed, "the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy." *Seagood*, 924 F.2d at 1574.  As the Eleventh Circuit has also warned, "when the defendant puts forth a plausible, procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred." *Id.*  GSRG has not presented the required evidence that "tend[s] to exclude the possibility that the alleged conspirators acted independently." *Id.* (quoting *Monsanto*, 465 U.S. at 764).

The Special Master succinctly articulated the essence of (and the flaw in) Plaintiff's argument regarding the contract[29] between Nucor and Casey:

> Plaintiff incorrectly adumbrates that somehow "contract, combination, and conspiracy" and "restraint of trade" are independent elements such that once an agreement regarding the economic event is shown, all that is needed for liability is evidence of one party's illegal act affecting the economic event.  The correct interpretation is that the joint meeting of the minds must incorporate the illegal restraint and, thus, those elements are inextricably intertwined.

(Doc. #188 at 4).  In this case, the only joint action agreed to by Casey/Park on the one hand, and Nucor on the other was an ordinary commercial brokerage arrangement.  GSRG's assertion that any

---

[28]Citing its earlier decision in *First National Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968), the Court in *Matsushita* identified two separate inquiries that are relevant to this issue: (1) whether the defendant had "any rational motive" to join the alleged conspiracy, and (2) whether the defendant's conduct was consistent with the defendant's independent interest," *Matsushita*, 475 U.S. at 587, citing 391 U.S. 253 (1968), the Court stated that "if [the defendants] had no rational motive to conspire, and if [their] conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596-97.

[29]*Albrecht* emphasized that Section 1 "covers combinations in addition to contracts and conspiracies." 390 U.S. at 149.  But again, neither there nor anywhere else has the Court defined "contract" as a different concept.  As the lower courts have consistently held, this statutory concept of contract, combination, or conspiracy is a unity rather than a trinity.

"concerted activity" can be deemed a Section 1 violation without evidence of a conscious commitment to an unlawful objective is, quite simply, not just off the mark – it's not the law. [30] One need look no further than the Eleventh Circuit's *Seagood* decision to understand this point.  In *Seagood*, the alleged conspirators, Long John Silver's ("LJS") and Martin-Brower ("M-B"), had entered into contracts for M-B to provide services to LJS.  924 F.2d at 1558-60.  Nevertheless, applying the standards established in *Matsushita* and *Monsanto*, the court of appeals affirmed the grant of summary judgment for M-B, concluding that there was no direct evidence of the alleged conspiratorial conduct and that the inferences drawn by the plaintiff from circumstantial evidence were not sufficient to implicate M-B in the alleged unlawful conspiracy.  *Id*. at 1573-76.

In *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, one of the cases cited by GSRG,[31] the Eleventh Circuit held that there was "insufficient evidence linking [the pawn] with Rule's scheme to constitute a conspiracy under the substantive proof requirements of federal antitrust law" *despite* the existence of a contract between which was related to the alleged restraint of trade.  7 F.3d 986,

---

[30]Both Supreme Court and Eleventh Circuit case law require a plaintiff relying upon the consequential affects of a contract that does not restrain trade by its own terms to show that the contracting parties "shared a common objective to restrain trade" in order to establish a Section 1 violation.  *Monsanto*, 465 U.S. at 764 (Section 1 claim requires proof of a "conscious commitment to a common scheme designed to achieve an unlawful objective"), quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980); *Seagood Trading*, 924 F.2d at 1573-74 (in order to establish an agreement to restrain trade, plaintiff must show a meeting of the minds to accomplish anticompetitive objective); *U.S. Anchor*, 7 F.3d at 1002 (no evidence that defendants shared a mutual objective to restrain trade in the relevant market).  Indeed, in both *Seagood* and *U.S. Anchor*, there was evidence of a competitively neutral written agreement between the allegedly conspiring defendants, but that did not dispense with the requirement that the antitrust plaintiff establish a shared "common objective" to restrain trade in the relevant market.  (*See* Doc. #249 at 7-8).

[31]GSRG cites *U.S. Anchor Mfg.* for the proposition that evidence of the contract between Nucor and Casey/Park eliminates the need to show a common objective to restrain trade.  As will be explained below, that argument is far wide of the mark.

1002 (11th Cir. 1993).  Notwithstanding GCRG's citation to it, *U.S. Anchor* simply does not support its argument.  In *U.S. Anchor*, the plaintiff alleged that the principal defendant, Rule, allegedly had conspired with one of its suppliers, Tie Down, to drive Rule's competitor out of the relevant market by predatory pricing.  The focus of the conspiracy claim was a report from Tie Down to Rule regarding the plaintiff's costs of production, which allegedly was used by Rule to carry out its anticompetitive, below-costs pricing tactic.  7 F.3d at 989-90, 1002.  Again, therefore, "joint action . . . was a given."  The Eleventh Circuit, however, concluded that Tie Down was entitled to judgment as a matter of law, holding that there was insufficient evidence of the alleged conspiracy involving that company.  *Id*. at 1001-02.  As in *Seagood*, the court stated that "a section 1 claim and a section 2 conspiracy to monopolize claim require the same threshold showing – the existence of an agreement to restrain trade."  *Id*. at 1002 (quoting *Seagood*, 924 F.2d at 1576).

### 3.      Analysis of the Contract

The contract at issue in this case does not, by its own terms, link the "pawn" with Nucor's alleged scheme in order to establish a conspiracy.  Accordingly, as the Special Master correctly noted, it is incumbent upon GSRG to present evidence *in addition to the contract* that tends to link Casey/Park to Nucor's scheme to survive summary judgment.  (Doc. #249 at 11).  Proof that Nucor alone may have had an intent to monopolize or restrain trade is not enough to establish the contract, combination or conspiracy in unreasonable restraint of trade.  *U.S. Anchor Mfg., Inc.* 7 F.3d at 1002 (although there was sufficient evidence to show an intent to achieve an unlawful objective on Rule's part, there was insufficient evidence linking the pawn to Rule's efforts to support a finding of conspiracy between them).

In *U.S. Anchor*, the Eleventh Circuit further stated that "[f]ederal antitrust law requires a plaintiff to introduce evidence that *tends to exclude the possibility* that the defendants acted independently or legitimately." *U.S. Anchor Mfg., Inc.*, 7 F.3d at 1002 (citing *Bolt v. Halifax Hosp. Medical Ctr.*, 891 F.2d 810, 820 (11th Cir. 1990), *cert. denied*, 495 U.S. 924 (1990), *appeal after remand*, 980 F.2d 1381 (11th Cir. 1993) and *Monsanto Co. v. Spray-Rite Serv. Co.*, 465 U.S. 752, 764 (1984)) (emphasis added). There are a myriad of undisputed legitimate reasons for Casey/Park to enter into the agreement in question with Nucor. Don Casey has testified about his extensive involvement in evaluating the Gulf States Steel assets long before he had any contact with Nucor about those assets, and that he initially contacted Nucor about the possible purchase of those assets before he was later contacted by Nucor's Vice President, Mr. Rutkowski. Mr. Casey also described Casey's purchase of various assets from the Gulf States Steel plant and his company's efforts to be involved in some manner in the liquidation of those assets. (Doc. #12 at ¶¶ 23-30, 36-38, 40-41).

Moreover, the mere fact that Casey/Park entered into an agreement to perform its usual business, even if it was at a higher profit than usual, does not show that it conspired to do anything other than make money. GSRG argues that the profit margin should have alerted it to the fact that Nucor had ulterior motives in hiring Casey/Park, but that is not enough and there is no evidence that Casey/Park entered into the agreement with a shared objective to achieve those alleged unlawful ends.

Casey's business is buying and selling used steel manufacturing equipment. It not only had prior dealings with Nucor, but also did business with most steel manufacturers in the United States. Casey's business was in no way dependent on Nucor and, in fact, Casey had made its own independent efforts to be appointed by the Bankruptcy Judge and Bankruptcy Trustee to be the

liquidator for the Gulf States equipment.  Moreover, for approximately two years prior to the September 2002 bankruptcy auction, Casey had tried repeatedly to get a contract with Gulf States Steel and the Trustee to liquidate the Gulf States Steel property and equipment.  (Doc. #96 at 11). Casey inspected the Gulf States Steel property and equipment on a number of occasions in 2000 and 2001 and was very familiar with those assets.  Mr. Casey attended the May 2001 auction on Casey's behalf, bid on several items at the auction, and successfully purchased some of the Gulf States Steel assets that were auctioned.  Casey also purchased additional assets from the Gulf States Steel bankruptcy estate before the May 2001 auction.  (Doc. #96).  Here, there is no evidence at all (direct or otherwise) that Casey/Park knew of any objective of Nucor other than to participate in the purchase and resale of the Gulf States Steel assets in order to make a profit.  And as GSRG admits, the two sides ultimately made a profit.[32]

Furthermore, Casey/Park had an independent reason for wishing to sell off Gulf States's assets: it would provide the financing to purchase the property and develop it into an industrial park, something that the record indicates Casey/Park is currently doing on a profitable basis.  In light of

---

[32]Inexplicably, GSRG has questioned the Special Master's "factual finding" that "[t]here is also evidence within the record that there existed at least some opportunity to resell the assets in the international market for a profit."  (Doc #190 at 18-19; *see also id*. at 10).  The Special Master simply made a Rule 56 finding based upon undisputed facts.  GSRG acknowledges, as it must, that this "finding" is supported by the "fact that (ultimately) Casey did in fact sell the assets for a profit." *Id*. at 19.  *See also* Doc. #120 at ¶ 82) (assets were resold to customers in Asia for approximately three times the purchase price).  GSRG's suggestion that there supposedly are "contrary facts in the record" about the state of the Asian used equipment market in 2001 and 2002 not only is incorrect but also irrelevant.  The key question is whether Casey recognized an opportunity to resell the Gulf States Steel assets in an overseas market, and the evidence is undisputed that Casey did.  (*See* Doc. #120 at ¶¶ 36-37, 39-41).  Moreover, given that there was a three-year window of time for resale of the assets under the Casey/Nucor agreement, the fact that the assets were resold at a substantial profit in about half that time (Doc. #120 at ¶¶ 81-82) certainly suggests that Casey's market perception was spot on.

these facts, GSRG simply has fallen short of the required showing that Casey/Park's reasons for entering into the agreement with Nucor were anything other than legitimate. Here, Casey/Park's "conduct [is] as consistent with permissible [activity] as with illegal conspiracy [and therefore] does not, standing alone, permit the inference of conspiracy." *Seagood Trading*, 924 F.2d at 1574 (citations omitted). In its response to GSRG's objections to the Special Master's Third Report, Nucor outlines the reasons that Plaintiff's objections to the Rule 56 determinations made in the Report are without merit. (Doc. #253 at 14-17.) Nucor's response is right on target. Moreover, in each instance, this is the critical failure in GSRG's objections: Whether they are taken individually or together, Casey/Park's acceptance of the contract provisions complained of by GSRG is explained just as much by its normal business practice as by GSRG's assertions of anticompetitive objective. In this case, and in light of GSRG's shotgun arguments, the legal point cannot be overstated: Where the evidence supporting a conspiracy claim is this equivocal, the Supreme Court has determined that it is insufficient to avoid summary judgment. *Matsushita*, 475 U.S. at 588 (citing *Monsanto* and holding that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy").[33]

Finally, GSRG's repeated contention that Casey/Park "should have known" or "suspected" Nucor's "apparent" objective (*e.g.*, Doc. #190 at 8, 11-12, 14-15, 20) is not only speculative[34] but

---

[33]Certainly, there is no evidence that Casey/Park's stated legitimate reasons for entering into the agreement were either fabricated or contrived. *See Boczar v. Manatee Hosps. & Health Sys., Inc.*, 993 F.2d 1514, 1518-19 (11th Cir. 1993) (finding sufficient evidence to support conspiracy claim when defendant's supposed legitimate reasons for acting were shown to be fabricated and contrived).

[34]Evidence that is "speculative or ambiguous" does not require a trial. *Matsushita* 475 U.S. at 595.

also invokes a negligence standard that is simply foreign to any requirement under the antitrust laws. To survive a Rule 56 challenge, GSRG must present evidence that Casey knew of and "consciously committed" to Nucor's allegedly anticompetitive objective to monopolize a relevant antitrust market. There is simply no such evidence in the record.

### C.    To Whatever Extent It Has Attempted To Do So, GSRG May Not Assert a Brand New Theory of Section 1 Liability

The Special Master also recommended that the court find untimely any attempt by GSRG to assert a new theory of liability – namely, that GSRG can avoid summary judgment here by asserting that Nucor conspired with other actors besides Casey/Park.[35]   The court agrees with the Special Master that "[a]t this stage of the case, it would be manifestly un[fair] to entertain GSRG's argument that Section 1 conspiracies could be found to exist with other actors." (Doc. #249 at 4; Doc. #305 at 4) (footnotes omitted).  GSRG did not put forward its new theory until July 30, 2009, almost seven years after it filed this case.  (*Compare* Doc. #1, *and* Doc. #115, *with* Doc. #305, p. 4).  There was never a single mention by GSRG of any additional conspirators or other contracts anywhere in the Complaint or Amended Complaint (*see* Docs. #1, 115), nor in any of the summary judgment papers (*see e.g.*, Docs. #129, 216).  Indeed, it was not until the July 30, 2009 oral argument before the

---

[35]As the Special Maser noted, "GSRG has pled only one 'contract and combination' in restraint of trade.  In order to protect and extend its near-monopoly dominance in the relevant market, Nucor contracted and combined with Casey to cause the creation of Gadsden Industrial Park, LLC [. . .] [Doc. #115 at ¶ 35].  Nucor contracted and combined with Casey Equipment Corporation and Gadsden Industrial Park, LLC to purchase the Gulf States Steel Plant with the common intention and objective of blocking a perceived competitive threat to Nucor. [Doc. #115 at ¶ 40]." (Doc. #249 at 3).  There is no mention of any additional conspirator in GSRG's pleadings, nor is there any reference to other contracts or combinations.

Special Master that GSRG first advanced this contention.  At that point GSRG was a day late and a dollar short; it is too late in the game for it to hatch a new theory of liability.[36]

For these reasons, the court agrees with the Special Master's conclusion that GSRG failed to meet its burden of establishing that Casey/Park shared Nucor's alleged objective to restrain trade. Therefore, GSRG's Section 1 claim fails as a matter of law.

### D.    Count III - Sherman Act Section 2 Conspiracy Claim

In Count III, GSRG alleges a *conspiracy* to monopolize the market for hot rolled coil in the Southeast.  To establish a Section 2 conspiracy to monopolize claim, a plaintiff must show: "(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy." *Levine v. Central Florida Medical Affiliates, Inc*., 72 F.3d 1538, 1556 (11th Cir. 1996) (citing *Todorov v. DCH Healthcare*

---

[36]Similarly, the court fully agrees with the Special Master's recommendation that, to the extent GSRG has attempted to assert a claim under Section 7 (or quasi-Section 7 claim), that assertion is untimely.  As an initial matter, the court notes that in its objections to the Special Master's Third Report (Doc. #251), GSRG plainly states it is *not* asserting that Nucor is liable under that section.  (*Id*. at 11).  Nevertheless, for completeness of the analysis, the court will address the arguments.  The Amended Complaint contained no such allegation even though GSRG was told in no uncertain terms that any claim under Section 7 of the Clayton Act must be expressly asserted in the Amended Complaint:

> Unless a claim under Section 7 of the Clayton Act, 17 U.S.C. § 18, is expressly asserted in Plaintiff's amended complaint, discovery on matters unique to Section 7 shall not be permitted.  This shall not preclude discovery on matters common to Section 7 and Sections 1 and 2 of the Sherman Act.

(Doc. #109 at ¶ 3).  To be clear, this language was inserted into the court's August 14, 2007 Case Management Order because, in its decision remanding this case, the Eleventh Circuit panel (somewhat curiously) opined that Plaintiff's claims under Sections 1 and 2 of the Sherman Act "implicated" Section 7, *Gulf States Reorganization Group*, 466 F.3d at 966-67, despite the fact that no such claim was asserted in the pleadings.  As with the multiple actors theory, any Section 7 claim is too late.

*Auth.*, 921 F.2d 1438,1460 n. 35 (11th Cir. 1991)).  A claim for conspiracy to monopolize does not require a showing of monopoly power.

In Section IV of the Third Report, the Special Master reaffirmed his ruling in the First Report that "GSRG simply has not adduced sufficient evidence to enable a rational fact-finder to find in favor of GSRG on its Section 2 Conspiracy [Count III] claims." (Doc. # 249 at 15). Accordingly, the Special Master recommended that the court grant summary judgment on GSRG's conspiracy-to-monopolize claim under Section 2 of the Sherman Act. (*Id.*). That recommendation is due to be adopted for two reasons: (1) GSRG has not challenged the recommendation in its objections (Doc. # 251); and (2) the recommendation is correct on the merits.

First, GSRG has not asserted any objection to Section IV of the Special Master's Third Report.  Nor has GSRG even attempted to argue that the Special Master misstated the law or improperly analyzed the record evidence with regard to the "specific intent" element of its Section 2 conspiracy-to-monopolize claim in Count III of the Amended Complaint.  Accordingly, any such objections have been waived – twice over.[37]  Therefore, Section IV of the Third Report (Doc. # 249) is due to be summarily affirmed and adopted.

Second, to prevail on a Section 2 conspiracy claim, GSRG had to present some evidence that Casey/Park – or, for that matter, any other actor – had a "*specific intent* to help Nucor monopolize the hot rolled steel coil industry."  (Doc. #188 at 20). (emphasis added).  After the Special Master issued his Third Report, GSRG failed to present any new evidence or argument regarding "specific

---

[37]*See also* Response of Casey Equipment Corporation and Gadsden Industrial Park, LLC, to Plaintiff's Objections to Report and Recommendation of Special Master (Doc. #191 at 24-25) (noting that none of GSRG's objections to the First Report challenged the Special Master's original recommendation that GSRG's conspiracy-to-monopolize claim under Sherman Act § 2 in Count III must be dismissed).

intent" in support of Count III. The record is devoid of any evidence that Casey/Park had any interest in whether Nucor monopolized the market for hot rolled coil in the Southeast. Casey/Park had its own legitimate reasons for entering into the agreement with Nucor. Therefore, even if GSRG's objections to the Special Master's Report related to its Section 2 claim was not waived (and to be clear, it was), the court agrees on the merits with the Special Master's conclusion that GSRG's Count III conspiracy claim fails – for essentially the same reasons that its Section 1 claim fails.

## V.    The Court's Review of the Special Master's Fourth Report

Following the issuance of the Special Master's Third Report and Recommendation recommending that Nucor be awarded summary judgment on Counts I and III, the Section 1 and Section 2 conspiracy claims, the court referred the following motions to the Special Master: Nucor's motion to exclude the testimony of Robert Crandall (Doc. #261); Nucor's motion to exclude the testimony of Michael Locker (Doc. #172); Nucor's motion to exclude the testimony of John Correnti (Doc. #175); GSRG's motion to exclude the testimony of Andrew Dick (Doc. #235); GSRG's Motion to exclude the testimony of Dr. Seth Kaplan (Doc. #237); and Nucor's Motion for Summary Judgment on all claims (Doc. #269).

In his Fourth Report, the Special Master recommended the following: Nucor's motion to exclude the testimony of Robert Crandall (Doc. #261) be denied; Nucor's motion to exclude the testimony of Michael Locker (Doc. #172) be granted; Nucor's motion to exclude the testimony of John Correnti (Doc. #175) be granted; GSRG's motion to exclude the testimony of Andrew Dick (Doc. #235) be granted; GSRG's Motion to exclude the testimony of Dr. Seth Kaplan (Doc. #237) be denied; and that Nucor's Motion for Summary Judgment (Doc. #269) be granted. (Doc. #305). The Special Master recommended that Correnti and Locker's testimony be excluded because they

would offer opinions for which they are not qualified.  He recommended that Dick's testimony be precluded because he cannot testify as to any decisions made by the DOJ and the probative value of his testimony is outweighed by its unfair prejudice.  The Special Master also recommended that Crandall's and Kaplan's testimony be allowed despite certain omissions and/or problems associated with such.

In evaluating Nucor's motion for summary judgment, the Special Master evaluated all three of the claims in Plaintiff's Amended Complaint.  The Special Master recommended that summary judgement be entered in favor of Nucor on Count II, which he had not previously addressed, as well as counts I and III.  The grounds on which the Special Master recommended summary judgment on Counts I and III in his Fourth Report and Recommendation are in addition to the reasons he recommended summary judgment on those claims in his Third Report and Recommendation.  (Doc. #305).

### A.    The Law of Attempted Monopolization

Section 2 of the Sherman Act provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . .

15 U.S.C. § 2. Thus, Section 2 makes it unlawful for a Defendant to monopolize, to attempt to monopolize, or to conspire to monopolize any part of interstate or foreign trade. This statutory provision covers behavior by a single business entity as well as coordinated action taken by more than one business.

A claim of attempted monopolization involves three distinct elements: "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spanish Broadcasting System of Fla., Inc. v. Clear Channel*, 376 F.3d 1065, (11th Cir. 2004) (quoting *Spectrum Sports*, 506 U.S. at 456).

> To have a dangerous probability of successfully monopolizing a market the defendant must be close to achieving monopoly power. Monopoly power is "the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market."

*U.S. Anchor Mfg., Inc.*, 7 F.3d at 994, quoting *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir. 1985).

The offense of attempted monopolization requires specific intent on the defendant's part to bring about a monopoly and a dangerous probability of success.[38] *Quality Foods v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 996 (11th Cir. 1983). Furthermore, like the monopolization offense itself, the attempt must happen in a defined relevant market. *Id.* The relevant market is defined by both a product and a geographic dimension. *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir. 1978), *cert. denied*, 440 U.S. 939 (1979); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 980 (5th Cir. 1977).

"The offense of [actual] monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product,

---

[38]Specific intent to monopolize is a necessary element of a Section 2 offense of actual monopolization. Von Kalinowski at § 9.01(1). Monopoly power is a critical element of a Section 2 offense of actual monopolization, *Id.* at § 8.02(1)

business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).[39]

The first element, monopoly power, requires a showing that the Defendant has the power to control prices in or to exclude competition from the relevant market.[40] *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Monopoly power, defined as "the power to control price or exclude competition," is measured with reference to a relevant market.

The second element requires evidence of predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market. *See United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001). A practice is exclusionary if it "harm[s] the competitive *process* and thereby harm[s] consumers." *Id.* "[H]arm to one or more competitors will not suffice" for a Section 2 violation. *Id.*; *see also Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983) ("The relevant inquiry is not whether [a company's] present attempt to exclude adversely impacts competition but rather whether its

---

[39]*See also T. Harris Young*, 931 F.2d at 823; *Austin v. Blue Cross & Blue Shield*, 903 F.2d 1385, 1391 (11th Cir. 1990). "Monopoly power under [Section] 2 requires, of course, something greater than market power under § 1." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 480 (1992).

[40]In *United States v. E. I. du Pont de Nemours & Co.*, the Supreme Court stated the classic test for determining the relevant market: "In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." 351 U.S. at 395. Factors such as functional interchangeability, responsiveness of the sales of one product to the price changes of the other, and degree of competition from the potential substitute are all relevant to the market inquiry. *See, e. g., Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347 (5th Cir. 1976).

acquisition of the power to exclude competitors had a sufficiently adverse impact on competition to constitute a [Sherman Act] violation.").

A plaintiff bringing a monopolization claim under Section 2 of the Sherman Act must define and prove the relevant market. *See U.S. Anchor Mfg., Inc.*, 7 F.3d at 994 ("Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2").

### B. The Special Master's Expert Witness Recommendation

#### 1. GSRG's Expert Crandall

The Special Master correctly applied the appropriate legal standards relating to the admissibility of expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, the Special Master evaluated Crandall's proposed testimony under appropriate Eleventh Circuit analysis: "whether (i) an expert is qualified to testify regarding the matters he intends to address, (ii) the expert's methodology is sufficiently reliable under *Daubert,* and (iii) the expert's testimony assists the trier of fact to understand the evidence or to determine a fact in issue." (Doc. #305 at 3 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003)). Under these standards, the Special Master correctly determined that, although Crandall's proposed testimony was subject to certain deficiencies, those issues went to the weight of his testimony, not its admissibility. (Doc. #305 at 24). Therefore, the Special Master correctly determined that Crandall's testimony should be admitted.

### 2.    GSRG's Experts Correnti and Locker

To evaluate the admission of expert testimony, courts engage in a *three part* inquiry to determine the admissibility of expert testimony under Federal Rule of Evidence 702. Specifically, courts consider whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

In his Fourth Report, the Special Master concluded that the testimony of GSRG's proposed experts, Locker and Correnti, should be excluded under Rule 702 and *Daubert* and its progeny. Specifically, the Special Master found that although both proposed experts opine on how relevant antitrust markets should be defined and whether Nucor possessed market power, neither individual has any relevant training or experience in antitrust economics. Thus, the Special Master concluded that neither individual is qualified under the first prong of the inquiry. Furthermore, the Special Master concluded that even if they had appropriate qualifications, neither person's testimony is based on reliable methodology and thus fails the second prong of the inquiry as well.

The Special Master applied the proper analysis under Rule 702 and *Daubert* in holding that these proposed experts are not qualified. Further, and in any event, even if one were to assume their status as industry experts qualified them to opine on relevant antitrust market issues, GSRG failed to establish that their opinions were based on reliable methodology. The *Daubert* inquiry is "a

flexible one," but the primary focus should be "on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95.

"[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct," but must establish "by a preponderance of the evidence, it is reliable." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). The court's gatekeeping obligation requires that it evaluate a proposed expert's qualifications and methodology in light of what is necessary to explain a particular subject matter to the jury. Interestingly, GSRG's objections to the Special Master's recommendation that the court exclude Correnti and Locker focus solely on the first prong of the inquiry, their alleged qualification to testify as to antitrust market matters based on their status as industry experts; GSRG does not even attempt to argue that Correnti and Locker applied proper and reliable methodologies in reaching their opinions. (*See generally* Doc. #313). Thus, even if the court were to conclude that the Special Master was incorrect in his conclusion that Correnti and Locker did not possess appropriate qualifications to opine on the relevant antitrust market, their proposed testimony is still due to be excluded due to GSRG's failure to establishing that their methodology is sufficiently reliable under *Daubert*. *Daubert*, 509 U.S. at 594-95; *see also Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003).

Furthermore, there is yet a third prong of the inquiry which these experts' proffered testimony fails to satisfy. The *Daubert* inquiry also requires that the proposed expert's testimony assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Daubert*, 509 U.S. at 589. Thus, even if an expert's testimony were admissible under the first two prongs of the *Daubert* analysis, it may still be

insufficient to create an issue of fact to overcome summary judgment.  11BAreeda at ¶ 309; *see also Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1097 (9th Cir. 1998).  In this case, the court finds that Correnti and Locker's proposed testimony not only fails the first two *Daubert* prongs, but also that it is too conclusory to satisfy the third prong, and even if considered, would be insufficient to create an issue of fact precluding summary judgment for Nucor.

### 3.    Nucor's Expert Andrew Dick

Nucor proffered the testimony of Andrew Dick, who had previously served as a staff economist, and later Assistant Chief and Acting Chief of the United States Department of Justice's Antitrust Division, Competition Policy Section.  (Doc. #305 at 24).  In particular, he oversaw the Steel Industry Task Force established in 2001 to address consolidation in the steel industry.  (*Id.*).  Nucor sought to have Dick testify, based upon his experience with the DOJ, about a decision in which he had no involvement.  The Special Master correctly concluded that Dick was neither qualified, nor in possession of sufficient data or facts, to offer an opinion on the basis for a particular decision in which he did not participate.

### 4.    Nucor's Expert Kaplan

Kaplan's testimony was proffered by Nucor as an expert of antitrust economic issues and in rebuttal to GSRG's expert Crandall.  GSRG's objection to Kaplan's testimony centers on its allegation that Nucor's counsel prepared Kaplan's report for him, rather than on the report's substance.  However, the Special Master correctly determined that the communications at issue merely reflected appropriate communication and consultation between attorneys and their expert. Therefore, the Special Master correctly determined that Kaplan's testimony was admissible.

C.      **The Special Master's Summary Judgment Recommendation**

After ruling on the various motions to exclude experts, the Special Master considered

Nucor's Motion for Summary Judgment on all claims in GSRG's Amended Complaint.  (Doc. #305

at 30).  The Special Master recommended that summary judgment be granted in favor of Nucor on

all claims, for reasons *in addition to* those in his Third Report.  (Doc. #305 at 45).  The court has

carefully reviewed the Special Master's Report regarding GSRG's Section 2 attempt to monopolize

claim.  Mr. Rill's analysis is right on target.  Moreover, a review of Nucor's response to GSRG's

objections (Docs. #314, 315) shows the flaws and shortcomings of GSRG's arguments.  In light of

these observations, the court need not devote much time to addressing the parties' arguments, but

writes briefly to make a few points.

Nucor raised the following additional arguments in support of its motion for summary

judgment: (1) GSRG failed to produce sufficient evidence to prove a relevant product market, an

essential element of each of GSRG's claims; (2) GSRG cannot prove its alleged geographic market,

also another essential element of each claim; and (3) GSRG cannot establish that Nucor possessed

a dangerous probability of achieving monopoly power, an essential element of Counts II and III.

(Doc. #305 at 30-31).

As the Eleventh Circuit stated so succinctly in *T. Harris Young*, "Where there is no Market,

there is no Monopoly."  931 F.2d at 823.  There, the Eleventh Circuit compared an attempt claim

with an actual monopolization claim:

> The offense of monopolization under Section 2 of the Sherman Act
> contains two elements: "(1) the possession of monopoly power in the
> relevant market and (2) the willful acquisition or maintenance of that
> power as distinguished from growth or development as a consequence
> of a superior product, business acumen, or historic accident." *United*

States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). The offense of attempted monopolization requires specific intent on the defendant's part to bring about a monopoly and a dangerous probability of success. *Quality Foods v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 996 (11th Cir. 1983). Furthermore, like the monopolization offense itself, the attempt must happen *in a defined relevant market. Id. The relevant market is defined by both a product and a geographic dimension.* Spectrofuge Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 276 (5th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); [*Heatrasfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 980 (5th Cir. 1977)].

*T. Harris Young & Assoc.*, 931 F.2d at 823 (emphasis added).[41]  Proof of a (1) relevant product market and (2) relevant geographic market are each essential elements to the "attempted monopolization" claim. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) ("Demonstrating the dangerous probability of monopolization in an attempt case . . . requires inquiry into the relevant product and geographic market"); *T. Harris Young*, 931 F.2d at 823 (attempt to

---

[41]Proof of these same elements - relevant product market and geographic market - is also required with respect to a Section 1 rule of reason claim such as that asserted by GSRG in Count I of the First Amended Complaint. *E.g., Levine v. Central Florida Medical Affiliates, Inc.,* 72 F.3d 1538, 1551 (11th Cir. 1996) (in Sherman Section 1 case, in order to prove that the alleged conspiracy or agreement had a "potential for genuine adverse effects on competition," the plaintiff must define the relevant market and establish that defendants possessed power in that market).  Thus, while the Special Master previously recommended summary judgment dismissing GSRG's Section 1 claims based on GSRG's failure to provide significant probative evidence of a conspiracy/agreement to restrain trade, (Docs. #188, 207, 249; *accord American Key Corp.*, 762 F.2d at 1579 n.8 ("significant probative evidence of a conspiracy is an essential element of all Section 1 violations and of a conspiracy to monopolize in violation of Section 2 ")), GSRG's failure to establish either relevant product market or relevant geographic market is a separate and independent alternative ground for dismissing its Section 1 claims.  *E.g., Levine,* 72 F.3d at 1553; *Gulfstream Park Racing Ass'n,* 479 F.3d at 1313 (affirming summary judgment dismissing § 1 claim because expert testimony regarding relevant market was legally insufficient).  That is because the relevant market is also an element of a Sherman Act Section 1 claim.  *See Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing,* 588 F.3d 908, 919 (6th Cir. 2009) (quoting *Worldwide Basketball & Sport Tours, Inc. v. NCAA,* 388 F.3d 955, 962 (6th Cir. 2005)  (listing the requisite elements for a claim under Section 1 of the Sherman Act, the second being unreasonable restraint of trade "in the relevant market ")).

51

monopolize "must happen in a defined relevant market" that is "defined by both a product and a geographic dimension"); *American Key*, 762 F.2d 1569, 1579 ("proof of the relevant product and geographic market is absolutely essential" to plaintiff's attempt to monopolize claims under Sherman Act § 2); *U.S. Anchor Mfg.*, 7 F.3d at 994 (defining the market is a "necessary step" in any "monopolization or attempt case arising under Section 2").

Moreover, Eleventh Circuit precedent requires an antitrust plaintiff to proffer expert testimony to establish a relevant product market and a relevant geographic market. *E.g., American Key*, 762 F.2d at 1579 (construction of a relevant economic market cannot be based upon lay testimony); *Colsa Corp. v. Martin Marretta Servs., Inc.*, 133 F.3d 853, 855 n. 4 (11th Cir. 1998); *Bailey v. Allgas*, 284 F.3d at 1237, 1246 (11th Cir. 2002).

If GSRG fails to proffer such testimony or if GSRG's proffered economic expert testimony is unreliable, legally unsound or unsupported by sufficient facts and data, summary judgment must be granted in Nucor's favor as matter of law under Sherman Act Sections 1 and 2. *E.g., Levine*, 72 F.3d at 1553; *Gulfstream Park*, 479 F.3d at 1313; *Bailey v. Allgas*, 284 F.3d at 1247, 1249 (affirming summary judgment where economic expert's evidence was insufficient to establish either relevant product market or relevant geographic market); *American Key*, 762 F.2d at 1581 (affirming summary judgment where plaintiff failed to establish relevant geographic market); *T. Harris Young*, 931 F.2d at 823-25 (affirming grant of JNOV because of plaintiff's failure to define either the geographic dimension or the product dimension of the relevant market). For the reasons explained by the Special Master (and as discussed briefly below), Plaintiff's failure to provide the necessary proof regarding either an appropriate product market or geographic market is fatal to its claims here.

### 1.   The Relevant Product Market

The Special Master recommended that summary judgment be entered against GSRG because its expert, Dr. Crandall, failed to present sufficient evidence regarding the relevant product market. (Doc. #305 at 43-45). GSRG insists that the relevant product market is black hot rolled coil. Nucor contends that it is necessary to examine both the product at issue, black hot rolled coil, and all reasonable substitutes available to consumers. Specifically, Nucor contends that GSRG's evidence on the relevant product market was insufficient because it failed to consider pickled and oiled hot rolled coil as a substitute for hot rolled coil. The Special Master agreed, as does the court. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *T. Harris Young & Assoc.*, 931 F.2d at 824; *Heatransfer*, 553 F.2d at 980.

The factors governing definition of relevant product market are discussed in the Eleventh Circuit's opinions in *U.S. Anchor* and *Bailey*. The Eleventh Circuit has noted that any economically meaningful relevant product market definition must take into account evidence of virtually complete "supply substitution." *See U.S. Anchor Mfg.*, 7 F.3d at 995 ("cross-elasticity of production facilities may also be an important factor in defining a product market"); *Bailey v. Allgas, Inc.*, 284 F.3d at 1247 (affirming failure of proof on relevant product market where plaintiff's expert failed to consider costs of switching); *Rebel Oil v. Atlantic Richfield Co.*, 51 F.3d 1421,1436 (9th Cir. 1995) (citing Areeda treatise for proposition: "If producers of product X can readily shift their production facilities to produce product Y, then the sales of both should be included in the relevant market."). Whether the relevant product market in this case can be limited solely to "black" HRC, or whether it must also include pickled and oiled HRC and other standard finishes, requires examination of a number of factors, including: (a) demand substitution; (b) supply substitution; (c) price sensitivity; (d)

specialized distribution channels; and (e) industry recognition.  *See U.S. Anchor*, 7 F.3d at 995;

*Bailey*, 284 F.3d at 1246-47.

Dr. Crandall's evidence concerning relevant product market is purely conclusory,[42] not

supported by actual data (or evidence) in the record, and does not take into account demand-side or

supply-side substitution. For example, the Rule 56 evidence is undisputed that producers can readily

increase their black HRC output by simply not pickling and oiling or performing other standard

finishing processes.[43]  Pickled and oiled hot rolled coil is essentially hot rolled coil that is subjected

to one additional process.  When pickled and oiled HRC is sold, the price increase is small and based

upon a fixed cost-based price differential (as compared to black HRC).  Accordingly, if there were

a black HRC price increase in the market, producers could (and would ) immediately increase their

black HRC output.

GSRG argues that because one cannot use both products as substitutes, the pickled and oiled

should be ignored.  However, this argument ignores the realities of the marketplace.  Producers of

pickled and oiled hot rolled coil already have the appropriate substitute product by simply foregoing

the one additional process required to produce the pickled and oiled product.  In light of GSRG's

expert's failure to consider the cross-elasticity of supply between these two products, the report is

fundamentally flawed and fails to consider the relevant product market.  For this reason, GSRG

---

[42]For this reason the Special Master correctly determined that even if Dr. Crandall's
assertions regarding product market were to be considered, given the overwhelming and undisputed
record evidence to the contrary, no reasonable trier of fact could find that the relevant product market
in this case is limited solely to black HRC. (Doc. #305 at 44-45).

[43]As the Special Master found based upon the undisputed evidence, "producers of 'pickled
and oiled' hot rolled coil need only refrain from running black hot rolled coil through the additional
process to change production in response to a price increase for black hot rolled coil."  (Doc. #305
at 44).

failed to present evidence that Nucor would possess market power in the relevant product market. The court agrees with the Special Master's conclusion that, GSRG's proposed product market definition fails as a matter of law and for this reason Nucor is entitled to summary judgment on all of GSRG claims.

### 2.        The Relevant Geographic Market

Contrary to GSRG's assertions otherwise, the Special Master faithfully applied the controlling test for geographic market definition in the Eleventh Circuit:[44]

> A geographic market is only relevant for monopoly purposes where [the evidence] show[s] that consumers within the geographic area cannot realistically turn to outside sellers should prices rise within the defined area.

*T. Harris Young*, 931 F.2d at 823; (Doc. #305 at 34).  GSRG has the burden of showing that its proposed market definition is correct.  To state a Sherman Act claim under either section 1 or section 2, the plaintiff bears the burden of proof on the alleged relevant market.  *Ad–Vantage Tel. Dir. Consult. v. GTE Directories*, 849 F.2d 1336, 1341 (11th Cir. 1987); *see also Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998).  "A relevant market consists of both a product market and a geographic market." *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009); *see also Ad-Vantage Tel. Dir. Consult.*, 849 F.2d at 1341; *Community*

---

[44]In one of its objections, GSRG asserts that the Special Master "compounds his error" by applying the Elzinga-Hogarty LIFO test rather than utilizing an applicable analysis.  (Doc. #312 at 8).  However, the Special Master referenced the Elzinga-Hogarty test, but only to illustrate a point. (Doc. #305 at 37). The Special Master applied and conducted his analysis under applicable Eleventh Circuit precedent pronounced in *T. Harris Young*, 931 F.2d at 823.  (Doc. #305 at 33-36).  GSRG is in error on one other point (albeit a moot one here).  Courts, including the one cited by GSRG, have utilized the Elzinga-Hogarty as part of an appropriate analysis.  *See, e.g., California v. Sutter Health System*, 130 F. Supp. 2d 1109, 1120-21 (N.D. Cal. 2001); *see also U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1161 (N.D. Cal. 2004).

*Hosp. of Andalusia, Inc. v. Tomberlin*, 712 F. Supp. 170, 172 (M.D. Ala. 1989).  The Special Master correctly applied the test formulated by our court of appeals.  In doing so he found that there were at least four independent reasons that GSRG's proposed geographic market does not pass muster.  GSRG proposes that the relevant geographic market in this case consists of 10 states in the Southeast (Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee and Texas), without consideration of any sources which could ship hot rolled coil into the Southeast Region.  (Doc. #305 at 33).  However, GSRG's expert report indicates that several steel mills outside the Southeast shipped large quantities of hot rolled coil into the Southeast during the relevant time period.  In fact, GSRG's expert has also indicated that at least some foreign-produced hot rolled coil enters these Southeast states.  (Doc. #305 at 34-36).  Therefore, GSRG's 10-state Southeast market is unrealistic.

The undisputed evidence of shipments hot rolled coil into the proposed market suggests that the mills that previously made these shipments, and others – including domestic and foreign suppliers – could expand production capacity and/or divert hot rolled coil into the Southeast region.  As noted by the Special Master, a "geographic market is only relevant for monopoly purposes where these factors show that consumers within the geographic area cannot realistically turn to outside sellers should prices rise within the defined area."  (Doc. #305 at 34) (quoting *T. Harris Young & Assoc.*, 931 F.2d at 823).  Indeed, some evidence supporting the inference that consumers within the proposed geographic market *could not* turn to sellers outside the geographic market is necessary to survive summary judgment.  *See T. Harris Young & Assoc.*, 931 F.2d at 824.  GSRG provided no such evidence.  To the contrary, the record is replete with evidence that sellers outside GSRG's proposed geographic market could, and did, ship significant quantities of hot rolled coil into GSRG's

56

proposed geographic market.  Applying the Eleventh Circuit's teaching in *T. Harris Young* here to the undisputed evidence, it is clear "that consumers within [GSRG's proposed] geographic area can[] realistically turn to outside sellers should prices rise within the defined area."  931 F.2d at 823. Therefore, the court agrees with the Special Master's conclusion that GSRG has failed to establish that the relevant geographic market should be limited to the region proposed by GSRG.

### 3.      No Dangerous Probability of Achieving Monopoly Power

For GSRG to establish Counts II and III, the Section 2 attempted monopolization claim and the conspiracy to monopolize claim, GSRG must establish that there was a "dangerous probability that the defendant might have succeeded in its attempt to achieve monopoly power."  *U.S. Anchor Mfg.*, 7 F.3d at 993 (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)).  "To have a dangerous probability of successfully monopolizing a market the defendant must be close to achieving monopoly power."  *U.S. Anchor Mfg., Inc.*, 7 F.3d at 994.  Where the alleged monopolist's market share is "less than 50% of the market at the time the alleged predation began and throughout the time when it was alleged to have continued, there was no dangerous probability of success . . . as a matter of law."  *U.S. Anchor Mfg., Inc.*, 7 F.3d at 1001. There can be no "dangerous probability of success" if the defendant "was never able to maintain a majority position in the market."  *U.S. Anchor Mfg.*, 7 F.3d at 1001.

> [B]ecause [defendant] possessed less than 50% of the market at the time alleged predation began and throughout the time it was alleged to have continued, there was no dangerous probability of success. . . as a matter of law.

*Id.*; *see* Fourth Report at 41 & n. 196 (quoting *U.S. Anchor*).

Applying *U.S. Anchor* to the Rule 56 facts in this case, the Special Master correctly found that:

> Like the plaintiffs in *U.S. Anchor*, GSRG cannot prove that Nucor's market share ever surpassed 50% during the relevant time period, even on the basis of current shipments into GSRG's postulated 10-State market. GSRG concedes that it cannot show Nucor's market share at the inception of the alleged anticompetitive activity in 2002, or in 2003, and that Nucor's market share had only reached 42.7% by 2004 – *two years after the alleged anticompetitive activity began [and was completed]*. Thus, GSRG cannot demonstrate that Nucor ever held a majority position in the market and, like the plaintiff's claim in *U.S. Anchor*, its attempted monopolization claim fails as a matter of law.

*Id.* at 41 (footnote omitted) (emphasis added).

Second, the Special Master also held that GSRG could not establish a "dangerous probability" of successful monopolization in its proposed "10 Southeast state" hot rolled coil market because it failed to prove that firms located outside that area could not expand or divert capacity to serve the 10-state area in the event of a Nucor-instigated price increase. *Id.* at 42; *see also Bailey*, 284 F.3d at 1256; *Rebel Oil Co.*, 51 F.3d at 1443. For those reasons, the Special Master correctly concluded that GSRG has failed to show that Nucor *ever* surpassed the 50% threshold during the relevant time period following the alleged anticompetitive conduct. Therefore, the court agrees with the Special Master's recommendation that GSRG has failed as a matter of law to show that Nucor had a dangerous probability of achieving monopoly power.

## VI.    Conclusion

For all the foregoing reasons, the court finds no error in the Reports of the Special Master and each Report is due to be adopted and the recommendations accepted. A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this _____29th_____ day of September, 2011

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE